# EXHIBIT 4



# ZORETIC LAW, PLLC

RECEIVED

APR 13 2021

Great American Ins. Co.
Property & Casualty Legal

April 8, 2021

**By Certified Mail, Return Receipt Requested**

Great American Insurance Group
Great American Insurance Company of New York
301 E. 4th St.
Cincinnati, OH 45202-4201

RE:  Great American Insurance Company of New York, WAOIC #107
*May v. MK Salvage Venture, et al*, King County Cause No. 19-2-10613-1SEA
Policy No. OMH 313372401
Insured:  Bear Enterprises LLC

Dear Great American Insurance Group:

I represent Plaintiff Rodger May in the above-referenced lawsuit.  Please find enclosed the following documents for service upon Great American Insurance Company of New York:

1. Note for Motion:  Friday, May 21, 2021 at 9:00 a.m.
2. Joint Motion for Determination of Reasonableness of Covenant Judgment Settlement.
3. Declaration of Rodger May.
4. Declaration of Peter Kuttel.
5. Declaration of Michael T. Zoretic.
6. Declaration of Terence K. McGee.
7. Declaration of James Williams.
8. Proposed Order.

We have also initiated service through the Washington State Office of the Insurance Commissioner as per RCW 48.05.200.

Please let me know if you have any questions.

Sincerely,

Michael T. Zoretic
Enclosures

P.O.Box 427 / 215 Pateros Mall
Pateros, WA 98846
mike@zoreticlaw.com

NCW Tel 509.923.9529
Seattle/Cell 206.465.8109
www.zoreticlaw.com

M. Meier Decl., Ex. 4, p. 1 of 275

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF KING

Rodger May

vs.

MK Salvage Venture LLC; Bear Enterprises LLC; and
Peter Kuttel

**CASE NO.** 19-2-10613-1
**NOTICE OF COURT DATE (Judges)**
**(NOTICE FOR HEARING)**
**SEATTLE COURTHOUSE ONLY**
(Clerk's Action Required)    (NTHG)

**TO:**    **THE CLERK OF THE COURT** and to all other parties per list on Page 2:
**PLEASE TAKE NOTICE** that an issue of law in this case will be heard on the date below and the Clerk is
directed to note this issue on the calendar checked below.

**Calendar Date:**  May 21, 2021                          **Day of Week:**  Friday

**Nature of Motion:**    Motion and Hearing for Reasonableness Determination

### CASES ASSIGNED TO INDIVIDUAL JUDGES – SEATTLE

If oral argument on the motion is allowed (LCR 7(b)(2)), contact staff of assigned judge to schedule date and time
before filing this notice. **Working Papers:** The judge's name, date and time of hearing <u>must</u> be noted in the upper
right corner of the Judge's copy.    **Deliver Judge's copies to Judges' Mailroom at C-203**

[ ] Without oral argument (Mon - Fri)

[x] With oral argument Hearing        Date/Time:  May 21, 2021 at 9:00 a.m.

Judge's Name:   Sandra Widlan                          Trial Date:   None

### CHIEF CRIMINAL DEPARTMENT – SEATTLE (E-1201)

[ ] Bond Forfeiture  3:15 pm, 2nd Thursday of each month
[ ] Extraordinary Writs from criminal or infraction (Show Cause Hearing) LCR 98.40(d)    3:00 p.m. Mon-Thurs.
[ ] Certificates of Rehabilitation- Weapon Possession (**Convictions from Limited Jurisdiction Courts**)
3:30 First Tues of each month

### CHIEF CIVIL DEPARTMENT – SEATTLE (Please report to W-928)

*Deliver working copies to Judges' Mailroom, Room C-203. In upper right corner of papers write "Chief Civil
Department" or judge's name and date of hearing*
[ ] Extraordinary Writs (Show Cause Hearing) (LCR 98.40) 1:30 p.m. Thurs/Fri
[ ] Supplemental Proceedings/ Judicial Subpoenas  (1:30 pm Thurs/Fri)(LCR 69)
[ ] Motions to Consolidate with multiple judges assigned (LCR 42) (without oral argument) M-F
[ ] Structured Settlements  (1:30 pm Thurs/Fri)(LCR 40(2)(S))

### Non-Assigned Cases:

[ ] Non-Dispositive Motions M-F (without oral argument).
[ ] Dispositive Motions and Revisions (1:30 pm Thurs/Fri).
[ ] Certificates of Rehabilitation (**Employment**) 1:30 pm Thurs/Fri (LR 40(a)(2)(B))

You may list an address that is not your residential address where you agree to accept legal documents.

Sign: _____    Print Type Name:  Michael T. Zoretic

WSBA # 21221    (if attorney)  Attorney for:  Plaintiff Rodger May

Address:  PO Box 427                          City, State, Zip  Pateros, WA 98846

Telephone:  (206) 465-8109    Email Address:  mike @zoreticlaw.com    Date:  3/29/21

## DO NOT USE THIS FORM FOR FAMILY LAW OR EX PARTE MOTIONS.

L. Meier Decl., Ex. 4, p. 2 of 275

| LIST NAMES AND SERVICE ADDRESSES FOR ALL NECESSARY PARTIES REQUIRING NOTICE |
|---|

Name  Terence K. McGee
Service Address: 15711 NE 143rd Place
City, State, Zip  Woodinville, WA 98072
WSBA# 6221    Atty. For: Def. MK Salva
Telephone #: (425) 368-2321
Email Address: tmcgee@mcgeelaw.net

Name  James F. Williams, Perkins Coie
Service Address:  1201 Third Ave., Suite 4900
City, State, Zip     Seattle, WA 98101-3099
WSBA# 23613 Atty. For:  Def. Bear Entr & Kuttel
Telephone #:  (206) 359-8000
Email Address:  JWilliams@perkinscoie.com

Name  Great American Insurance Co. of NY
Service Address:  301 E. 4th St.
City, State, Zip  Cincinnati, OH 45202-4201
WSBA#         Atty. For: Insurer for Bear Ent.
Telephone #:  (513) 369-5000
Email Address:

Name  Zachary E. Davison, Perkins Coie
Service Address:  1201 Third Ave., Suite 4900
City, State, Zip     Seattle, WA 98101-3099
WSBA# 47873 Atty. For: Def. Bear Entr & Kuttel
Telephone #: (206) 359-8000
Email Address:  ZDavison@perkinscoie.com

Name  Washington Insurance Commissioner
Service Address:  PO Box 40255
City, State, Zip  Olympia, WA 98504
WSBA#         Atty. For:
Telephone #:
Email Address:

Name
Service Address:
City, State, Zip
WSBA#         Atty. For:
Telephone #:
Email Address:

## IMPORTANT NOTICE REGARDING CASES

Party requesting hearing must file motion & affidavits separately along with this notice. List the names, addresses and telephone numbers of all parties requiring notice (including GAL) on this page. Serve a copy of this notice, with motion documents, on all parties.

The original must be filed at the Clerk's Office not less than **six** court days prior to requested hearing date, except for Summary Judgment Motions (to be filed with Clerk 28 days in advance).

THIS IS ONLY A PARTIAL SUMMARY OF THE LOCAL RULES AND ALL PARTIES ARE ADVISED TO CONSULT WITH AN ATTORNEY.

The SEATTLE COURTHOUSE is in Seattle, Washington at 516 Third Avenue. The Clerk's Office is on the sixth floor, room E609. The Judges' Mailroom is Room C-203.

L. Meier Decl., Ex. 4, p. 3 of 275

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| RODGER MAY, an individual,<br><br>             Plaintiff,<br><br>       v.<br><br>MK SALVAGE VENTURE LLC; a Washington limited liability company; BEAR ENTERPRISES LLC, a Washington limited liability company, and PETER KUTTEL, an individual.<br><br>             Defendants. | NO. 19-2-10613-1-SEA<br><br>JOINT MOTION FOR DETERMINATION OF REASONABLENESS OF COVENANT JUDGMENT SETTLEMENT |

Plaintiff Rodger May and Defendants MK Salvage Venture LLC ("MKSV"), Bear

Enterprises LLC, and Peter Kuttel, by and through their undersigned counsel of record,

submit the following joint motion to the Court:

## I. **RELIEF REQUESTED**

This motion requests the Court to approve the reasonableness of a covenant

judgment settlement reached between the parties in this dispute over the intellectual

property generated during their salvage operations of the 1901 *SS Islander* shipwreck in

Stephens Passage in Southeast Alaska. Plaintiff May contends the *SS Islander* was carrying

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 1

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

large amounts of gold that in present day values could be worth several hundred million dollars or more, the vast majority of which was not recovered during previous salvage operations. As set forth below, Plaintiff May has alleged he was wrongfully deprived his contractual right to use the intellectual property in future salvage operations, and in this lawsuit sought over $60 million for his lost opportunity and market value damages. Defendants actively and robustly defended the case, but after prolonged litigation, the parties were able to negotiate a covenant judgment settlement in the amount of $30 million, with an assignment of Defendants' insurance rights to May and other provisions discussed below.

The parties now respectfully move the Court pursuant to RCW 4.22.060 for an order determining the Restated and Amended Settlement Agreement reached by the parties, a true and correct copy of which is attached hereto as ***Attachment 1*** and incorporated by reference, is reasonable under the nine (9) factor test as per *Besel v. Viking Ins. Co. of Wisconsin*, 146 Wn.2d 730, 737 (2002).

## II. **FACTS**

As set forth in the Recitals of the Settlement Agreement, and the subjoined declarations, the parties have stipulated to the following background facts:

A.    On March 28, 2012, May and Bear Enterprises formed MKSV as a limited liability company under the laws of the State of Washington.

B.    May and Bear Enterprises were and have at all times remained 50/50 members and managers of MKSV.

C.    Kuttel owns the controlling interest in Bear Enterprises.

D.    After its formation, MKSV engaged in gold salvage operations under contract with Ocean Mar (Washington), Inc. ("OMI"), seeking the gold carried on the *SS Islander*, a passenger ship that sank in Stephens Passage in Southeast Alaska in 1901.

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 2

E.    OMI had obtained the legal rights to salvage the *S/S Islander* through contract with London underwriters and the court proceedings in the United States District Court for the District of Alaska entitled *Yukon Recovery, L.L.C. v. Certain Abandoned Property, in rem, Defendant; Ocean Mar, Inc.*, 3:96-cv-0270 (Consol.) (the "Alaska Salvage Action"), culminating in a 1998 court-approved salvage plan.

F.    MKSV conducted the operations under a "Financing and Salvage Management Contract" (the "OMI Contract") entered with OMI, dated March 28, 2012, as later amended by the parties. A true and correct copy of the OMI Contract is attached as Exhibit A to this Settlement Agreement.

G.    Under the OMI Contract, MKSV was to manage the salvage operations, in cooperation with OMI. MKSV was also to provide funding for operations up to the amount of $5 million ("the Recovery Investment"), subject to certain reimbursement rights as stated therein.

H.    Section 3 of the OMI Contract created a contractual "security interest or lien" in favor of MKSV over certain described tangible and intangible property of OMI to be generated during the future salvage operations funded by MKSV, "including, without limitation, computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc." (referred to therein and herein as the "Intellectual Property" or "IP.")

I.    Section 3 of the OMI Contract further provides that the Intellectual Property was to be downloaded to a media disc on a daily basis and held by the Cairncross & Hempelmann, P.S. law firm ("C&H") in escrow pursuant to the terms of the accompanying "Escrow Agreement" until the security lien is satisfied or otherwise released following MKSV's receipt of its Recovery Investment, plus twelve percent interest.

J.    OMI and MKSV also executed an "Escrow Agreement" on March 28, 2012, which mirrored the OMI Contract and more fully set forth the terms as to the escrow of the Intellectual Property. A true and correct copy of the Escrow Agreement is attached as Exhibit B to this Settlement Agreement.

K.    MKSV proceeded to invest substantial sums (in excess of $5.5 million) in conducting two salvage operations in 2012 and 2013. Much of the investment funds were spent on the investigation and engineering analysis in the first operation, conducted while trying to locate the remains of the *SS Islander*. OMI and MKSV hired the engineering firm Tetra Tech to conduct sea bottom mapping, non-ferrous target identification, and measurement and core sampling of sediment depths in the target area.

L.    The measurements, charts, tangible work product and electronic data generated during the two salvage operations (i.e., the "Intellectual Property" as described in Section 3 of the OMI Contract) were kept on board the salvage vessel and also stored on computer disks and hard drives. Initially, the Intellectual Property was in fact downloaded to

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 3

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1  C&H on a daily basis or near-daily basis, but this proved impractical, so all parties agreed to

2  maintain the Intellectual Property on board until the end of each voyage.

3      M.    During the first operation in August 2012, the team located the *SS Islander*'s
   bow, buried in the ocean sediment.  The salvage operations resulted in the recovery of a large

4  box, containing bags of gold dust.  The gold dust was estimated to have value in excess of $1
   million.

5      N.    Upon completion of the second salvage operation, in 2013, all Intellectual
   Property was delivered to C&H.

6

7      O.    In approximately November of 2015, without the consent of any party, C&H
   delivered a box containing the Intellectual Property to MKSV at its office in Seattle, which

8  was also the principal office of Bear Enterprises.

9      P.    All parties became aware that the IP had been transferred from C&H (the
   Escrow Agent) and now was, by the parties' agreement, in the possession of MKSV, the

10 secured creditor under the OMI Agreement.

11     Q.    The parties agree that MKSV thereafter continued to have a security interest
   in the IP, which still secured MKSV's rights to reimbursement of the remaining Recovery

12 Investment.

13     R.    In November 2016, May and Bear Enterprises agreed to divide the known
   assets of MKSV and dissolve the company.

14     S.    May and Bear Enterprises executed a "Record of Action of MK Salvage
   Venture LLC to Distribute All Known Assets", a copy of which is attached as Exhibit C to

15 this Settlement Agreement.   Section 1 of the Record of Action purports to identify "the only
   known assets" of the company as the following:

16

17     a.    The right to conduct further salvage efforts relating to the sunken S/S
          ISLANDER, as contained in the Financing and Salvage Management

18        Agreement between MK Salvage Venture LLC and Ocean Mar, Inc.
          (the OMI contract") dated March 29, 2012, as amended;

19     b.    The right to reimbursement of MK Salvage Venture LLC's Recovery
          Investment (as defined in the OMI contract) under Paragraph 2(a)(i) of

20        the OMI Contract;

21     c.    Any rights to other salvage recovery proceeds under Paragraph 2 of the
          OMI contract, except as set forth in the immediately preceding

22        paragraph;

23

24

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 4

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1      d.    The protector vessel AU1, USCG Official No. 1199468, and
             appurtenances;

2
       e.    Ownership units of Gold Leaf Productions, LLC, an Alaskan limited
3            liability company, Entity No. 1001005.

4      f.    Wells Fargo Bank Account No. 3139238962.

5          Section 2 of said Record of Action provides for distribution of the identified assets as
       follows:
6
       a.    To Rodger D. May, all assets as described ¶ 1(a), ¶ 1(c), and ¶1 (e),
7            above, at no cost to him;

8      b.    To Bear Enterprises LLC, the asset described in ¶ 1(d) above. Bear
             Enterprises will pay $180,000 to Rodger D. May for this asset;
9
       c.    To Rodger D. May and Bear Enterprises LLC equally, the asset
10           described in ¶ 1(b) above;

11     d.    The bank account identified in ¶ 1(f) above will be distributed in
             accordance with ¶ 7 below.
12
            Section 3 further provides that MKSV "hereby assigns all of its right, title, and interest
13     in the salvage contract rights described in 1(a) and 1(c), above, to Rodger D. May…"

14          Section 4 states: "By this resolution, MKSV hereby assigns all of its right, title and
       interest in the reimbursement rights set forth in ¶1 (b) above, to its two members equally…"
15
            T.    Section 11 of said Record of Action further provided: "After the distribution
16     of all assets and the payment of all expenses as set forth above, MK Salvage Venture LLC
       authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the
17     Washington Secretary of State and to the State of Alaska Department of Commerce, a
       Certificate of Dissolution."
18
            U.    May and Bear Enterprises also executed a document entitled "Assignment of
19     MK Salvage Venture LLC Assets." This Settlement Agreement states that MKSV was
       assigning to May "100% of any and all rights, title and interest it has in . . . The right to
20     conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in [the
       OMI Contract]." A true and correct copy of this assignment is attached as Exhibit D to this
21     Settlement Agreement.

22          V.    The parties also simultaneously executed a "Record of Action of MK Salvage
       Venture LLC to Dissolve Company," in which the parties further agreed that MKSV had
23     "distributed all of the assets it holds to its members" except funds in MKSV's checking

24     MOTION FOR DETERMINATION OF                                ZORETIC LAW
       REASONABLENESS OF COVENANT                                 P.O. Box 427
       JUDGMENT SETTLEMENT - 5                                    Pateros, WA 98846
                                                                  Tel. 206.465.8109

account. This agreement again authorizes Daniel Leston to dissolve the MKSV entity once all assets were distributed and final expenses were paid. A true and correct copy of this record of action is attached as Exhibit E to this Settlement Agreement.

W.     As part of their agreed resolutions, the parties also executed a release agreement. A true and correct copy of this release agreement is attached as Exhibit F to this Settlement Agreement.

X.     May did not receive the Intellectual Property after the closing of the transactions in November 2016.

Y.     In January of 2017, May's counsel, Kristofer Larson, contacted counsel for Bear Enterprises, Vi Jean Reno, with May's request for all of the Intellectual Property so that May could use it in future salvage operations with OMI. The Intellectual Property was not released or made available.

Z.     By letter of July 20, 2017, Mr. Larson again requested possession of the Intellectual Property for May to use in performance of additional salvage efforts.

AA.     Ms. Reno responded on July 25 and 26, 2017. Bear Enterprises refused to allow MKSV to relinquish the Intellectual Property, claiming that it was owned by OMI and held in escrow under contract with OMI, and that MKSV had a possessory lien on the Intellectual Property to secure repayment of the initial investment. Ms. Reno said OMI should contact MKSV directly if it wanted the Intellectual Property.

BB.     No Certificate of Dissolution was filed as authorized by the above resolutions. The company had no ongoing business after the salvage operations were completed.

CC.     In April of 2018, Kuttel moved Bear Enterprises' office, MKSV's office, and the Intellectual Property to his residence. Kuttel did not ask or obtain permission from May and/or OMI to move MKSV's office and the Intellectual Property. Kuttel also never notified the Washington Secretary of State or May that he had changed the company's business address.

DD.     OMI's contract with London underwriters for the performance of *SS Islander* salvage expired in May 2018. With the OMI salvage rights expired, May had lost any ability to conduct further salvage operations under contract with OMI.

EE.     In August of 2018, the Washington Secretary of State administratively dissolved MKSV for failure to file its Annual Report. Ms. Reno immediately filed for reinstatement of MKSV and changed the business address of MKSV to her law office. Bear Enterprises, through Kuttel, authorized Ms. Reno to reinstate MKSV because the "company was not ready to be dissolved" in 2018. May was not notified of, nor did he consent to, any of these actions.

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 6

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1  FF.   MKSV was not dissolved following its reinstatement but continued in existence without conducting any business except defense of this action.

2

3  GG.   May's counsel, Michael T. Zoretic of Zoretic Law, PLLC, filed the subject Complaint initiating this action on April 17, 2019, against MKSV, Bear Enterprises, and Kuttel as defendants.

4

5  HH.   The Complaint seeks declaratory relief and alleges breach of contract, conversion, and derivative claims relating to MKSV's refusal to release the Intellectual Property to May.

6

7  II.   On May 16, 2019, Jed Powell, counsel for OMI, wrote Ms. Reno a letter asserting that OMI did not object to MKSV, Bear Enterprises, or Kuttel releasing the Intellectual Property to May for use in future salvage operations, but the sole owner, director, and officer of OMI had died two weeks before Mr. Powell's letter was written, and Mr. Powell presented no evidence of his authority to write this letter.

8

9  JJ.   MKSV continued to retain possession and/or control of the Intellectual Property.

10

11  KK.   May contends, and Defendants have acknowledged in the litigation, that the Intellectual Property has independent value and contains information about the salvage operations performed in 2012-2013.

12

13  LL.   MKSV's refusal to surrender or share the Intellectual Property with May prevented May from using the Intellectual Property in continuing salvage operations with OMI during the times OMI still had the contract salvage rights.

14

15  MM.   On June 17, 2019, the court in the Alaska Salvage Litigation issued its "Order Amending Findings of Fact and Conclusions of Law" recognizing Tyche High Seas Capital Corp. as the contract salvor with exclusive salvage rights with respect to the wreckage of the *SS Islander*.

16

17

18  NN.   On June 18, 2019, the same court issued its supplemental "Amended Judgment in a Civil Case" enjoining "Ocean Mar, Inc. and their agents, servants, employees, and all other acting in concert with them" from "taking any further action with respect to exploring or conducting operations at the site of the sinking of the *SS Islander*, and from interfering in any way with the salvage operations at that site to be undertaken by Tyche."

19

20

21  OO.   May claims to have suffered damages in the form of the lost opportunity to conduct further salvage operations to recover what he alleges could be millions of dollars' worth of additional gold from the *SS Islander* wreckage and/or to market his salvage rights to outside investors.

22

23

24  MOTION FOR DETERMINATION OF
   REASONABLENESS OF COVENANT
   JUDGMENT SETTLEMENT - 7

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 10 of 275

1

PP.    May has produced expert opinion from Fred Holabird, a mineral exploration and mine geologist, who opined that between 300,000 to 355,000 troy ounces of gold (with a current spot value of $517.5 million to $612 million) likely remains in or around the *SS Islander* wreckage.

2

3

QQ.    Based on this estimate, May's economic loss expert, Neal Beaton of Alvarez & Marsal, has opined that the associated lost market value of May's contract salvage rights is approximately Sixty Million Dollars ($60,000,000).

4

5

RR.    Defendants moved for summary judgment dismissal of all of May's claims, as well as judgment in their favor on Defendants' asserted claims under the Release for indemnification. (Dkt. 26, 27, 28, 81, 82, 83, 87, 88). Judge Regina Cahan denied the motions for summary judgment on December 10, 2019 (Dkt. 92).

6

7

SS.    Trial by jury before Judge Roger Rogoff is scheduled for April 26, 2021.[1]

8

9

TT.    Defendants were insured under insurance policies issued by Great American Insurance Company of New York ("Great American") in 2015-19 under Policy Nos. OMH 3133724-04, -05, -06, and -07. The policies have per occurrence limits of One Million Dollars ($1,000,000) and aggregate limits of Two Million Dollars ($2,000,000).

10

11

UU.    Defendants tendered defense and indemnity of the lawsuit to Great American in October of 2019.

12

13

VV.    Great American denied coverage (both defense and indemnity) by letter dated November 14, 2019, without conducting any investigation or otherwise contacting any of the insureds under the policies.

14

15

WW.    Based on the above agreed-upon recitals, May and Defendants enter into this Settlement Agreement to resolve the claims filed by the parties against each other and to memorialize their agreements on other matters as stated herein.

16

17

XX.    The parties hereby incorporate by this reference May's complaint (Dkt. 1), MKSV's first amended answer and counterclaim (Dkt. 58), Bear Enterprises' answer and counterclaim (Dkt. 23), Kuttel's answer and counterclaim (Dkt. 21), and documents filed in support of and against Defendants' motion for summary judgment (Dkt. 26, 27, 28, 81, 82, 83, 87, 88).

18

19

20

21

22

23

---

[1] This case has since been transferred from Judge Rogoff following his resignation and has recently been assigned to Judge Sandra Widlan effective January 15, 2021. The April 26, 2021 trial date was stricken by the Court's Order dated January 28, 2021 (Dkt. 120).

24

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 8

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

<u>Settlement Negotiations and Covenant Judgment Settlement Terms:</u>

Beginning in July of 2020, the parties (through their respective attorneys) negotiated the terms of the present settlement agreement. Over the course of the next four (4) months, the parties exchanged detailed settlement offers and counteroffers and finally reached their original Settlement Agreement on November 12, 2020. The agreement was amended on December 11, 2020 in the form of a "Restated and Amended Settlement Agreement," which is the form submitted for the Court as ***Attachment 1*** to approve as reasonable.

The Restated and Amended Settlement Agreement has the following key provisions:

Section 1. <u>Judgment</u>: Entry of a Thirty Million Dollar ($30,000,000) stipulated covenant judgment in favor of May against MKSV and Bear Enterprises, inclusive of costs and attorney's fees, to accrue interest at 12% per annum.

Section 2. <u>Reasonableness Hearing</u>: Joint submission to Court for reasonableness determination under RCW 4.22.060.

Section 3. <u>Minimum Reasonableness Amount</u>: May shall have the right to void the Settlement Agreement if the Court determines the reasonableness amount to be less than $7.5 million.

Section 4. <u>Assignment of Insurance Rights</u>: Defendants assign all their available contract and tort claims against Great American Insurance Company of New York to May.

Section 6. <u>Covenant Not To Execute</u>: May agrees he may only collect the stipulated judgment from Great American.

Section 9. <u>Entitlement to Proceeds</u>: May is entitled to all proceeds in subsequent litigation with Great American, except Defendants shall receive 10% of any recovery up to $400,000 for compensation for attorney's fees and costs associated with the Reasonableness Hearing and/or the assigned claims proceedings.

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 9

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

Section 10. <u>Guaranteed Minimum Recovery</u>: Defendants Kuttel and Bear Enterprises guarantee a minimum recovery of $1,250,000 on the Assigned Claims.

Section 11. <u>Release of Other Claims by May</u>. May releases all claims against the Defendants except claims preserved in the Restated and Amended Settlement Agreement.

Section 13. <u>Intellectual Property</u>. May receives physical possession of the Intellectual Property and assignment of any ownership or security rights of Defendants therein.

Section 15: <u>Stipulated Judgment</u>. Entry of a Stipulated Judgment upon presentation after the Court's determination of reasonableness, subject to the provisions above.

## III. <u>EVIDENCE RELIED UPON</u>

The parties rely on the accompanying Declarations of Rodger May, Peter Kuttel, Michael Zoretic, James Williams and Terence McGee, their attached exhibits, and the pleadings and files herein.

## IV. <u>ISSUE PRESENTED</u>

Is the parties' covenant judgment settlement, including the $30 million stipulated judgment amount, reasonable under the factors set forth in *Besel v. Viking Ins. Co., supra*?

## V. <u>ARGUMENT</u>

Washington courts have long recognized stipulated judgments accompanied by covenants to execute only against the defendants' insurance policy rights and claims – otherwise known as "covenant judgments." *See Besel v. Viking Ins. Co. of Wisconsin*, 146 Wn.2d 730, 736-737 (2002). *Accord, Bird v. Best Plumbing Group, LLC*, 17 Wn.2d 756, 764 (2012). Covenant judgments typically involve three features: "(1) a stipulated or consent judgment between the plaintiff and insured, (2) a plaintiff's covenant not to execute on that

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 10

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

judgment against the insured, and (3) an assignment to the plaintiff of the insured's coverage and bad faith claims against the insurer." *Bird*, at 764-65.

Reasonableness hearings under RCW 4.22.060 apply to covenant judgments. *Bird*, 175 Wn.2d at 767. The statute provides: "A hearing shall be held on the issue of the reasonableness of the amount to be paid with all parties afforded an opportunity to present evidence. A determination by the court that the amount to be paid is reasonable must be secured." RCW 4.22.060(1).

The reasonableness hearing is utilized to protect the rights of the defendants' insurers, as "[a] carrier is liable for reasonable settlements that are paid in good faith." *Besel*, 146 Wn.2d at 738. "If the amount of the covenant judgment is deemed reasonable..., it becomes the presumptive measure of damages in a later bad faith action against the insurer." *Bird*, 175 Wn.2d at 765. If the court determines that a settlement is unreasonable, then it sets a different reasonable amount. *Id.*

In reaching such a determination, the Court should consider nine factors:

1. The plaintiff's damages;

2. The merits of the plaintiff's liability theory;

3. The merits of the defendant's defense theory;

4. The defendant's relative faults;

5. The risks and expenses of continued litigation;

6. The defendant's ability to pay;

7. Whether there is any evidence of bad faith, collusion, or fraud;

8. The extent of the plaintiff's investigation and preparation of the case; and

9. The interest of the parties not being released.

*Id.; see also Chausee v. Maryland Cas. Co.*, 60 Wn. App. 504, 509-10, *citing Glover v. Tacoma Gen. Hosp.*, 98 Wn.2d 708, 717-718 (1983.) No single factor is determinative, and

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 11

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

not all nine factors are relevant in every case. *Id.* at 739, n.2. In this case, an evaluation of all nine factors weighs in favor a finding of reasonableness.

### 1. Plaintiff's Damages.

Plaintiff's primary claim against Defendants was for breach of contract. Under Washington law, the general measure of damages for breach of contract is "(1) recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a position pecuniarily as he would have been had the contract been performed." *Knox v. Microsoft*, 92 Wn. App. 204, 208-09 (1998).

"The measure of damages in any particular case will depend upon the facts in that case." *Bill & Melinda Gates Foundation v. Todd Pierce*, ___ Wn. App. ___, Case No. 79354-3-I (published opinion) (November 16, 2020), *citing Dunseath v. Hallaur*, 41 Wn.2d 895, 904 (1953). A plaintiff need only prove its damages with reasonable certainty. *See Greensun Group v. City of Bellevue*, 7 Wn. App. 2d 754, 776 (2019); *see also Rorvig v. Douglas*, 123 Wn.2d 854, 861 ("Evidence of damages is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture.")

May's asserted claim for damages in this case was in the form of lost opportunity value of his rights to utilize the Intellectual Property in future salvage operations with OMI, due to Defendants' refusal to grant access to this valuable tangible and intangible property. May presented damages of $60 million, based on expert testimony laying out a two-prong analysis.

First, Fred Holabird, an expert on shipwreck recoveries, was retained to estimate the likely amount of gold that would likely still be available for recovery. Mr. Holabird had previously been involved in analyzing and assessing the gold and other artifacts that had been recovered during the MKSV/OMI salvage expeditions. Mr. Holabird conducted an analysis of 1) the history of the Alaskan/Yukon Gold Rush of the late 1800's, 2) the

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 12

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

contemporary reports and statements of the amount of gold likely present on the ship on its voyage in 1901, 3) subsequent salvage efforts, and 4) the forensic evidence of gold that has been discovered in the previous MKSV operations. Based on this information and his experience with shipwreck salvage operations over the last forty plus years, Mr. Holabird calculated and opined that over $500 million and up to $650 million worth of gold likely remains in and around the *SS Islander* wreckage.

Second, May retained business valuation expert Neil Beaton of Alvarez & Marsal to assess the current value of May's alleged contractual rights to use the Intellectual Property in subsequent operations with OMI. Based on Mr. Holabird's estimate, Mr. Beaton applied the OMI/MKSV profit-sharing provisions to several different recovery scenarios. He then used a weighted present value analytical formula to reach the conclusion that May's contract rights were likely worth $60 million, or <u>double</u> the final covenant judgment amount. Washington courts have recognized that similar jury verdicts can be used by the trial court to assess the reasonableness of Plaintiff's claimed damages. *See CBS Corporation v. Ulbricht*, Wn. App. Nos. 79490-6-I & 79590-2-I (unpublished) (February 10, 2020). While the unusual factual background of this case makes it difficult to find direct comparisons, the $60 million claimed damages and $30 million covenant judgment amount falls well below the jury verdicts on other confidential information/trade secret misappropriation cases in recent years.[2]

---

[2] *See Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Group*, Case No. 1:15-cv-00211 (S.D.N.Y, October 27, 2020) ($855 million jury verdict for software developer against information technology company that misappropriated trade secrets and infringed copyrighted software related to a popular insurance administrative platform); *Optis Wireless v. Apple, Inc.*, Case No. 2:19-CV-00066 (E.D. Texas, August 11, 2020) ($506 million for patent infringement of LTE cellular technology); *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation*, Case No. 2:07-cv-08108 (C.D. Cal., November 9, 2018) ($268 million intellectual property infringement); *Densify v. VMware*, Case No. 19-742-LPS (D. Del., January 24, 2020) ($236 million verdict for infringement of software patent and trademark infringement, subsequently vacated by trial judge for lack of standing); *United States Automobile Association v. Wells Fargo & Co.*, Case No. 2-18-cv-00245 (E. Dist. Texas, November 6, 2019) ($200 million verdict for violation of mobile banking software patent); *United States Automobile Association v. Wells Fargo & Co.*, Case No. 2:18-CV-00366 (E.Dist. Tex., January 13, 2020) (Second verdict for $102.8 million on separate software technology); *Frontline Processing Corp. v. Global Payments, Inc.*, Case No. 15CV6007 (Dekalb County, Georgia, September 23, 2019) ($135 million to independent sales

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 13

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 16 of 275

## 2. The merits of Plaintiff's liability theory.

May's principal argument on liability was that when he and Bear terminated their relationship in their November 2016 agreements, the agreement was that May would be assigned all rights and interest in MKSV's ability to conduct future salvage operations under the OMI contract, and the right to use the Intellectual Property, while not specifically listed as one of the assets transferred, was logically included in the transfer of the OMI salvage contract rights. Quite literally, May asserted, the IP was the treasure map to be used in going back to find the rest of the gold – and May argued it only made sense that the right to use it was included in the contract salvage rights.

May originally sought injunctive relief to obtain use of the Intellectual Property so that he could participate in future salvage operations with OMI. As stated above, OMI's contract with the owners of the *SS Islander* wreckage had expired by the time suit was filed in April of 2019, but the Alaska Court had not awarded the contract rights to another party. Shortly after the lawsuit was filed, the Alaska court terminated OMI's rights and awarded the contract to a different salvage company.

At this point, May, as MKSV's assignee, did not have the right to use the Intellectual Property with OMI. May's primary claim therefore became one for damages for Defendants' interference with May's salvage rights. As discussed above, the expert testimony in support of May's damages opined that $60 million constitutes the fair value of what May's contract rights were worth during the period he was deprived of the use of the Intellectual Property by Defendants.

organization for breach of contract when processor who blocked plaintiff from using defendant's computer systems); *see also*, *Trinity East Energy, LLC v. The City of Dallas*, Cause No. DC-14-01443 (Dallas County Texas, February 27, 2020) ($44.5 million for breach of contract and fraud for failing to allow oil exploration to drill on parkland as promised.) Copies of reports of these verdicts are included in *Attachment 2* hereto.

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 14

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

### 3. The merits of Defendants' defense theory.

Defendants' defense theory was that (1) the Intellectual Property was owned by OMI, (2) MKSV assigned to May the right to conduct further salvage efforts relating to *SS Islander,* not all the salvage rights under the OMI Contract, (3) the interest MKSV had in the Intellectual Property was not an "asset" of MKSV that was or could have been assigned, (4) the Escrow Agreement was still in effect, and the Intellectual Property could not be used by May under the terms of the Escrow Agreement unless and until MKSV had been paid the remainder of the Recovery Investment amount of approximately $4 million, (5) the settlement between May and Bear Enterprises did not grant ownership or use of the Intellectual Property to May, and (6) the mutual release executed by all parties released all of May's claims against Defendants.

Defendants submitted these defenses to Judge Cahan on summary judgment in December 2019. Judge Cahan determined that genuine issues of material fact existed on all Plaintiff's claims, along with Defendants' counterclaims for indemnity.

In addition to the arguments made at summary judgment, Plaintiff would also argue at trial Defendants' liability defense is also undercut by RCW 62A.9A-207(b)(4)(A), which provides that a secured party having possession of collateral (i.e., a possessory lien) has the right to use the collateral as follows:

> The secured party may use or operate the collateral: (A) *For the purpose of preserving the collateral or its value;* (B) As permitted by an order of a court having competent jurisdiction; or (C) Except in the case of consumer goods, in the manner and to the extent agreed by the debtor."

May would argue that Section 4(A) applies here, and May – as assignee of MK Salvage's possessory lien -- had the right to use of the collateral (i.e., the Intellectual Property) as it would have preserved its value.

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 15

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

While the parties continue to disagree on the merits and validity of these defenses, the parties were able to negotiate a good faith settlement that resulted in a covenant judgment representing a 50% reduction of Plaintiff's claimed damages.

### 4. The Defendants' relative faults.

This factor is of little or no relevance to this case because all Defendants have entered into the Settlement Agreement, leaving no unallocated fault.

### 5. The risks and expenses of continued litigation.

This case presented a significant risk to Defendants. Given May's expert testimony on damages and theories of recovery, Defendants faced exposure of well more than twice the $30 million that has been stipulated to, plus the continuing costs of litigation and attorney's fees.

Defendants' insurer had denied any coverage and refused to defend the lawsuit after Defendants tendered the claim, leaving Defendants to face the specter of mounting an expensive legal defense, with potential exposure to an adverse judgment in the high 8-figures. Thus, it was in Defendants' interest to settle this matter by entering into a covenant judgment for a reduced amount of $30 million to limit their further risk and expense.

The Court is also allowed to consider the risk of continued litigation for the Plaintiff in the future bad faith litigation assigned as part of the covenant judgment in assessing reasonableness. *See CBS Corporation v. Ulbricht,* Wn. App. Nos. 79490-6-I & 79590-2-I (unpublished) (February 10, 2020), *citing to Werlinger v. Warner,* 126 Wn.App. 342, 350-51 (2005) (consideration of outside bankruptcy proceedings proper.) In this case, May was justified in holding out for a $30 million covenant judgment and other terms based on the risk and expense of the eventual bad faith claim against Great American.

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 16

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 19 of 275

### 6. The Defendants' ability to pay.

As set forth in the accompanying declaration of Peter Kuttel, Defendant MKSV is no longer in business and has no financial assets to satisfy any judgment that would be entered in this case. The insurance indemnity proceeds would be its only source of payment. Defendant Bear Enterprises and Defendant Peter Kuttel personally have significant assets, but a judgment for even a fraction of May's claimed amount would be damaging to Bear and Kuttel's financial liquidity. Defendants' agreement to execute a covenant judgment settlement was reasonable under these circumstances.

### 7. No evidence of bad faith, collusion, or fraud.

The terms of the settlement agreement were negotiated by counsel over the period of several months and after literally dozens of offers and counter-offers. The Defendants entered into the agreement with the advice and representation of their experienced legal counsel, who vigorously defended their position in summary judgment proceedings, discovery and through the settlement negotiations.[3]

After Great American denied coverage and Judge Cahan denied Defendants' summary judgment motion, Defendants faced a lengthy discovery process and likely trial on the merits. After Plaintiff submitted its experts' opinions on damages identifying over $60 million in damages and with their insurer denying a defense or indemnity, Defendants made the logical choice of negotiating a covenant judgment settlement. Rather than simply entering into Plaintiff's requested agreement, Defendants negotiated for over four months in a good faith effort to reach a reasonable settlement. All counsel of record agree that the proffered settlement is reasonable under the applicable factors stated in *Besel, et al.*

---

[3] MKSV was represented by Terence McGee, an experienced civil litigation and maritime lawyer. James Williams, Managing Partner of Perkins Coie, along with associate Zachary Davison, represented Bear and Kuttel.

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 17

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

**8. The extent of Plaintiff's investigation and preparation of the case.**

The parties reached this settlement more than 19 months after Plaintiff's counsel filed the lawsuit in April of 2019. Plaintiff's counsel has invested hundreds of hours into the investigation, research and preparation of the case, with considerable time analyzing the extensive and complicated background of the case, conducting discovery, developing Plaintiff's theories of recovery, and working with experts to prepare the damages claims for trial. Plaintiff's preparation of the case, the arguments presented, and preparation of expert damages testimony successfully postured the case for the current settlement amount.

**9. The interest of the parties not being released.**

All defendants in the case are parties to this settlement agreement. Peter Kuttel, individually, is not a named judgment debtor on the judgment (another sign of the good-faith negotiation) but remains liable for the guaranteed minimum recovery as per the Settlement Agreement. No other culpable parties are <u>not</u> being released, so this factor is not applicable.

## VI. <u>CONCLUSION</u>

In this case, all nine of the relevant factors weigh in favor of approving the parties' $30 million covenant judgment settlement as reasonable. Accordingly, the parties jointly request that the Court enter an order finding the settlement reasonable and entering judgment thereon as stipulated by the parties.

DATED this 7th day of April, 2021.

*The undersigned certify that this memorandum contains 5,735 words as permitted by prior authorization of the Court in compliance with Local Civil Rules.*

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 18

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

ZORETIC LAW

/s Michael T. Zoretic
By_____
    Michael T. Zoretic, WSBA #21221
    PO Box 427
    Pateros, WA 98846
    (206) 465-8109
    mike@zoreticlaw.com (email)
Attorney for Plaintiff Rodger May

McGEE LAW OFFICES PLLC

/s Terence K. McGee
By_____
    Terence K. McGee, WSBA #6221
    15711 NE 143rd Place
    Woodinville, WA 98072
    (425) 368-2321 (tel)
    (425) 368-2322 (fax)
    tkmcgee@mcgeelaw.net (email)
Counsel for Defendant MK Salvage Venture LLC

PERKINS COIE LLP

/s James F. Williams
By_____

/s Zachary E. Davison
By_____
    James F. Williams, WSBA #23613
    JWilliams@perkinscoie.com (email)
    Zachary E. Davison, WSBA #47873
    ZDavison@perkinscoie.com (email)
    1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
    (206) 359-8000 (tel)
    (206) 359-9000 (fax)
Attorneys for Defendant Bear Enterprises LLC and
Peter Kuttel

MOTION FOR DETERMINATION OF
REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 19

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

# ATTACHMENT 1

L. Meier Decl., Ex. 4, p. 23 of 275

# AMENDED AND RESTATED SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into by and between the parties to the lawsuit entitled *May v. MK Salvage et al.*, King County Superior Court Case No. 19-2-10613-1 SEA ("this action" or "the lawsuit"). Those parties are Rodger May ("May"), on the one hand, Plaintiff, and MK Salvage Venture LLC ("MKSV"), Bear Enterprises LLC ("Bear Enterprises"), and Peter Kuttel ("Kuttel") (collectively, "Defendants") on the other, and is effective as of the date of latest execution below.

## RECITALS

A.    On March 28, 2012, May and Bear Enterprises formed MKSV as a limited liability company under the laws of the State of Washington.

B.    May and Bear Enterprises were and have at all times remained 50/50 members and managers of MKSV.

C.    Kuttel is the sole member and manager of Bear Enterprises.

D.    After its formation, MKSV engaged in gold salvage operations under contract with Ocean Mar (Washington), Inc. ("OMI"), seeking the gold carried on the *SS Islander*, a passenger ship that sank in Stephens Passage in Southeast Alaska in 1901.

E.    OMI had obtained the legal rights to salvage the *S/S Islander* through contract with London underwriters and the court proceedings in the United States District Court for the District of Alaska entitled *Yukon Recovery, L.L.C. v. Certain Abandoned Property, in rem, Defendant: Ocean Mar, Inc.*, 3:96-cv-0270 (Consol.) (the "Alaska Salvage Action"), culminating in a 1998 court-approved salvage plan.

F.    MKSV conducted the operations under a "Financing and Salvage Management Contract" (the "OMI Contract") entered with OMI, dated March 28, 2012, as later amended by the parties. A true and correct copy of the OMI Contract is attached as Exhibit A to this Settlement Agreement.

G.    Under the OMI Contract, MKSV was to manage the salvage operations, in cooperation with OMI. MKSV was also to provide funding for operations up to the amount of $5 million ("the Recovery Investment"), subject to certain reimbursement rights as stated therein.

H.    Section 3 of the OMI Contract created a contractual "security interest or lien" in favor of MKSV over certain described tangible and intangible property of OMI to be generated during the future salvage operations funded by MKSV, "including, without limitation, computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc." (referred to therein and herein as the "Intellectual Property" or "IP.")

1

L. Meier Decl., Ex. 4, p. 24 of 275

I.      Section 3 of the OMI Contract further provides that the Intellectual Property was to be downloaded to a media disc on a daily basis and held by the Cairncross & Hempelmann, P.S. law firm ("C&H") in escrow pursuant to the terms of the accompanying "Escrow Agreement" until the security lien is satisfied or otherwise released following MKSV's receipt of its Recovery Investment, plus twelve percent interest.

J.      OMI and MKSV also executed an "Escrow Agreement" on March 28, 2012, which mirrored the OMI Contract and more fully set forth the terms as to the escrow of the Intellectual Property. A true and correct copy of the Escrow Agreement is attached as Exhibit B to this Settlement Agreement.

K.      MKSV proceeded to invest substantial sums (in excess of $5.5 million) in conducting two salvage operations in 2012 and 2013. Much of the investment funds were spent on the investigation and engineering analysis in the first operation, conducted while trying to locate the remains of the *SS Islander*. OMI and MKSV hired the engineering firm Tetra Tech to conduct sea bottom mapping, non-ferrous target identification, and measurement and core sampling of sediment depths in the target area.

L.      The measurements, charts, tangible work product and electronic data generated during the two salvage operations (i.e., the "Intellectual Property" as described in Section 3 of the OMI Contract) were kept on board the salvage vessel and also stored on computer disks and hard drives. Initially, the Intellectual Property was in fact downloaded to C&H on a daily basis or near-daily basis, but this proved impractical, so all parties agreed to maintain the Intellectual Property on board until the end of each voyage.

M.      During the first operation in August 2012, the team located the *SS Islander*'s bow, buried in the ocean sediment. The salvage operations resulted in the recovery of a large box, containing bags of gold dust. The gold dust was estimated to have value in excess of $1 million.

N.      Upon completion of the second salvage operation, in 2013, all Intellectual Property was delivered to C&H.

O.      In approximately November of 2015, without the consent of any party, C&H delivered a box containing the Intellectual Property to MKSV at its office in Seattle, which was also the principal office of Bear Enterprises.

P.      All parties became aware that the IP had been transferred from C&H (the Escrow Agent) and now was, by the parties' agreement, in the possession of MKSV, the secured creditor under the OMI Agreement.

Q.      The parties agree that MKSV thereafter continued to have a security interest in the IP, which still secured MKSV's rights to reimbursement of the remaining Recovery Investment.

L. Meier Decl., Ex. 4, p. 25 of 275

R.     In November 2016, May and Bear Enterprises agreed to divide the known assets of MKSV and dissolve the company.

S.     May and Bear Enterprises executed a "Record of Action of MK Salvage Venture LLC to Distribute All Known Assets", a copy of which is attached as Exhibit C to this Settlement Agreement.    Section 1 of the Record of Action purports to identify "the only known assets" of the company as the following:

a.     The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the OMI contract") dated March 29, 2012, as amended;

b.     The right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under Paragraph 2(a)(i) of the OMI Contract;

c.     Any rights to other salvage recovery proceeds under Paragraph 2 of the OMI contract, except as set forth in the immediately preceding paragraph;

d.     The protector vessel AU1, USCG Official No. 1199468, and appurtenances;

e.     Ownership units of Gold Leaf Productions, LLC, an Alaskan limited liability company, Entity No. 1001005.

f.     Wells Fargo Bank Account No. 3139238962.

Section 2 of said Record of Action provides for distribution of the identified assets as follows:

a.     To Rodger D. May, all assets as described ¶ 1(a), ¶ 1(c), and ¶1 (e), above, at no cost to him;

b.     To Bear Enterprises LLC, the asset described in ¶ 1(d) above. Bear Enterprises will pay $180,000 to Rodger D. May for this asset;

c.     To Rodger D. May and Bear Enterprises LLC equally, the asset described in ¶ 1(b) above;

d.     The bank account identified in ¶ 1(f) above will be distributed in accordance with ¶ 7 below.

3

Section 3 further provides that MKSV "hereby assigns all of its right, title, and interest in the salvage contract rights described in 1(a) and 1(c). above. to Rodger D. May…"

Section 4 states: "By this resolution. MKSV hereby assigns all of its right, title and interest in the reimbursement rights set forth in ¶1 (b) above. to its two members equally…"

T.     Section 11 of said Record of Action further provided:  "After the distribution of all assets and the payment of all expenses as set forth above, MK Salvage Venture LLC authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the Washington Secretary of State and to the State of Alaska Department of Commerce, a Certificate of Dissolution."

U.     May and Bear Enterprises also executed a document entitled "Assignment of MK Salvage Venture LLC Assets." This Settlement Agreement states that MKSV was assigning to May "100% of any and all rights, title and interest it has in . . . The right to conduct further salvage efforts relating to the sunken S/S ISLANDER. as contained in [the OMI Contract]." A true and correct copy of this assignment is attached as Exhibit D to this Settlement Agreement.

V.     The parties also simultaneously executed a "Record of Action of MK Salvage Venture LLC to Dissolve Company," in which the parties further agreed that MKSV had "distributed all of the assets it holds to its members" except funds in MKSV's checking account. This agreement again authorizes Daniel Leston to dissolve the MKSV entity once all assets were distributed and final expenses were paid. A true and correct copy of this record of action is attached as Exhibit E to this Settlement Agreement.

W.     As part of their agreed resolutions, the parties also executed a release agreement. A true and correct copy of this release agreement is attached as Exhibit F to this Settlement Agreement.

X.     May did not receive the Intellectual Property after the closing of the transactions in November 2016.

Y.     In January of 2017, May's counsel. Kristofer Larson, contacted counsel for Bear Enterprises. Vi Jean Reno, with May's request for all of the Intellectual Property so that May could use it in future salvage operations with OMI. The Intellectual Property was not released or made available.

Z.     By letter of July 20, 2017. Mr. Larson again requested possession of the Intellectual Property for May to use in performance of additional salvage efforts.

AA.     Ms. Reno responded on July 25 and 26, 2017. Bear Enterprises refused to allow MKSV to relinquish the Intellectual Property, claiming that it was owned by OMI and held in escrow under contract with OMI, and that MKSV had a possessory lien on the

L. Meier Decl., Ex. 4, p. 27 of 275

Intellectual Property to secure repayment of the initial investment. Ms. Reno said OMI should contact MKSV directly if it wanted the Intellectual Property.

BB.     No Certificate of Dissolution was filed as authorized by the above resolutions. The company had no ongoing business after the salvage operations were completed.

CC.     In April of 2018, Kuttel moved Bear Enterprises' office, MKSV's office, and the Intellectual Property to his residence. Kuttel did not ask or obtain permission from May and/or OMI to move MKSV's office and the Intellectual Property. Kuttel also never notified the Washington Secretary of State or May that he had changed the company's business address.

DD.     OMI's contract with London underwriters for the performance of *SS Islander* salvage expired in May 2018. With the OMI salvage rights expired, May had lost any ability to conduct further salvage operations under contract with OMI.

EE.     In August of 2018, the Washington Secretary of State administratively dissolved MKSV for failure to file its Annual Report. Ms. Reno immediately filed for reinstatement of MKSV and changed the business address of MKSV to her law office. Bear Enterprises, through Kuttel, authorized Ms. Reno to reinstate MKSV because the "company was not ready to be dissolved" in 2018.   May was not notified of, nor did he consent to, any of these actions.

FF.     MKSV was not dissolved following its reinstatement but continued in existence without conducting any business except defense of this action.

GG.     May's counsel, Michael T. Zoretic of Zoretic Law, PLLC, filed the subject Complaint initiating this action on April 17, 2019, against MKSV, Bear Enterprises, and Kuttel as defendants.

HH.     The Complaint seeks declaratory relief and alleges breach of contract, conversion, and derivative claims relating to MKSV's refusal to release the Intellectual Property to May.

II.     On May 16, 2019, Jed Powell, counsel for OMI, wrote Ms. Reno a letter asserting that OMI did not object to MKSV, Bear Enterprises, or Kuttel releasing the Intellectual Property to May for use in future salvage operations, but the sole owner, director, and officer of OMI had died two weeks before Mr. Powell's letter was written, and Mr. Powell presented no evidence of his authority to write this letter.

JJ.     MKSV continued to retain possession and/or control of the Intellectual Property.

5

KK. May contends, and Defendants have acknowledged in the litigation, that the Intellectual Property has independent value and contains information about the salvage operations performed in 2012-2013.

LL. MKSV's refusal to surrender or share the Intellectual Property with May prevented May from using the Intellectual Property in continuing salvage operations with OMI during the times OMI still had the contract salvage rights.

MM. On June 17, 2019, the court in the Alaska Salvage Litigation issued its "Order Amending Findings of Fact and Conclusions of Law" recognizing Tyche High Seas Capital Corp. as the contract salvor with exclusive salvage rights with respect to the wreckage of the *SS Islander*.

NN. On June 18, 2019, the same court issued its supplemental "Amended Judgment in a Civil Case" enjoining "Ocean Mar, Inc. and their agents, servants, employees, and all other acting in concert with them" from "taking any further action with respect to exploring or conducting operations at the site of the sinking of the *SS Islander*, and from interfering in any way with the salvage operations at that site to be undertaken by Tyche."

OO. May claims to have suffered damages in the form of the lost opportunity to conduct further salvage operations to recover what he alleges could be millions of dollars' worth of additional gold from the *SS Islander* wreckage and/or to market his salvage rights to outside investors.

PP. May has produced expert opinion from Fred Holabird, a mineral exploration and mine geologist, who opined that between 300,000 to 355,000 troy ounces of gold (with a current spot value of $517.5 million to $612 million) likely remains in or around the *SS Islander* wreckage.

QQ. Based on this estimate, May's economic loss expert, Neal Beaton of Alvarez & Marsal, has opined that the associated lost market value of May's contract salvage rights is approximately Sixty Million Dollars ($60,000,000).

RR. Defendants moved for summary judgment dismissal of all of May's claims, as well as judgment in their favor on Defendants' asserted claims under the Release for indemnification. (Dkt. 26, 27, 28, 81, 82, 83, 87, 88). Judge Regina Cahan denied the motions for summary judgment on December 10, 2019 (Dkt. 92).

SS. Trial by jury before Judge Roger Rogoff is scheduled for April 26, 2021.

TT. Defendants were insured under insurance policies issued by Great American Insurance Company of New York ("Great American") in 2015-19 under Policy Nos. OMH 3133724-04, -05, -06, and -07. The policies have per occurrence limits of One Million Dollars ($1,000,000) and aggregate limits of Two Million Dollars ($2,000,000).

L. Meier Decl., Ex. 4, p. 29 of 275

UU.     Defendants tendered defense and indemnity of the lawsuit to Great American in October of 2019.

VV.     Great American denied coverage (both defense and indemnity) by letter dated November 14, 2019, without conducting any investigation or otherwise contacting any of the insureds under the policies.

WW.     Based on the above agreed-upon recitals, May and Defendants enter into this Settlement Agreement to resolve the claims filed by the parties against each other and to memorialize their agreements on other matters as stated herein.

XX.     The parties hereby incorporate by this reference May's complaint (Dkt. 1), MKSV's first amended answer and counterclaim (Dkt. 58), Bear Enterprises' answer and counterclaim (Dkt. 23), Kuttel's answer and counterclaim (Dkt. 21), and documents filed in support of and against Defendants' motion for summary judgment (Dkt. 26, 27, 28, 81, 82, 83, 87, 88).

Wherefore, in consideration of the promises, assignments, covenants and releases stated herein and in the attached Stipulated Judgment, the Parties agree as follows:

## AGREEMENT

1.     Judgment. Defendants agree to entry of a covenant judgment in favor of May against MKSV and Bear Enterprises on his asserted claims in *May v. MK Salvage et al.*, King County Superior Court Case No. 19-2-10613-1 SEA, in the sum of Thirty Million Dollars ($30,000,000), including all costs and attorney's fees, to be entered in King County Superior Court in this action, in the form attached as Exhibit G. The parties agree that the amount of the judgment reflects the reasonable settlement value of May's claims in the lawsuit. The judgment shall accrue interest at Twelve Percent (12%) per annum from date of entry.

2.     Reasonableness Hearing. The parties acknowledge this Settlement Agreement and the covenant judgment is intended as complete resolution of all claims by May against Defendants and that May and Defendants shall submit it for a reasonableness determination pursuant to RCW 4.22.060. May, in his sole and unfettered discretion, shall determine whether to provide notice to Great American to the extent required by Washington law. May and his counsel shall control the presentation of argument and evidence at the Reasonableness Hearing and in any other proceedings and/or communications relating thereto, subject to Defendants' cooperation as set forth below. Defendants shall assist in addressing the factors established in *Chausee/Glover* and progeny, including: "The releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the

7

releasing person's investigation and preparation of the case; and the interests of the parties not being released."

3. __Minimum Reasonableness Amount.__ While the parties agree that the covenant judgment reflects the reasonable settlement value of May's claims in this action, they recognize that the Court may decide otherwise following the Reasonableness Hearing. The parties agree that should the Court find this settlement to be unreasonable, or if May withdraws the parties' motion for a reasonableness determination, this Settlement Agreement shall remain effective between the parties, provided only that if the reasonable settlement value of May's claims as found by the Court is less than Seven Million Five Hundred Thousand Dollars ($7,500,000), May, in his sole and unfettered discretion, shall have the option to void this Settlement Agreement and revive all his claims against Defendants in this action by written notice delivered to all counsel for Defendants within seven (7) days after entry of the Court's ruling on the reasonable settlement value of May's claims. If May exercises his option to void this Settlement Agreement as provided in this paragraph, all of the terms of this Settlement Agreement, and the very existence of this Settlement Agreement, the covenant judgment, or the Reasonableness Hearing shall be inadmissible in any subsequent proceedings in this or any other action, and all defenses and counterclaims of Defendants shall likewise be revived, with the result that this action shall proceed exactly as if this Settlement Agreement had not been entered except as provided in paragraph 26 below.

4. __Assignment of Insurance Rights.__ In consideration of the releases set forth herein, Defendants assign all of their rights, claims, and causes of action against Great American relating to or arising out of any applicable insurance policy, this action, and/or the covenant judgment, including but not limited to all statutory rights, contractual rights and/or rights arising in tort or otherwise, relating to Great American's duties to Defendants to defend and/or indemnify May's claims and/or this action, including but not limited to claims for breach of contract, breach of the covenant of good faith and fair dealing, bad faith, Insurance Fair Conduct Act (RCW 48.30.015), WAC 284-30-300 *et seq.*, the Consumer Protection Act (RCW 19.86 *et seq.*), claims for compensatory damages, emotional distress and/or punitive damage thereunder, and any similar claims existing under New York or federal maritime laws, together with their rights to recover attorney's fees, costs, and/or expenses in pursuing the claims and coverage under any Great American policy of insurance. Defendants further assign all rights to prosecute any such claims against Great American. The foregoing assigned rights are hereinafter referred to as the "Assigned Claims."

5. __No Prior Transfer of Claims.__ Defendants further warrant and covenant that they have not assigned, sold, or otherwise transferred any interest in the insurance policies and/or Assigned Claims to any person or entity other than May, and will not do so in the future.

6. __Covenant Not to Execute.__ MKSV and Bear Enterprises shall remain liable on the covenant judgment, but May hereby covenants that he shall not take any action of any kind to collect the judgment against MKSV, Bear Enterprises, Kuttel, and/or any of

L. Meier Decl., Ex. 4, p. 31 of 275

their assets. May's sole remedy shall lie in the pursuit of the assigned claims against Great American. The Covenant Judgment shall not be satisfiable by attachment of, nor shall it become a lien upon, any assets or property of Defendants or any of them individually. May shall not report the covenant judgment to any credit agency. May agrees and acknowledges that Defendants and their owners, managers, members, employees, agents and/or attorneys are not personally exposed to any liability to May beyond insurance coverage available from Great American. This covenant not to execute shall be effective immediately upon filing the covenant judgment with the Court.

7.     <u>May's Control of Assigned Claims</u>. May shall be solely responsible for all efforts and proceedings against Great American and shall have sole and unfettered discretion, ownership, and control of the prosecution of the Assigned Claims, including, except as otherwise provided in this Settlement Agreement, the right to settle, appeal, and/or dismiss the Assigned Claims. May shall have the sole right to select counsel to prosecute the Assigned Claims. May shall be solely responsible for his counsel's fees and all expenses relating to the pursuit of the Assigned Claims.

8.     <u>Defendants' Cooperation</u>. Defendants agree to cooperate reasonably and in good faith with May in the Reasonableness Hearing and pursuit of the Assigned Claims by providing written documents, assisting in responding to discovery requests, providing access to relevant, non-privileged documents, and providing truthful witness testimony in the form of declarations, depositions, and/or live testimony, if necessary. Defendants shall also make their defense counsel reasonably available for submission of testimony as described above. Defendants will refrain from taking any actions that will prejudice May's ability to prosecute the Assigned Claims, provided that truthful testimony shall not be deemed prejudicial to May's ability to prosecute the Assigned Claims.

9.     <u>Entitlement to Proceeds</u>. May shall be entitled to all proceeds, payments, settlements, recoveries, verdicts and/or awards obtained from any actions relating to the Assigned Claims against Great American, with the following exception: Defendants shall be entitled to Ten Percent (10%) of any such gross recovery up to a maximum of Four Hundred Thousand Dollars ($400,000) as compensation for attorney's fees and expenses associated with the Reasonableness Hearing and/or the Assigned Claims proceedings.

10.     <u>Guaranteed Minimum Recovery</u>. If May's pursuit of the Assigned Claims does not lead to gross recovery for May of at least One Million Two Hundred and Fifty Thousand Dollars ($1,250,000) from Great American, whether by way of judgment or settlement, Bear Enterprises and/or Kuttel shall pay May any shortfall. May shall be entitled to invoke this provision upon final resolution of the lawsuit(s) relating to the Assigned Claims, provided that Bear Enterprises and Kuttel's guarantee as provided in this paragraph shall be void if May enters into any settlement with Great American that does not lead to gross recovery for May of at least One Million Two Hundred and Fifty Thousand Dollars ($1,250,000) without the prior written consent of Bear Enterprises and Kuttel, who may reject any such settlement in their sole and unfettered discretion. Bear

9

Enterprises and/or Kuttel shall pay the guaranteed amount with thirty (30) days of receiving written notice from May with satisfactory proof of the recovery and its basis.

11.     Release of Other Claims by May.  Unless May elects pursuant to paragraph 3 to exercise his option to void this Settlement Agreement, then within seven (7) days after entry of the Court's ruling on the reasonable amount of settlement in this action, May shall, on his own behalf and on behalf of MK Pacific, LLC, MKSV, and any and all affiliated persons, subsidiaries, and related companies, and their successors and assigns, release with prejudice and forever discharge each of Defendants, as well as their officers, directors, employees, parent companies, and affiliates, of and from any and all obligations, claims, and/or liabilities of any kind or nature whatsoever, regardless of the subject matter, including, without limitation, those that are legal, equitable, based in tort, statute, or contract, extra-contractual, or otherwise, and regardless of whether asserted or unasserted, presently existing or hereinafter arising, known or unknown, except (1) as preserved herein and satisfiable out of liability insurance provided by Great American and (2) claims relating to Seattle Bank.

12.     Release by Defendants.  Unless May elects pursuant to paragraph 3 to exercise his option to void this Settlement Agreement, within fourteen (14) days after entry of the Court's ruling on the reasonable amount of settlement in this action, Defendants shall, on behalf of themselves and on behalf of MK Pacific, LLC, and any and all affiliated persons, subsidiaries, and related companies, and their successors and assigns, release with prejudice and forever discharge May of and from any and all obligations, claims, and/or liabilities of any kind or nature whatsoever, regardless of the subject matter, including, without limitation, those that are legal, equitable, based in tort, statute, or contract, extra-contractual, or otherwise, and regardless of whether asserted or unasserted, presently existing or hereinafter arising, known or unknown, except (1) as preserved herein and (2) claims relating to Seattle Bank.

13.     Intellectual Property.

a.      The parties have stipulated in this action to a discovery order acknowledging Defendants' belief that the Escrow Agreement remains in force and compelling Defendants to produce the Intellectual Property to May, and Defendants hereby assign to May any and all of their legal and/or equitable rights in the tangible and/or intangible computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc., related to the salvage of *SS Islander* and obtained or created during any of OMI's salvage recovery efforts funded by MKSV after March 28, 2012. May shall hereafter be deemed and understood to be the sole legal and equitable owner of any and all rights May and/or Defendants have in the Intellectual Property.  Defendants shall not object to May's use of the Intellectual Property in any future salvage operations.

b.      An inventory list of the Intellectual Property materials is attached as Exhibit H.  Defendants have made a single copy of the Intellectual Property, which shall be held by counsel for Defendants and used solely for purposes of litigation in this action if May elects pursuant to paragraph 3 to exercise his option to void this Settlement

L. Meier Decl., Ex. 4, p. 33 of 275

Agreement. Defendants shall retain no ownership interest or other rights of use of the Intellectual Property. If the Settlement Agreement is not voided by May pursuant to paragraph 3, Defendants shall, at May's option, sell the copy to May at Defendants' cost of making the copy or destroy the copy within 10 (ten) days of confirmation and request.

14. <u>Indemnification by May Re: Intellectual Property</u>. May shall indemnify, defend, and hold Defendants MKSV, Bear Enterprises, and Kuttel harmless from any and all claims, demands, or potential liability arising from or concerning the possession or release of the Intellectual Property and/or May's use of the Intellectual Property in the future, whether or not foreseen or foreseeable by the Parties or any of them. This obligation shall include any and all claims from any third parties, including but not limited to OMI, its officers, directors, shareholders, investors, assigns and/or creditors, any state or federal court orders, and/or any other person or entity claiming an interest in or damage arising from the possession, release, or use of the Intellectual Property.

15. <u>Entry of Stipulated Judgment</u>. Unless May elects pursuant to paragraph 3 to exercise his option to void this Settlement Agreement (in which case the Stipulated Judgment shall be void), the parties shall submit the Stipulated Judgment to the Court for entry within fourteen (14) days after entry of the Court's ruling on the reasonable amount of settlement in this action. This Settlement Agreement is conditioned upon the Court's entry of the Stipulated Judgment as submitted, without material modification by the Court except by record agreement of all parties. If the Court enters a materially modified judgment without the record agreement of all parties, any party shall have the option to move to vacate that judgment, and in that event all other parties shall join in such motion to vacate. If the Court enters a materially modified judgment without the record agreement of the parties and any party exercises its option to move to vacate that judgment, then, regardless of the Court's ruling on the motion to vacate, the judgment entered and this Settlement Agreement shall be void as between the parties, all of whom covenant that they will take no action to enforce or assign either the judgment entered or this Settlement Agreement, except for those provisions of this Settlement Agreement that are agreed in paragraph 26 below to survive the voiding of this Settlement Agreement.

16. <u>Satisfaction of Judgment</u>. Promptly upon settlement or other conclusion of May's prosecution of the Assigned Claims against Great American, May shall provide to counsel for MKSV a satisfaction of the Stipulated Judgment in form suitable for filing.

17. <u>Dissolution and Wind Up</u>. MKSV shall be dissolved and wound down by mutual assent of May and Bear Enterprises, with all claims and debts satisfied as per RCW 25.15.297 and .305, and May and Bear Enterprises shall share the expenses of such dissolution and wind-down equally.

18. <u>Advice of Counsel</u>. Each party has consulted with counsel prior to executing this Settlement Agreement. Michael Zoretic of Zoretic Law, PLLC represented May. Terence McGee of McGee Law Offices PLLC represented MKSV. James Williams and Zachary Davison of Perkins Coie represented Bear Enterprises and

L. Meier Decl., Ex. 4, p. 34 of 275

Kuttel. This Settlement Agreement shall be construed neutrally and as the commemoration of the mutual assent of all Parties rather than for or against any party.

19. Choice of Law. This Settlement Agreement is made in the State of Washington and shall be interpreted, construed, and enforced according to the laws of the State of Washington.

20. Entire Agreement. This Settlement Agreement and the attached Stipulated Judgment constitute the entire agreement and understanding between and among the Parties concerning the matters set forth herein. This Settlement Agreement may not be amended or modified except in writing signed by all of the Parties.

21. Binding Effect. Each person executing this Settlement Agreement represents and warrants that he/she is authorized to sign this Settlement Agreement on behalf of the party on whose behalf he/she has executed this Settlement Agreement and that he/she has full power and authority to bind such party to each and every provision of this Settlement Agreement. This Settlement Agreement shall be binding upon and inure to the benefit of the undersigned settling Parties and their respective heirs, executors, administrators, representatives, successors and assigns. May concurs and consents to MKSV's entry into this Settlement Agreement and its stipulation to the attached Stipulated Judgment.

22. Severability. In the event any provision of this Settlement Agreement is declared invalid or unenforceable, this Settlement Agreement and the Stipulated Judgment shall be void at the option of any party exercised in writing within fourteen (14) days after the entry of the ruling of invalidity or unenforceability.

23. Disputes. Any disputes over the interpretation, construction, and/or alleged breach of this Settlement Agreement shall be submitted to King County Superior Court of the State of Washington in this action.

24. Counterparts. This Settlement Agreement may be executed in counterparts, and an authentic electronic signature or photocopy shall be considered valid as an original. Such counterparts when so executed shall together constitute the final Settlement Agreement.

25. Attorney's Fees. Each party is responsible for its own attorney's fees in the drafting and negotiation of this Settlement Agreement and in conducting the Reasonableness Hearing and pursuit of the Assigned Claims. In the event of any dispute over the enforcement of this Settlement Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs incurred in the connection with any lawsuit or proceeding.

26. Survival of Provisions. Any language in this Settlement Agreement to the contrary notwithstanding, the following provisions shall survive even if this Settlement Agreement is otherwise voided: paragraph 3, Minimum Reasonableness Amount;

12

L. Meier Decl., Ex. 4, p. 35 of 275

paragraph 6, Covenant Not to Execute; paragraph 13, Intellectual Property; paragraph 14, Indemnification by May Re: Intellectual Property; paragraph 15, Entry of Stipulated Judgment; paragraph 16, Satisfaction of Judgment; paragraph 25, Attorney's Fees; and this paragraph 26, Survival of Provisions.

Dated this **11th** day of December, 2020.

RODGER MAY

Ro _____

Dated this **11** day of December, 2020.

BEAR ENTERPRISES LLC

By _____
Peter Kuttel, its Member

Dated this **11** day of December, 2020.

MK SALVAGE VENTURE LLC
By BEAR ENTERPRISES LLC
Its Member

By _____
Peter Kuttel, its Member

Dated this **11** day of December, 2020.

PETER KUTTEL

_____
Peter Kuttel

13

# Financing and Salvage Management Agreement

This Financing and Salvage Management Agreement ("**Agreement**"), dated as of March 28, 2012, is by and between Ocean Mar (Washington) Inc. ("**Ocean Mar**") and MK Salvage Venture, LLC ("**MK**").

## RECITALS

A.     Pursuant to the express terms of the August 28, 1998 Order from the United States District Court for the District of Alaska (the "**Court**"), affirmed on appeal, Ocean Mar has been designated as the entity responsible for the operational and preservation aspects of the effort to salvage the SS Islander's wreckage and all gold and artifacts related thereto (the "**Salvage**"). Ocean Mar represents and warrants that Ocean Mar, Inc. referenced in the court documents and Ocean Mar (Washington), Inc. are one and the same entities and Ocean Mar (Washington), Inc. has full right and authority to enter into and perform under this Agreement.

B.     Ocean Mar anticipates the Salvage operation will commence as early as May 15, 2012.

C.     Ocean Mar wishes to engage MK to finance and manage the Salvage. In its role as the financier and manager of the Salvage, MK will contract with and pay the entities and individuals that will assist with the Salvage. MK will have operational control of the Salvage subject to the limitations and conditions herein.

D.     MK is prepared to provide up to $5,000,000 (the "**Recovery Investment**") to fully finance the Salvage on the terms set forth herein.

## AGREEMENT

The parties agree as follows:

1.     **Financing of the Salvage**. MK agrees to:

(a)     Identify vendors and other subcontractors (collectively, "**Salvage Vendors**") needed to accomplish the Salvage efforts;

(b)     Negotiate and enter into contracts with Salvage Vendors and pay amounts owed to such Salvage Vendors;

(c)     Engage Theodore P. Jaynes, the principal of Ocean Mar ("Ted Jaynes") as a consultant pursuant to that certain Consulting Agreement attached hereto as <u>Exhibit A</u>, pursuant to which MK will pay Ted Jaynes (i) $15,000.00 upon execution of this Agreement, and (ii) $5,000 per month commencing on the later of May 15, 2012 or the date that Ted Jaynes, MK's

owners, employees, or Salvage Vendors first depart for Juneau, Alaska to begin the Salvage operations, provided further that the payment obligations under the Consulting Agreement cannot be terminated by MK for any reason unless MK terminates this Agreement; and

(d)     Engage Tetra Tech, Inc. as a subcontractor in connection with the Salvage operations.

As the manager of the Salvage, MK has the right to hire and fire any subcontractor.

2.     **Consideration for Funding**. In consideration for MK's covenants and obligations set forth herein, Ocean Mar agrees to make the following payments:

(a)     Subject to approval of the Recovery Plan (defined below) by the Court, Ocean Mar will pay to MK: (i) an amount equal to the Recovery Investment, or (ii) an amount equal to seven times the Recovery Investment but if and only if the value of the Salvage recovery proceeds is at least 15 times the amount of the Recovery Investment. Notwithstanding anything herein to the contrary, the total payment to MK under this Section 2(a) will not exceed $30,000,000. Examples of the possible distribution of proceeds pursuant to this Section 2(a) are set forth at Exhibit B hereto.

(b)     After payment of Ocean Mar's payment obligations to the Salvage Association in accordance with the Salvage Agreement (NO CURE NO PAY) "ISLANDER" (the "**SA Agreement**"), payment to the State of Alaska pursuant to the settlement with the State (the "**State Agreement**")[1], and after payment of the amounts required to be paid under Section 2(a) hereof, then fifty percent (50%) of any remaining Salvage recovery proceeds will be paid to MK, up to a maximum payment of $100 million. All liens and claims against the Salvage recovery proceeds (other than those related to or arising out of contracts to which MK is a party), if any, will be paid out of Ocean Mar's share of the Salvage recovery proceeds.

(c)     In the event the value of the Salvage recovery proceeds exceeds $1 billion then MK will be paid an additional fifty percent (50%) of the recovery proceeds from $1 billion to $1.2 billion, up to a maximum payment of $100 million.

(d)     The Recovery Plan that Ocean Mar will submit to the State and to SA for approval before filing with the Court will assume that their recoveries are net, not gross, i.e. subordinate to MK's Recovery Investment. However, MK acknowledges and agrees that the payments (and the order of payments) to be made by Ocean Mar hereunder are subject to approval of the Court. Notwithstanding anything in this Section 2 to the contrary, in the event that the Court does not approve the subordination of the Salvage Association's and the State of Alaska's claims to the recovery proceeds to MK's Recovery Investment (including the 15X multiple under this Section 2(a)), then payment of MK's Recovery Investment shall be subordinate to the claims of the Salvage Association and the State of Alaska.

---

[1] The SA Agreement requires payment of 25% of the recovery of insured gold. The State Agreement requires payment of 10% of the recovery of personal gold (as defined therein).

L. Meier Decl., Ex. 4, p. 38 of 275

3.     **Lien on Intellectual Property**. Ocean Mar hereby grants MK a security interest in and to all of Ocean Mar's intellectual property, including, without limitation, computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc. that is related to the salvage of the SS Islander and that is obtained or created during any of Ocean Mar's salvage recovery efforts funded by MK after the date hereof (the "**Intellectual Property**"). For sake of clarity, the Intellectual Property will not include any intellectual property created by Ocean Mar prior to the date of this Agreement. MK's security interest shall be evidenced by a lien on the Intellectual Property (the "**Lien**"). The Intellectual Property will be downloaded to a media disc on a daily basis and held by Cairncross & Hempelmann, P.S. in escrow pursuant to the terms of an escrow agreement ("**Escrow Agreement**") until the Lien is satisfied or otherwise released. The Lien will be released to Ocean Mar (or its successor in interest) when MK receives payment pursuant to this Agreement that is equal to or greater than the Recovery Investment plus interest at 12% per annum. Except for payments received by Ocean Mar with respect to revenues generated from the Media Rights (described in Section 5 below) which are not subject to MK's security interest or Lien, in no event shall Ocean Mar be entitled to revenues from the use of the Intellectual Property until MK receives payment in full.

4.     **Salvage and Recovery Operations**.

(a)     MK will consult in good faith with its team of experts, which will include Ted Jaynes, before making operational decisions with regard to the Salvage; however, MK will have final say on all operational matters related to the Salvage.

(b)     Ocean Mar, Inc. will be represented (by either Ted Jaynes personally or Jed Powell on his behalf) on the Salvage vessels at all times to ensure that the Salvage is conducted in full compliance with the Court approved Recovery Plan to be prepared by Cairncross & Hempelmann, P.S. (the "**Recovery Plan**"). Ocean Mar and MK will work with Cairncross & Hempelmann, P.S. attorneys to assemble a team of qualified experts to handle the logging, securing, storage, transportation, conversion, and ultimate distribution of gold and artifacts recovered during the Salvage. The parties agree and understand that the handling of all gold and artifacts from the point of recovery to the point of ultimate distribution will be in accordance with the State Agreement, the SA Agreement, and the requirements of the Court.

(c)     MK reserves the exclusive right to remove at any time any persons from the vessels located at the site of the Salvage operations in Juneau, Alaska if (i) such persons become continuously argumentative, combative, disruptive, or in any way consistently challenge the authority of Rodger May while Mr. May conducts onsite Salvage operations, or (ii) such persons' behavior causes or poses a serious risk to the safety of the crew and/or technology used at the site of the Salvage operations. Notwithstanding anything in this Agreement to the contrary, if Ocean Mar's on-board representative is removed from any vessel located at the site of the Salvage operations, MK agrees that Jed Powell, in consultation with Ted Jaynes, has the unfettered right to appoint any other person, including Jed Powell, to participate in the onsite Salvage operations and be on board such vessel or vessels in order to protect the interests of Ocean Mar, and MK agrees that such designated person cannot be removed from the vessels without Jed Powell's written approval.

L. Meier Decl., Ex. 4, p. 39 of 275

     (d)    MK understands that persons and/or entities may have pirated some of the gold from the SS Islander in violation of contracts and/or NDAs with Ocean Mar. MK has the right to fund any action or lawsuit against such persons or entities in order to recover any stolen gold and artifacts. All funds expended by MK in connection with the action or lawsuit against such persons or entities shall be considered part of the Recovery Investment and subject to Section 2(a).

5.    **Media Rights and Revenues**.

     (a)    MK and Ocean Mar want to contract with any and all available media entities the best available contracts for the exploitation of the media rights attending this adventure. These media rights shall be limited to the following: television, video, and feature and/or documentary film rights related to the Salvage operation ("**Media Rights**"). Notwithstanding the provisions of paragraph 3 herein, MK will have exclusive rights to negotiate and enter into media contracts for the licensing of the Media Rights on best terms available subject to final approval by Ocean Mar. Ocean Mar will not contact any of the media entities during the period in which MK is negotiating these contracts.

     (b)    All revenues generated from the licensing of the Media Rights ("**Licensing Revenues**") will be distributed as follows:

     (i)    thirty-three percent (33.3%) of all Licensing Revenues will be paid to Ted Jaynes (Ted Jaynes agrees to pay the first $400,000 of such Licensing Revenues to Cairncross & Hempelmann, P.S. for past due legal fees);

     (ii)    thirty-three percent (33.3%) of all Licensing Revenues will be paid to MK; and,

     (iii)    thirty-three percent (33.3%) of all Licensing Revenues will be held in escrow by Cairncross & Hempelmann, P.S. pursuant to the terms of the Escrow Agreement. Any remaining escrowed Licensing Revenues shall only be released: (i) to an entity or person if MK and Ocean Mar jointly direct Cairncross & Hempelmann, P.S. to distribute such funds to that entity or person, or (ii) in equal amounts to MK and Ocean Mar one year from the date that the Licensing Revenues are first received by MK and Ocean Mar.

     (c)    In the event this Agreement is terminated, MK shall be entitled to all Media Rights and its share of the Licensing Revenues for those media contracts entered into during the term of this Agreement. For media contracts that were in the process of negotiation but not finalized during the term of this Agreement, and for all Media Rights obtained after the termination of this Agreement in which MK and/or its principals, employees and agents were a part of the subject matter thereof, MK shall receive twenty-five percent (25%) of all Licensing Revenues therefrom.

6. **Confidentiality**.

(a) MK acknowledges and agrees that all information, knowledge or data concerning or relating to the Salvage to which MK has been or shall become privy by reason of this Agreement, discussions or negotiations relating to this Agreement, or financing of the Salvage, whether orally or in writing, that has not already been publicly disclosed by Ocean Mar shall be considered confidential information of Ocean Mar (the "**Confidential Information**"). MK agrees that, except with the prior written permission of Ocean Mar, it shall at all times keep confidential and shall not use, divulge, furnish, publish or otherwise disclose or make accessible to anyone, or permit the use by others, any of the Confidential Information. To the extent any press release is to be published regarding the Salvage, MK and Ocean Mar will jointly agree on the content of such press release.

(b) Ocean Mar acknowledges and agrees that all the Intellectual Property will be kept confidential until such time as the Lien is released to Ocean Mar or its assigns. Ocean Mar also agrees to keep confidential the identity of MK and its owners and MK's contractual relationships with third parties; provided, however, that Ocean Mar may disclose MK's involvement in the Salvage to Ocean Mar's investors so long as MK's identity is not revealed to such investors.

7. **Non-Competition**.    During the term of this Agreement neither party and/or its affiliates and assigns shall directly or indirectly, engage in, nor directly or indirectly finance, own any interest in, be employed by, or work for on a contractual basis any business or business entity which engages or intends or attempts to engage in, activities related to the Salvage. And for a period of sixty (60) months after the termination of this Agreement or the financing relationship memorialized herein, regardless of the reason either may end, MK and its affiliates and assigns shall not, directly or indirectly, engage in, nor directly or indirectly finance, own any interest in, be employed by, or work for on a contractual basis any business or business entity which engages or intends or attempts to engage in, activities related to the Salvage, unless MK is engaged in the Salvage after foreclosing on the Lien. Ocean Mar and MK agree that an example of a company that would fall within the scope of this non-compete includes, without limitation, Yukon Recovery, Inc., a company that was previously involved in a dispute with Ocean Mar related to the rights to perform the Salvage. This dispute eventually led to litigation and was resolved solely in favor of Ocean Mar pursuant to the August 28, 1998 Order from Court.

MK acknowledges that the terms of this Agreement, including this Section 7, are reasonably necessary to protect Ocean Mar's legitimate business interests and are reasonably limited in scope and duration.

8. **Injunctive Relief**.    MK and Ocean Mar mutually acknowledge that any violation by MK or Ocean Mar of any provision of this Agreement may cause the offended party (be it Ocean Mar or MK) substantial and irreparable injury. Therefore, MK and Ocean Mar agree that, upon a violation or threatened violation of any such Section, the offended party will be entitled, in addition to any other remedies it may have under this Agreement or at law, to seek injunctive and other equitable relief to prevent or curtail such violation.

9. **Indemnification**. From and after the execution date of this Agreement, Ocean Mar shall indemnify, defend, save and hold harmless MK from and against any damage, liability, loss,

expense or injury (including, without limitation, reasonable attorneys' fees and costs and expenses incident to any claim, suit action or proceeding) suffered by MK with respect to claims against Ocean Mar, Ted Jaynes, or their affiliates and assigns whether known or unknown, that exist as of the date of this Agreement. Ocean Mar's indemnification obligations hereunder only extend to claims for direct damages, not consequential, special, indirect, incidental, or punitive damages.

10.     **Insurance Requirements.** MK shall at all times during the term of this Agreement provide and maintain in effect those insurance policies and minimum limits of coverage as designated below, and any other insurance required by law in any jurisdiction where MK or its affiliates, contractors and assigns perform services related to this Agreement, with insurance companies authorized to do business in the jurisdiction where the work is to be performed and will comply with all those requirements as stated below. 50% of the cost of this insurance will be reimbursed to MK from Ocean Mar's recovery, if any, from the salvage. MK does not get a multiplier on insurance premiums paid.

    (a)     Workers' Compensation insurance shall be provided by MK as required by any applicable law or regulation and, in accordance with the provisions of the laws of the nation, state, territory or province having jurisdiction over MK's employees. If any such applicable jurisdiction has a social scheme to provide insurance or benefits to injured workers, MK must be in full compliance with all laws thereof;

    (b)     MK shall carry Commercial General Liability insurance covering all operations by or on behalf of MK or its affiliates and contractors arising out of or connected with this Agreement including coverage for bodily injury, death, property damage, personal and advertising injury, products liability, completed operations liability, claims by one insured against another insured, with limits of not less than $1,000,000 per occurrence. The "your work" exclusion in such insurance shall except damage caused by work done by a company of the insured. Such insurance must be on an "occurrence" basis and not "claims-made" basis;

    (c)     MK shall carry Hull, Machinery, Equipment, and Dinghy insurance that covers the operation of its boats on domestic and international waters, including coverage for damage to the hull, or other parts of the boat and any injuries to the crew or other passengers on the boat, including persons that carry out diving services from the boat, with limits not less than $1,000,000 per occurrence;

    (d)     MK shall carry Umbrella Liability and/or Excess Liability insurance for not less than $10,000,000 per occurrence in excess of the limits provided by MK's Commercial General Liability insurance policy. The Umbrella/Excess policy shall not contain an exclusion for contractual liability;

    (e)     Ocean Mar, its subsidiaries and affiliates, and their respective officers, directors, employees and agents shall be named as Additional Insureds for the insurance policies required to be maintained by MK under this Agreement. The policies shall provide that MK's insurance shall be primary to and noncontributory with any and all other insurance maintained or otherwise

L. Meier Decl., Ex. 4, p. 42 of 275

afforded to MK, its subsidiaries and affiliates, and their respective officers, directors, employees and agents;

(f)     Certificates of Insurance or other formalized evidence of the coverages required above shall be furnished by MK to Cairncross & Hempelmann, P.S. when this Agreement is signed, or within a reasonable time thereafter, and within a reasonable time after such coverage is renewed or replaced. If reasonably requested by Ocean Mar, a certified copy of the actual policies with appropriate endorsements shall be provided to Ocean Mar. Any acceptance of insurance certificates by Ocean Mar shall not limit or relieve MK of the duties and responsibilities with respect to maintaining insurance assumed by it under this Agreement; and

(g)     If MK does not comply with the insurance requirements of this Section 10, Ocean Mar may, at its option, provide insurance coverage to protect Ocean Mar and MK and charge MK for the cost of such insurance.

11.     **Termination**. This Agreement may be terminated by MK at any time, without cause upon written notice to Ocean Mar. In the event of termination, MK's funding obligations shall cease, including obligations for payments under the Consulting Contract or for payments to any other consultants and subcontractors, and its rights to receive future proceeds from the salvage operations contemplated in this Agreement shall terminate, with the exception of its rights to a return of the Recovery Investment and future License Revenues as set forth in Sections 2, 3 and 5 herein which shall survive the term of this Agreement. In the event of termination of this Agreement for any reason, Sections 6 – 13 and 15-17 shall also survive termination of this Agreement.

12.     **Notices**. All notices required or permitted to be given under this Agreement (collectively, including any Requests, "**Notices**") shall be in writing. Notices may be served by certified or registered mail, postage paid with return receipt requested; by private courier, prepaid; or personally. Mailed notices shall be deemed delivered five days after mailing, properly addressed. Couriered notices shall be deemed delivered when delivered as addressed, or if the addressee refuses delivery, when presented for delivery notwithstanding such refusal. Personal delivery shall be effective when accomplished. Unless a party changes its address by giving notice to the other party as provided herein, notices shall be delivered to the parties at the following addresses:

(a)     Notice to Ocean Mar: By notice to:

Ted Jaynes
c/o Cairncross & Hempelmann, P.S.
524 Second Ave., Suite 500
Seattle, WA 98104
Attn.: Jed Powell

(b)     Notice to MK: By notice to:

MK Salvage Venture, LLC
4209 21st Avenue W.
Suite 400

L. Meier Decl., Ex. 4, p. 43 of 275

Seattle, WA 98199
Attn: Peter Kuttel and Rodger D. May

13. **Independent Counsel.** MK acknowledges that this Agreement has been prepared on behalf of Ocean Mar by Cairncross & Hempelmann, P.S. and that MK has elected to retain Vi Jean Reno as its independent counsel in connection with the negotiation of this Agreement. Cairncross & Hempelmann, P.S. is not representing, nor acting on behalf of MK with regard to the formation of this Agreement.

14. **Transfer Prohibited.** Neither this Agreement nor any of the rights of the parties hereto may be transferred or assigned by either party without the other party's prior written consent; provided, however, MK's rights under this Agreement may be assigned to any entity in which Rodger May and/or Peter Kuttel (i) own at least 51% of such entity's voting power, or (ii) Rodger May and/or Peter Kuttel are the CEOs/Presidents, managers, managing members or general partners. MK represents, warrants and covenants that Rodger May, Peter Kuttel and/or entities controlled by each of them, currently own and will continue to own at least 51% of the voting power of MK and that Rodger May and Peter Kuttel will continuously serve as the co-Operating Managers of MK with full authority and power to act for, and represent the interests of MK.

15. **Choice of Law; Venue.** This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Washington, without giving effect to principles and provisions thereof relating to conflict or choice of laws, irrespective of the fact that any one of the parties is now or may hereafter become a resident of a different state. Venue for any action under this Agreement shall lie in the state and federal courts located in King County, Washington. In the event of a dispute between the parties concerning this Agreement or the subject matter thereof, the most prevailing party shall be entitled to recovery of its reasonable attorney's fees and costs incurred, regardless of whether suit was instituted or on appeal.

16. **Waiver; Amendment.** This Agreement, and the terms and conditions hereof, may only be amended, terminated, or waived with the written consent of all of the parties hereto.

17. **Miscellaneous.** This Agreement: (a) sets forth the entire agreement of Ocean Mar and MK with respect to the subject matter hereof; and (b) shall inure to the benefit of, and be binding upon, Ocean Mar, MK, and their respective heirs, legal representatives, successors, and assignees.

**[Remainder of Page Intentionally Left Blank; Signature Page Follows]**

Accepted and agreed to as of the date first written above.

**OCEAN MAR (WASHINGTON) INC.**

By: _____

Name:   Theodore Jaynes

Title:   President

Date:   3-29-12

**MK SALVAGE VENTURE, LLC**

By: _____

Name: _____

Title: _____

Date: _____


By: _____

Name: _____

Title: _____

Date: _____

Accepted and agreed to as of the date first written above.

OCEAN MAR (WASHINGTON) INC.

By: _____

Name: Theodore Jaynes

Title: President

Date: 3-29-12

MK SALVAGE VENTURE, LLC

By: _____

Name: Rodger May

Title: _____

Date: 3-29-12


By: _____

Name: _____

Title: _____

Date: _____

{01884280.DOC;9 }

L. Meier Decl., Ex. 4, p. 46 of 275

## Exhibit A

## Ted Jaynes Consulting Agreement

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "**Agreement**"), dated as of March 28, 2012, is by and between MK Salvage Venture, LLC, a Washington limited liability company (the "**Company**") and Theodore P. Jaynes ("**Consultant**"). All terms not otherwise defined herein shall have the meaning ascribed thereto in that certain Financing and Salvage Management Agreement (the "**Financing Agreement**") by and between the Company and Consultant and dated of even date herewith.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

**1.**     **Engagement of Consultant**.  The Company hereby engages Consultant to provide services to the Company, and Consultant hereby accepts such engagement, on the terms and conditions set forth herein.

**2.**     **Description of Services**.  Throughout the term of this Agreement, Consultant shall provide services (the "**Services**") to the Company on a variety of matters relating to the salvage and recovery of the S.S. Islander, as further described in the Financing Agreement (the "Salvage").  Subject to the rights of Ocean Mar and/or Consultant set forth in the Financing Agreement, including, without limitation, Section 4 of the Financing Agreement, the type and manner of services provided by Consultant shall be at the sole and absolute discretion of Company. Nothing herein shall limit Consultant's right to engage in activities outside the scope of this Agreement, provided that such activities are not inconsistent with the terms of this Agreement.

**3.**     **Compensation**.  Company will pay Consultant as follows:

(a)     A onetime payment of $15,000 upon the date this Agreement is executed by the parties as more particularly set forth in the Financing Agreement.

(b)     A flat fee of $5,000 per month as compensation for the Services beginning on May 1, 2012, or the date on which Mr. Jaynes, Company's owners or employees, or any persons or entities hired by Company to assist with the Salvage operations first depart for Juneau, Alaska in connection with the Salvage.  Payment for such monthly fee shall be due within 10 days of the end of each completed month and shall be pro-rated with respect to any partially completed months. Company will not pay Consultant for his expenses incurred in connection with the Services.  Company's obligation to pay this monthly fee shall cease at such time as this Agreement terminates in accordance with the provisions of paragraph 4 herein.,

L. Meier Decl., Ex. 4, p. 48 of 275

4.    **Term and Termination**.

(a)    This Agreement shall commence on March 28, 2012, and shall continue until the earlier of the date that (i) Company ceases to be involved with the Salvage through termination of the Financing Agreement or (ii) Ted Jaynes receives Salvage recovery proceeds as a result of the recovery of gold during the Salvage.

(b)    Upon the termination or expiration of this Agreement, the Company shall pay Consultant any fees owed prior to the date of termination.

5.    **Duty of Full Disclosure**.  Upon execution of this Agreement Consultant represents and warrants that he shall have a duty of full disclosure to the Company with respect to all aspects of the Salvage.  The parties acknowledge that Consultant's knowledge of the Salvage operations is critical to the continuance of the Salvage and it is agreed that Consultant's duty of full disclosure is for the purpose of continuing operations in the event of Consultant's death or incapacity.  The Company represents and warrants that all information received from Consultant shall not be deemed Intellectual Property (as defined in the Financing Agreement) of Company and shall be subject to the Confidentiality provisions and Non-Competition provisions of the Financing Agreement.

6.    **Independent Contractor Status**.  The parties agree that Consultant is an independent contractor and not an employee of the Company.  Consultant is not entitled to worker's compensation, retirement, insurance or other benefits provided to employees of the Company, nor will the Company make deductions from the advisory fees for taxes, insurance, bonds or any other subscription of any kind, which shall be Consultant' sole responsibility.  Consultant acknowledges that he is responsible for the payment of all personal taxes, fees and other assessments arising from providing the Services and shall otherwise comply with applicable laws, ordinances, regulations and other government requirements related thereto.  The parties acknowledge and agree that neither party has the power or authority to act for, represent or bind the other in any manner, except as so authorized in writing by the Company or Consultant.  This Agreement is expressly not intended to create a joint venture, partnership, agency, employment or other relationship.

7.    **Miscellaneous**.

(a)    If court or alternative dispute resolution proceedings are required to enforce any provision of this Agreement, the substantially prevailing party shall be entitled to an award of reasonable costs and expenses of litigation or dispute resolution proceeding and any appeal, including reasonable attorneys' fees.

(b)    If any provision of this Agreement is held to be unenforceable as written, it shall be enforced to the maximum extent allowed by applicable law.

(c)    Neither this Agreement nor any of the rights, interests, or obligations under this Agreement will be assigned by any party without the prior written consent of the other party.

L. Meier Decl., Ex. 4, p. 49 of 275

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

(d)     This Agreement constitutes the entire agreement between the Company and Consultant, represents the final and complete expression of the parties' agreement on the subject matter hereof, and merges all prior and contemporaneous communications with respect to the subject matter hereof.  This Agreement may not be modified except by a subsequent written agreement signed by both parties.

(e)     This Agreement shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of Washington. Venue for any action under this Agreement shall lie in the state and federal courts located in King County, Washington.

(f)     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and together will constitute one and the same instrument.  A facsimile signature or an emailed signature shall have the same force and effect as an original signature.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

## SIGNATURE PAGE TO CONSULTING AGREEMENT

The Company and Consultant have executed this Agreement as of the date first above written.

**COMPANY:**  **MK SALVAGE VENTURE, LLC**

By: _____

Name: _____

Title: _____

Date: _____


By: _____

Name: _____

Title: _____

Date: _____


**CONSULTANT:**  **THEODORE P. JAYNES**

## Exhibit B

### Recovery Distribution Examples

**Attached.**

| Investment Amount | $ 5,000,000.00 | | |
|---|---|---|---|
| | | | |
| Recovery Amount (15X) | | | |
| 15 | | $ | 75,000,000.00 |
| | | | |
| **Less:** | | | |
| Salvage Association | | | 18,750,000.00 |
| Rodger 7X or $30M Cap | | $ | 30,000,000.00 |
| **Distributable Proceeds** | | $ | 26,250,000.00 |
| | | | |
| Rodger May | | $ | 13,125,000.00 |
| Ocean Mar | | $ | 13,125,000.00 |

Table below works up to $4,285,714

| Investment Amount | $ 1,500,000.00 | | |
|---|---|---|---|
| | | | |
| Recovery Amount (15X) | | | |
| 15 | | $ | 22,500,000.00 |
| | | | |
| **Less:** | | | |
| Salvage Association | | | 5,625,000.00 |
| Rodger 7X or $30M Cap | | $ | 10,500,000.00 |
| **Distributable Proceeds** | | $ | 6,375,000.00 |
| | | | |
| Rodger May | | $ | 3,187,500.00 |
| Ocean Mar | | $ | 3,187,500.00 |

L. Meier Decl., Ex. 4, p. 53 of 275

## ESCROW DEPOSIT AGREEMENT

This ESCROW DEPOSIT AGREEMENT (this "**Agreement**") dated as of this 28th day of March 2012, by and among Ocean Mar (Washington) Inc. a Delaware corporation ("**Ocean Mar**"), having an address c/o Cairncross & Hempelmann at 524 2nd Avenue, Suite 500 Seattle, Washington, MK Salvage Venture, LLC, a Washington limited liability company and or its assignees (collectively, "**MK**"), having an address at 4209 21st Avenue W, Suite 400 Seattle, Washington, and Cairncross & Hempelmann, P.S. (the "**Escrow Agent**"), a Washington personal services corporation, having an office at 524 Second Avenue Suite 500, Seattle Washington. All capitalized terms not herein defined shall have the meaning ascribed to them in that certain Financing and Salvage Management Agreement dated March 28, 2012, as amended or supplemented from time-to-time, including all attachments, schedules and exhibits thereto (the "**Financing Agreement**"). All capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Financing Agreement.

## W I T N E S S E T H:

**WHEREAS**, Ocean Mar, and MK desire to establish an escrow account with the Escrow Agent into which (i) Ocean Mar will deposit the IP, and (ii) certain media companies may deposit checks and other instruments for the payment of Licensing Revenues, and Escrow Agent is willing to accept the deposit of said IP and Licensing Revenues in accordance with the terms hereinafter set forth;

**WHEREAS**, Ocean Mar and MK represent and warrant to the Escrow Agent that they have not stated to any individual or entity that the Escrow Agent's duties will include anything other than those duties set forth in this Agreement; and

**NOW, THEREFORE, IT IS AGREED** as follows:

1.  Delivery of Escrow Funds.

    (a)  Ocean Mar shall deposit one third of all Licensing Revenues paid to it to the following account by means of check or wire transfer to Washington Trust. Escrow agent shall then deposit such checks or wire transfers into a non interest-bearing account at Signature Bank entitled "Signature Bank, as Escrow Agent for NorWesTech, Inc." (the "**Escrow Account**").

    (b)  The collected funds deposited into the Escrow Account are referred to as the "**Escrow Funds.**"

    (c)  Ocean Mar shall download all Intellectual Property onto a disk on a daily basis and such disk or disks (the "**IP Disks**") shall be held by Escrow Agent. The IP Disks shall be held by Escrow Agent in a safe place until they are released by Escrow Agent pursuant to this Agreement.

1

L. Meier Decl., Ex. 4, p. 54 of 275

2.     Distribution of Escrow Funds. The Escrow Funds shall be paid by the Escrow Agent to third parties in accordance with the following:

(a)     In the event that Ocean Mar and MK jointly advise the Escrow Agent in writing that the Escrow Funds, in whole or in part, should be distributed to a third party (the "**Distribution Notice**"), the Escrow Agent shall promptly pay the amounts set forth in the Distribution Notice to the third party designated therein. The funds paid out to such designated third party shall be free and clear of any and all claims of the Escrow Agent.

3.     Release of Escrow Funds.

(a)     One year from the date that Licensing Revenues are first received by MK and Ocean Mar (the "**Termination Date**"), the Escrow Agent shall promptly distribute to each of the parties 50% of the remaining Escrow Funds. The funds returned to each party shall be free and clear of any and all claims of the Escrow Agent.

(b)     If the Termination Date or any date that is a deadline under this Agreement for giving the Escrow Agent notice or instructions or for the Escrow Agent to take action is not a business day, then such date shall be the business day that immediately follows that date. A business day is any day other than a Saturday, Sunday or a bank holiday.

4.     Release of IP Disks. The IP disks will be released to the parties as follows:

(a)     In the event that Escrow Agent receives joint written notice from Ocean Mar and MK that MK has received payment from Ocean Mar in an amount equal to or greater than the Recovery Investment plus interest at 12% per annum (the "**Lien Payment**"), Escrow Agent shall release the IP Disks to Ocean Mar immediately.

5.     Acceptance by Escrow Agent. The Escrow Agent hereby accepts and agrees to perform its obligations hereunder, provided that:

(a)     The Escrow Agent may act in reliance upon any signature believed by it to be genuine, and may assume that any person who has been designated by MK or Ocean Mar to give any written instructions, notice or receipt, or make any statements in connection with the provisions hereof has been duly authorized to do so. Escrow Agent shall have no duty to make inquiry as to the genuineness, accuracy or validity of any statements or instructions or any signatures on statements or instructions. The names and true signatures of each individual authorized to act singly on behalf of (i) Ocean Mar are stated on Schedule I(a) (the "**Ocean Mar Authorized Signatories**") and (ii) MK are stated on Schedule I(b) (the "**MK Authorized Signatories**") which such schedules are attached hereto and made a part hereof. Ocean Mar and MK may each remove or add one or more of its authorized signers stated on their respective sections of Schedule I by notifying the Escrow Agent of such change in accordance with this Agreement, which notice shall include the true signature for any new authorized signatories.

2

L. Meier Decl., Ex. 4, p. 55 of 275

(b)     The Escrow Agent will act in good faith and use due care in performing its duties and responsibilities hereunder.  The Escrow Agent may act relative hereto in reliance upon advice of counsel in reference to any matter connected herewith.  The Escrow Agent shall not be liable for any mistake of fact or error of judgment or law, or for any acts or omissions of any kind, unless caused by its willful misconduct or gross negligence.

(c)     Ocean Mar and MK agree to indemnify and hold the Escrow Agent harmless from and against any and all claims, losses, costs, liabilities, damages, suits, demands, judgments or expenses (including but not limited to reasonable attorney's fees) claimed against or incurred by Escrow Agent arising out of or related, directly or indirectly, to this Escrow Agreement unless caused by the Escrow Agent's gross negligence or willful misconduct.

(d)     In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder, the Escrow Agent shall be entitled to (i) refrain from taking any action other than to keep safely the Escrow Funds until it shall be directed otherwise by a court of competent jurisdiction, or (ii) deliver the Escrow Funds to a court of competent jurisdiction.

(e)     The Escrow Agent shall have no duty, responsibility or obligation to interpret or enforce the terms of any agreement other than Escrow Agent's obligations hereunder, and the Escrow Agent shall not be required to make a request that any monies be delivered to the Escrow Account, it being agreed that the sole duties and responsibilities of the Escrow Agent shall be to the extent not prohibited by applicable law (i) to accept checks or other instruments for the payment of money and wire transfers delivered to the Escrow Agent for the Escrow Account and deposit said checks and wire transfers into the non-interest bearing Escrow Account, and (ii) to disburse or refrain from disbursing the Escrow Funds as stated above, provided that the checks received by the Escrow Agent have been collected and are available for withdrawal.

6.     Escrow Account Statements and Information. The Escrow Agent agrees to send to Ocean Mar and MK a copy of the Escrow Account periodic statement, upon request in accordance with the Escrow Agent's regular practices for providing account statements to its non-escrow clients and to also provide Ocean Mar and MK, or their designee, upon request, other deposit account information, including account balances, by telephone or by computer communication, to the extent practicable. Ocean Mar and MK agree to complete and sign all reasonable forms or agreements required by the Escrow Agent for that purpose. Ocean Mar and MK each consent to the Escrow Agent's release of such account information to any of the individuals designated by Ocean Mar or MK, which designation has been signed in accordance with paragraph 3(a) by any of the persons in Schedule I. The Escrow Agent's liability for failure to comply with this section shall not exceed the cost of providing such information.

7.     Resignation and Termination of the Escrow Agent. The Escrow Agent may resign at any time by giving 30 days' prior written notice of such resignation to MK and Ocean Mar.  Upon providing such notice, the Escrow Agent shall have no further obligation hereunder except to hold as depositary the Escrow Funds that it receives until the end of such 30-day period.  In such event, the Escrow Agent shall not take any action, other than receiving and depositing checks

3

L. Meier Decl., Ex. 4, p. 56 of 275

and wire transfers in accordance with this Agreement, until Ocean Mar and MK have designated a banking corporation, trust company, attorney or other person as successor. Upon receipt of such written designation signed by MK and Ocean Mar, the Escrow Agent shall promptly deliver the Escrow Funds to such successor and shall thereafter have no further obligations hereunder. If such instructions are not received within 30 days following the effective date of such resignation, then the Escrow Agent may deposit the Escrow Funds held by it pursuant to this Agreement with a clerk of a court of competent jurisdiction pending the appointment of a successor. In either case provided for in this Section 5, the Escrow Agent shall be relieved of all further obligations and released from all liability thereafter arising with respect to the Escrow Funds.

8.      Termination. Ocean Mar and MK may terminate the appointment of the Escrow Agent hereunder upon written notice specifying the date upon which such termination shall take effect, which date shall be at least 30 days from the date of such notice. In the event of such termination, Ocean Mar and MK shall, within 30 days of such notice, appoint a successor escrow agent and the Escrow Agent shall, upon receipt of written instructions signed by Ocean Mar and MK, turn over to such successor escrow agent all of the Escrow Funds; *provided, however,* that if Ocean Mar and MK fail to appoint a successor escrow agent within such 30-day period, such termination notice shall be null and void and the Escrow Agent shall continue to be bound by all of the provisions hereof. Upon receipt of the Escrow Funds, the successor escrow agent shall become the escrow agent hereunder and shall be bound by all of the provisions hereof and Cairncross & Hempelmann, P.S. shall be relieved of all further obligations and released from all liability thereafter arising with respect to the Escrow Funds and under this Agreement.

9.      Investment. All funds received by the Escrow Agent shall be invested only in a non-interest bearing bank accounts at Washington Trust Bank.

10.     Compensation. Escrow Agent will not be entitled to compensation for the duties to be performed by it hereunder. However, MK shall be obligated to reimburse Escrow Agent for all fees, costs and expenses incurred or that become due in connection with this Agreement or the Escrow Account, including reasonable attorney's fees. Neither the modification, cancellation, termination or rescission of this Agreement nor the resignation or termination of the Escrow Agent shall affect the right of Escrow Agent to retain the amount of any fee which has been paid, or to be reimbursed or paid any amount which has been incurred or becomes due, prior to the effective date of any such modification, cancellation, termination, resignation or rescission. To the extent the Escrow Agent has incurred any such expenses, or any such fee becomes due, prior to any distribution of the Escrow Funds, the Escrow Agent shall advise Ocean Mar and MK and the same shall direct all such amounts to be paid directly at any such distribution.

11.     Notices. All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if sent (a) by hand-delivery, (b) by electronic transmission, if sent by email or facsimile (followed by first-class mail), (c) by nationally recognized overnight courier service or (d) by prepaid registered or certified mail, return receipt requested, to the addresses set forth below:

4

If to Ocean Mar:

    Ted Jaynes
    c/o Cairncross & Hempelmann, P.S.
    524 Second Ave., Suite 500
    Seattle, WA 98104
    Attn.: Jed Powell

If to MK:

    MK Salvage Venture, LLC
    4209 21st Avenue W.
    Suite 400
    Seattle, WA 98199
    Attn:  Peter Kuttel and Rodger D. May

If to Escrow Agent:

    Cairncross & Hempelmann, P.S.
    524 Second Ave., Suite 500
    Seattle, WA 98104
    Attn.: Jed Powell

12.    <u>General</u>.

    (a)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Washington applicable to agreements made and to be entirely performed within such State, without regard to choice of law principles and any action brought hereunder shall be brought in the courts of the State of Washington, located in King County. Each party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any manner permitted by applicable law and consents to the jurisdiction of said courts.

    (b)    This Agreement sets forth the entire agreement and understanding of the parties with respect to the matters contained herein and supersedes all prior agreements, arrangements and understandings relating thereto.

    (c)    All of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by, the parties hereto, as well as their respective successors and assigns.

    (d)    This Agreement may be amended, modified, superseded or canceled, and any of the terms or conditions hereof may be waived, only by a written instrument executed by each

5

L. Meier Decl., Ex. 4, p. 58 of 275

party hereto or, in the case of a waiver, by the party waiving compliance. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver of any party of any condition, or of the breach of any term contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term of this Agreement. No party may assign any rights, duties or obligations hereunder unless all other parties have given their prior written consent.

(e)     If any provision included in this Agreement proves to be invalid or unenforceable, it shall not affect the validity of the remaining provisions.

(f)     This Agreement and any modification or amendment of this Agreement may be executed in several counterparts or by separate instruments and all of such counterparts and instruments shall constitute one agreement, binding on all of the parties hereto.

13.     <u>Form of Signature.</u> The parties hereto agree to accept a facsimile transmission copy of their respective actual signatures as evidence of their actual signatures to this Agreement and any modification or amendment of this Agreement; *provided, however*, that each party who produces a facsimile signature agrees, by the express terms hereof, to place, promptly after transmission of his or her signature by fax, a true and correct original copy of his or her signature in overnight mail to the address of the other party.

**[Signatures follow on next page]**

6

L. Meier Decl., Ex. 4, p. 59 of 275

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the date first set forth above.

**ESCROW AGENT:**

CAIRNCROSS & HEMPELMANN, P.S.

By: _____

    Name: _JED POWELL_

    Title: _Partner_

**OCEAN MAR:**

OCEAN MAR (WASHINGTON) INC.

By: _____

    Name:   Theodore P. Jaynes

    Title:   President

**MK:**

MK SALVAGE VENTURE, LLC

By: _____

    Name:   Rodger D. May

    Title: _____

By: _____

    Name:   Peter Kuttel

    Title: _____

<u>Schedule I</u>

The Escrow Agent is authorized to accept instructions signed or believed by the Escrow Agent to be signed by any one of the following on behalf of Ocean Mar or MK, respectively.

(a)    Ocean Mar (Washington) Inc.

<u>Name</u>                                      <u>True Signature</u>

Theodore P. Jaynes                      _____

(b)    MK Salvage Venture, LLC

<u>Name</u>                                      <u>True Signature</u>

Rodger D. May                           _____

Peter Kuttel                              _____

L. Meier Decl., Ex. 4, p. 61 of 275

**Record of Action of MK Salvage Venture LLC**
**to Distribute All Known Assets**

COME NOW all of the members of MK Salvage Venture LLC, (the "Company"), a Washington limited liability company consisting of Rodger D. May and Bear Enterprises LLC, and they unanimously resolve that:

1.     The only known assets of MK Salvage Venture LLC are:

    a.     The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the "OMI contract") dated March 29, 2012, as amended;

    b.     The right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under Paragraph 2(a)(i) of the OMI contract;

    c.     Any rights to other salvage recovery proceeds under Paragraph 2 of the OMI contract, except as set forth in the immediately preceding paragraph;

    d.     The protector vessel AU1, USCG Official No. 1199468, and appurtenances;

    e.     Ownership units of Gold Leaf Productions, LLC, an Alaskan limited liability company, Entity No. 1001005; and

    f.     Wells Fargo Bank Account No. 3139238962.

2.     The assets of MK Salvage Venture LLC will be distributed as follows:

    a.     To Rodger D. May, all assets as described in ¶ 1(a), ¶ 1(c), and ¶ 1(e) above, at no cost to him;

    b.     To Bear Enterprises LLC, the asset described in ¶ 1(d) above. Bear Enterprises LLC will pay $180,000 to Rodger D. May for this asset;

    c.     To Rodger D. May and Bear Enterprises LLC equally, the asset described in ¶ 1(b) above; and

    d.     The bank account identified in ¶ 1(f) above will be distributed in accordance with ¶ 7 below.

EXHIBIT C Page 1 of 3

L. Meier Decl., Ex. 4, p. 62 of 275

3.    By this resolution, MK Salvage Venture LLC hereby assigns all of its right, title, and interest in the salvage contract rights described in ¶ 1(a) and ¶ 1(c), above to Rodger D. May, as well as the ownership units of Gold Leaf Productions, LLC to Rodger D. May. As of the date of execution of this Record of Action, and except as provided herein, Bear Enterprises LLC shall have no further right to gold recovered by Rodger D. May in any salvage efforts initiated by Rodger D. May.

4.    By this resolution, MK Salvage Venture LLC hereby assigns all of its right, title and interest in the reimbursement rights set forth in ¶ 1(b) above, to its two members equally: Rodger D. May and Bear Enterprises LLC.

5.    Peter J. Kuttel, as a representative of MK Salvage Venture LLC, shall execute a Coast Guard form of Bill of Sale (USCG Form 1340) in substantially the form attached, so as to transfer title of the vessel AU1 from MK Salvage Venture LLC to Bear Enterprises LLC.

6.    The members of MK Salvage Venture LLC shall execute a Release of Hold Harmless in substantially the form attached.

7.    MK Salvage Venture LLC has one bank account, located at Wells Fargo Bank, and this account is used to pay routine expenses. This account shall remain in place to cover any corporate tax liabilities and tax preparation expenses, plus vessel expenses until title has been transferred. After all expenses have been paid, any remaining account balance shall be distributed to the Company members equally.

8.    MK Salvage Venture LLC agrees that any applicable tax losses to which the Company is entitled shall be taken in tax year 2015.

9.    The Company's regular certified public accountants will be directed to prepare final tax returns for 2015 and 2016.

10.    Counsel for Rodger D. May and Peter J. Kuttel shall execute a Stipulation and Order of Dismissal, with prejudice and without costs to either party, of the lawsuit filed in King County Superior Court, Cause No. 16-2-00620-5 SEA, Kuttel v. May.

11.    After the distribution of all assets and the payment of all expenses as set forth above, MK Salvage Venture LLC authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the Washington Secretary of State and to the State of Alaska Department of Commerce, a Certificate of Dissolution.

[ *signature page follows* ]

Page 2

EXHIBIT C Page 2 of 3

L. Meier Decl., Ex. 4, p. 63 of 275

Dated this _____ day of August, 2016.

RODGER D. MAY

_L_____

Rodger D. May, Member
MK Salvage Venture LLC

BEAR ENTERPRISES LLC

_____

Bear Enterprises LLC, Member
MK Salvage Venture LLC

By: _____PETER  KUTNER_____

Its: _____MEMBER_____

### Assignment of MK Salvage Venture LLC Assets

COME NOW all of the members of MK Salvage Venture LLC, (the "Company"), a Washington limited liability company consisting of Rodger D. May and Bear Enterprises LLC, and they unanimously resolve that:

1.    MK Salvage Venture LLC, pursuant to the Record of Action to Distribute Assets dated August ____, 2016, hereby unconditionally sells, assigns, and transfers to Rodger D. May 100% of any and all rights, title, and interest it has in the following:

- The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the "OMI contract") dated March 29, 2012, as amended;

- Ownership units of Gold Leaf Productions, LLC, an Alaskan limited liability company, Entity No. 1001005;

2.    MK Salvage Venture LLC, pursuant to the Record of Action to Distribute Assets dated August ____, 2016, hereby unconditionally sells, assigns and transfers, equally, to Rodger D. May and Bear Enterprises LLC, the right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under ¶ 2(a)(i). Any rights to other salvage recovery proceeds under ¶ 2 of the OMI contract are hereby assigned to Rodger D. May solely.

3.    This assignment is effective as of August __, 2016.

*[ signature page follows ]*

EXHIBIT D Page 1 of 2

L. Meier Decl., Ex. 4, p. 65 of 275

Dated this _____ day of August, 2016.

RODGER D. MAY

_____
Rodger D. May, Member
MK Salvage Venture LLC

BEAR ENTERPRISES LLC

_____
Bear Enterprises LLC, Member
MK Salvage Venture LLC
By: _____PETER KUTTEL_____
Its: _____MEMBER._____

## Record of Action of MK Salvage Venture LLC
## to Dissolve Company

COME NOW all of the members of MK Salvage Venture LLC, (the "Company"), a Washington limited liability company consisting of Rodger D. May and Bear Enterprises LLC, and they unanimously resolve that:

1.  MK Salvage Venture LLC is in the process of winding up all of its affairs and activities in accordance with RCW 25.15.297.

2.  MK Salvage Venture LLC has, in accordance with RCW 25.15.305, distributed all of the assets it holds to its two members, equally, except that it will retain its sole checking account at Wells Fargo Bank, Account No. 3139238962, in order to pay the Company's final expenses, such as income tax, insurance and tax preparation fees and costs. The division of Company assets is as set forth in a separate Record of Action of this same date. After the 2016 taxes and preparation fees and any other routine expenses have been paid, any amount remaining in that bank account will be distributed to its two members equally.

3.  Other than as set forth in ¶ 2 above, MK Salvage Venture LLC knows of no claims against the Company.

4.  After the distribution of all assets and the payment of final expenses as set forth in ¶ 2 above, MK Pacific LLC authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the Washington Secretary of State a Certificate of Dissolution.

Dated this _____ day of August, 2016.

**RODGER D. MAY**

_____
Rodger D. May, Member
MK Salvage Venture LLC

**BEAR ENTERPRISES LLC**

_____
Bear Enterprises LLC, Member
MK Salvage Venture LLC

By: _____

Its: _____

# MUTUAL RELEASE, HOLD HARMLESS AND INDEMNITY AGREEMENT
## (MK Pacific, LLC, MK Salvage Venture LLC, Rodger D. May, Peter J. Kuttel, Bear Enterprises LLC)

FOR THE SOLE CONSIDERATION of the mutual covenants contained herein, the receipt and sufficiency of which is hereby acknowledged, the undersigned, Peter J. Kuttel, Bear Enterprises LLC and Rodger D. May, on behalf of themselves and on behalf of MK Pacific, LLC and MK Salvage Venture LLC, (the "Entities") and any and all affiliated persons, subsidiaries and related companies, their successors and assigns (hereinafter "RELEASORS"), hereby forever release and discharge each other individually, and in their corporate capacity (hereinafter "RELEASEES"), none of whom admit any liability to other Releasors, but all expressly deny any liability from any and all claims, demands or suits of any kind on account of and resulting from any and all damage to any Releasors, arising from their activities as owners, operators, managers, and/or Members of the Entities and the conduct of the business and affairs of the Entities, said damages to include but not be limited to expenses, fees, damages of any kind whatsoever, whether known or unknown, loss of profits, and other costs and expenses. Releasors hereby expressly release the Releasees from any and all obligations which have arisen or may arise under any applicable limited liability company Operating Agreement between the Entities.

Releasors hereby indemnify and hold Releasees harmless from any and all claims for damage, contribution or indemnity brought by any person or entity arising out of the said ownership and conduct of business of the Entities.

This Release, Hold Harmless and Indemnity Agreement extends and applies to the Releasors and all related persons or Entities, and also covers and includes all unknown, unforeseen, unanticipated, and unsuspected injuries, damages, loss and liability, and the

Page 1

L. Meier Decl., Ex. 4, p. 68 of 275

consequences thereof as well as those now disclosed and known to exist. The provisions of any state, federal, local or territorial law or state providing in substance that releases shall not extend to claims, demands, injuries or damages which are unknown or unsuspected to exist at the time of this release to the persons executing this release, are hereby expressly waived.

Releasors hereby declare that the terms of this settlement have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final compromise, adjustment, and settlement that any and all claims, disputed or otherwise, on account of damages above mentioned, and for the express purpose of precluding forever any further or additional claims, arising out of the circumstances stated above.

*[ signature pages follow ]*

Page 2

L. Meier Decl., Ex. 4, p. 69 of 275

IN WITNESS WHEREOF, we have hereunto set our hand and seal(s) this _____ day of August, 2016.

_____
Peter J. Kuttel

_____
Rodger D. May

**BEAR ENTERPRISES LLC**

By: _____

Its: _____

**MK PACIFIC, LLC**

By: _____

Its: _____

**MK SALVAGE VENTURE LLC**

By: _____

Its: _____

L. Meier Decl., Ex. 4, p. 70 of 275

L. Meier Decl., Ex. 4, p. 71 of 275

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| RODGER MAY, an individual, | NO. 19-2-10613-1 |
| Plaintiff, | STIPULATED JUDGMENT |
| v. | ***Clerk's Action Required*** |
| MK SALVAGE VENTURE LLC; a Washington limited liability company; BEAR ENTERPRISES LLC, a Washington limited liability company, and PETER KUTTEL, an individual. | |
| Defendants. | |

COME NOW THE PARTIES HERETO, and stipulate to the entry of the following judgment pursuant to the Settlement Agreement filed concurrently herewith:

## I. JUDGMENT SUMMARY

1. Judgment Creditor:      Rodger May

2. Attorney for Judgment Creditors:      Michael T. Zoretic
ZORETIC LAW, PLLC

3. Judgment Debtors:      MK Salvage Venture LLC
Bear Enterprises LLC

STIPULATED JUDGMENT - 1

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

| 1 | 4. | Attorneys for Judgment Debtor: | Terence K. McGee |
|---|---|---|---|

| 1 | 4. | Attorneys for Judgment Debtor: | Terence K. McGee<br>McGEE LAW OFFICES PLLC<br>(for MK Salvage Venture LLC) |
| 2 | | | |
| 3 | | | James Williams<br>Zachary Davison<br>Perkins Coie LLLP<br>(for Bear Enterprises LLC) |
| 4 | | | |
| 5 | 5. | Principal Judgment Amount: | $30,000,000.00 |
| 6 | 6. | Prejudgment Interest: | $0.00 |
| 7 | 7. | Costs: | $0.00 |
| 8 | 8. | Attorney Fees: | $0.00 |
| 9 | 9. | Post-Judgment Interest | 12% per annum |

## II. JUDGMENT

THIS MATTER came before the Court on stipulation of Plaintiff and Defendants that judgment be entered as stated herein.

Accordingly, it is ORDERED, ADJUDGED and DECREED that judgment in this matter, which is the final determination of the rights of the parties in this action and entered pursuant to the parties' Settlement Agreement entered herewith, is entered as follows:

1. Defendants MK Salvage Venture LLC and Bear Enterprises LLC are liable for Plaintiff Rodger May's damages, jointly and severally, in the amount of THIRTY MILLION DOLLARS ($30,000,000.00) without costs

2. The post-judgment interest rate applicable to the amount of judgment set forth above is 12% per annum commencing from the date of entry as per the Settlement Agreement.

3. Plaintiff's claims against Defendant Peter Kuttel are hereby dismissed with prejudice without costs.

STIPULATED JUDGMENT - 2

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

EXHIBIT G Page 2 of 4

4. Defendants' counterclaims against Plaintiff are hereby dismissed with prejudice without costs.

JUDGMENT ENTERED this _____ day of _____, 2021.

_____
KING COUNTY SUPERIOR COURT JUDGE

Stipulated to form and content by:

ZORETIC LAW

/s Michael T. Zoretic
By_____
Michael T. Zoretic, WSBA #21221
P.O. Box 427
Pateros, WA 98846
206.465.8109 (tel)
mike@zoreticlaw.com(email
Attorney for Plaintiff Rodger May

McGEE LAW OFFICES PLLC

/s Terence K. McGee
By_____
Terence K. McGee, WSBA #6221
19020 Bothell Way NE, Suite D
Bothell, WA 98011
(425) 368-2321 (tel)
(425) 368-2322 (fax)
tkmcgee@mcgeelaw.net (email)
Attorney for Defendant MK Salvage Venture, LLC

PERKINS COIE LLP

/s James F. Williams
By_____

/s Zachary E. Davison
By_____
James F. Williams, WSBA #23613
JWilliams@perkinscoie.com (email)
Zachary E. Davison, WSBA #47873
ZDavison@perkinscoie.com (email)
1201 Third Avenue, Suite 4900

STIPULATED JUDGMENT - 3

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1    Seattle, WA 98101-3099
   (206) 359-8000 (tel)
2    (206) 359-9000 (fax)
   Attorneys for Defendant Bear Enterprises LLC
3    and Peter Kuttel

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    STIPULATED JUDGMENT - 4

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

Intellectual Property Inventory List

| Description | Size | Attached Labels/Notes |
|---|---|---|
| WD My Passport external drive | 500 GB | Drive from Gillware (data recovery) |
| Sony external drive | 500 GB | Rodger May |
| WD My Passport external drive | 1 TB | OMI 1996 Rov Video Box. Islander Bow Video. |
| Seagate external drive | 1 TB | |
| Hitachi Touro Desk Dx3 | 2 TB | |
| HP Pavilion dv4 (laptop) | ~700 GB | |
| Synology | 4 TB (Two drives, each 2 TB) | |
| iOmega | 500 GB | Original Corrupted iPhoto Library |
| Toshiba | 1 TB | Original Broken Drive |

# ATTACHMENT 2

*JURY VERICT REPORTS:*

1. *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Group*, Case No. 1:15-cv-00211 (S.D.N.Y, October 27, 2020) ($855 million jury verdict for software developer against information technology company that misappropriated trade secrets and infringed copyrighted software related to a popular insurance administrative platform)

2. *Optis Wireless v. Apple, Inc.*, Case No. 2:19-CV-00066 (E.D. Texas, August 11, 2020) ($506 million for patent infringement of LTE cellular technology)

3. *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation*, Case No. 2:07-cv-08108 (C.D. Cal., November 9, 2018) ($268 million intellectual property infringement)

4. *Densify v. VMware*, Case No. 19-742-LPS (D. Del., January 24, 2020) ($236 million verdict for infringement of software patent and trademark infringement, subsequently vacated by trial judge for lack of standing)

5. *United States Automobile Association v. Wells Fargo & Co.*, Case No. 2-18-cv-00245 (E. Dist. Texas, November 6, 2019) ($200 million verdict for violation of mobile banking software patent)

6. *United States Automobile Association v. Wells Fargo & Co.*, Case No. 2:18-CV-00366 (E.Dist. Tex., January 13, 2020) (Second verdict for $102.8 million on separate  software technology)

7. *Frontline Processing Corp. v. Global Payments, Inc.*, Case No. 15CV6007 (Dekalb County, Georgia, September 23, 2019) ($135 million to independent sales organization for breach of contract when processor who blocked plaintiff from using defendant's computer systems)

8. *Trinity East Energy, LLC v. The City of Dallas*, Cause No. DC-14-01443 (Dallas County Texas, February 27, 2020) ($44.5 million for breach of contract and fraud for failing to allow oil exploration to drill on parkland as promised)

1. *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Group*, Case No. 1:15-cv-00211 (S.D.N.Y, October 27, 2020)

# KIRKLAND & ELLIS

In the News *Law360*

# Syntel Hit With $855M Trade Secrets Verdict In Software Row

28 October 2020

A New York federal jury slapped Syntel Inc. with an $855 million verdict Tuesday after finding that the information technology company misappropriated trade secrets and infringed copyrighted software related to a popular insurance administrative platform owned by Cognizant.

The massive compensatory and punitive damages award followed almost six years of litigation over TriZetto's Facets Core Administration platform, which is used for processing insurance claims. Cognizant Technology Solutions Corp. and subsidiary TriZetto initially started out as defendants.

In the 2015 suit, Syntel Inc., which has since been acquired by Atos, accused TriZetto of breach of contract. Syntel was after more than $6 billion in damages, according to the case. But TriZetto fired back with counterclaims, hitting Syntec with its own breach of contract claim as well as trade secret misappropriation and copyright infringement.

TriZetto and Cognizant convinced the court to realign the parties so they could proceed as plaintiffs in the trial, according to the case docket.

By clicking "Accept All Cookies," you agree that we can store cookies on your device. We use cookies to improve your Website experience, provide additional security, and remember you when you return to the Website. Privacy Policy

**Cookies Settings**

**Accept All Cookies**

**The jury awarded TriZetto and Cognizant $284.8 million in damages, plus $569.7** million in punitive damages, according to the verdict.

It was one of the first in-person civil jury trials held in the Southern District of New York since the beginning of the COVID-19 pandemic, according to a statement from Kirkland & Ellis LLP, which represented TriZetto and Cognizant.

The Kirkland team called the verdict "a major victory" for its clients. A Cognizant representative declined to comment Wednesday.

Atos said in a statement Wednesday that it has already challenged the validity of TriZetto's claims and will seek to overturn the verdict.

"Atos considers that the jury's verdict is not supported by the evidence presented during the trial or the applicable law," the company said. "In addition, Atos considers the amount of damages grossly out of proportion to the acts complained of."

Atos added that the maximum amount of damages legally available in the case is about $8.5 million.

The dispute goes back to January 2010, when Syntel and TriZetto allegedly started working together. The companies entered into an agreement under which Syntel provided TriZetto with software application and product development, infrastructure, consulting and customer support, as well as other services, according to the complaint.

After Cognizant acquired TriZetto in 2014, it and Syntel stopped working together, per the suit. Under their agreement, Syntel was entitled to receive about $3.4 million in transition rebates from TriZetto, Syntel said. But TriZetto refused to pay up and "unabashedly and admittedly" violated the nonsolicitation and nonhiring provision of the companies' agreement, Syntel claimed.

Syntel filed suit in January 2015. Cognizant and TriZetto initially retained Latham & Watkins LLP, according to the case docket. Kirkland took over the case about a year and a half into the litigation.

L. Meier Decl., Ex. 4, p. 80 of 275

TriZetto fired back with counterclaims in February, accusing Syntel of using its confidential information to compete, according to the docket.

In September 2018, U.S. District Judge Stewart D. Aaron sanctioned Syntel for failing to comply with discovery orders.

Heading into trial, Syntel's claims included breach of contract, intentional interference with contractual relations and misappropriation of confidential information, while TriZetto alleged similar claims against Syntel.

Syntel is represented by Jaren Janghorbani, Nicholas P. Groombridge, Kripa Raman, Crystal Parker, Joshua D. Reich, Cecilia Copperman, J. Steven Baughman and Melissa Alpert of Paul Weiss Rifkind Wharton & Garrison LLP and Todd C. Norbitz, Anne B. Sekel, Robert Weisbein, Nicole M. Marschean, Patrick J. Rodriguez and Norman C. Ankers of Foley & Lardner LLP.

Cognizant and Trizetto are represented by Mike De Vries, Gianni Cutri, Adam Alper, Pat Carson, Leslie Schmidt, Ben Herbert, Adam Kaufmann and Joshua Simmons of Kirkland & Ellis LLP.

The case is Syntel Sterling Best Shores Mauritius Ltd. et al. v. The Trizetto Group Inc. et al., case number 1:15-cv-00211, in the U.S. District Court for the Southern District of New York.

## Related Professionals

Michael W. De Vries, P.C.

Partner / Los Angeles – Downtown

Gianni Cutri, P.C.

Partner / Chicago

Adam R. Alper, P.C.

L. Meier Decl., Ex. 4, p. 81 of 275

Partner / Bay Area – San Francisco

## Patricia A. Carson

Partner / New York

## Leslie M. Schmidt, P.C.

Partner / New York

## Benjamin Herbert

Partner / Los Angeles – Downtown

## Adam M. Kaufmann

Partner / Chicago

## Joshua L. Simmons

Partner / New York

# Related Services

## Practices

- Litigation
- Intellectual Property

# Suggested Reading

- 19 March 2021 In the News Litigator of the Week: Eli Lilly Turns to Kirkland's O'Quinn to Block New Dispute Resolution Procedure Over Drug Discount Program
- 12 March 2021 Article UK's Revised Merger-Review Definitions Will Ease Compliance

L. Meier Decl., Ex. 4, p. 82 of 275

- 12 March 2021 In the News NY Defamation Ruling Seen As Win For Sex Assault Survivors

REPRINTED WITH PERMISSION FROM THE OCTOBER 28, 2020 EDITION OF LAW360 © 2020 PORTFOLIO MEDIA INC. ALL RIGHTS RESERVED. FURTHER DUPLICATION WITHOUT PERMISSION IS PROHIBITED. WWW.LAW360.COM

L. Meier Decl., Ex. 4, p. 83 of 275

2. *Optis Wireless v. Apple, Inc.*, Case No. 2:19-CV-00066 (E.D. Texas, August 11, 2020)

# McKool Smith Secures $506 Million Patent Infringement Verdict For PanOptis Against Apple

MCKOOL SMITH
TRIAL LAWYERS

NEWS PROVIDED BY
**McKool Smith →**
Aug 12, 2020, 13:08 ET

NEW YORK, Aug. 12, 2020 /PRNewswire/ -- McKool Smith, along with Irell & Manella LLP, secured a $506,200,000 patent infringement verdict on behalf of Optis Wireless Technology, LLC, Optis Cellular Technology, LLC, Unwired Planet, LLC, Unwired Planet International Limited, and PanOptis Patent Management (collectively, "PanOptis") against Apple, Inc.

The verdict was announced on August 11, 2020, following a six-day jury trial before Judge Rodney Gilstrap in the U.S. District Court for the Eastern District of Texas in Marshall. Jurors awarded PanOptis $506 million in damages finding that Apple willfully infringed five PanOptis patents, including U.S. Patent Nos. 8,019,332; 8,385,284; 8,411,557; 9,001,774; and 8,102,833, which cover wireless communication technology essential to the 4G LTE wireless standard.

"As we maintained throughout trial, PanOptis made good faith efforts to reach a licensing agreement for Apple to use their valuable intellectual property. Apple failed to negotiate in good faith, declined the licensing opportunity, and infringed PanOptis' patents," said McKool Smith principal Steve Pollinger, trial counsel for PanOptis. "The jury worked very hard to consider the facts and review the evidence in this case. Our client is pleased with the verdict."

Along with Mr. Pollinger, the McKool Smith trial team included firm principals Sam Baxter, Jennifer Truelove, and Jonathan Yim. The Irell & Manella LLP team included Jason Sheasby and Dr. Hong Zhong.

L. Meier Decl., Ex. 4, p. 85 of 275

The case is *Optis Wireless Technology, LLC et al v. Apple Inc.*, case number 2:19-CV-00066, in the United States District Court for the Eastern District of Texas Marshall Division.

With 150 trial lawyers across offices in Austin, Dallas, Houston, Los Angeles, Marshall, New York, and Washington, D.C., McKool Smith has established a reputation as one of America's leading trial firms. Since 2006, the firm has secured 12 nine-figure jury verdicts and 14 eight-figure jury verdicts. The firm has also won more *VerdictSearch* and *The National Law Journal* "Top 100 Verdicts" over the last 10 years than any other law firm in the country. Courtroom successes like these have earned McKool Smith critical acclaim and helped the firm become what *The Wall Street Journal* describes as "one of the biggest law firm success stories of the past decade." McKool Smith represents clients in complex commercial litigation, insurance recovery, intellectual property, bankruptcy, and white collar defense matters.

Contact: Keith Hill, 903-923-9005

SOURCE McKool Smith

Related Links

http://www.mckoolsmith.com

L. Meier Decl., Ex. 4, p. 86 of 275

3. *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation,* Case No. 2:07-cv-08108 (C.D. Cal., November 9, 2018) ($268 million intellectual property infringement)

# Federal Circuit Affirms Alfred E.

NEWS PROVIDED BY
**Alfred Mann Foundation →**
Mar 19, 2020, 17:00 ET

LOS ANGELES, March 19, 2020 /PRNewswire/ -- The U.S. Court of Appeals for the Federal Circuit has affirmed a $268 million award in favor of the Alfred E. Mann Foundation for Scientific Research (AMF) in a long-running dispute with Australia-based Cochlear Corporation over ground-breaking cochlear implant patents.

The Federal Circuit issued a summary affirmance without opinion on March 16 after hearing oral arguments on the appeal on March 6 of this year. The decision upheld a November 2018 judgment by District Court Judge Fernando Olguin that reinstated a jury award in AMF's favor for $134 million and also granted AMF's motion for enhanced damages due to a finding of willful infringement by Cochlear, doubling the jury's damages award.

"This is an enormous win for AMF in litigation that has been ongoing for well over a decade," said John Petrovich, CEO of AMF. "We've known since day one that Cochlear infringed on our groundbreaking patents and are thankful that a jury and the courts agree with us."

"We are gratified at the speedy disposition of this matter by the Federal Circuit following the oral argument. We felt confident in our position in the appeal and are grateful to see that our confidence was justified."

L. Meier Decl., Ex. 4, p. 88 of 275

The dispute dates back to 2007 when AMF – a small nonprofit medical research organization – sued Cochlear for infringing on its patented cochlear implant technology. The $268 million award will allow AMF to carry out its important mission to develop and commercialize innovative solutions for significant unmet or poorly met medical conditions.

In addition to the $268 million award affirmed by the Federal Circuit, AMF seeks approximately $123 million in pre-judgment interest and approximately $14.5 million in attorney fees and costs.

**About the Alfred Mann Foundation**

Founded in 1985 by serial healthcare entrepreneur Alfred E. Mann, the Alfred Mann Foundation for Scientific Research's (AMF) mission is to develop and commercialize innovative solutions for significant unmet or poorly met medical conditions. AMF has developed a myriad of medical devices that change the lives of patients across the globe, including the cochlear implant that enables deaf people to hear, several diabetes products, numerous products in the neuromodulation space for the eradication of pain, and recovery of function. AMF spin-out companies include Axonics Modulation Technologies, Inc.; Medallion Therapeutics; Monolythix, Inc. and Bioness, Inc. AMF is located in Santa Clarita, California.

SOURCE Alfred Mann Foundation

L. Meier Decl., Ex. 4, p. 89 of 275

4.    *Densify v. VMware*, Case No. 19-742-LPS (D. Del., January 24, 2020)

# Reichman Jorgensen Secures $236 Million Patent Infringement Verdict for Densify Against VMware

NEWS PROVIDED BY
**Reichman Jorgensen LLP →**
Jan 27, 2020, 12:30 ET

REDWOOD SHORES, Calif., Jan. 27, 2020 /PRNewswire/ -- Reichman Jorgensen LLP has secured a $236 million patent infringement verdict on behalf of Densify against tech giant VMware, Inc.

The verdict was announced on January 24, 2020, following a nine-day jury trial before Judge Leonard P. Stark in the U.S. District Court for the District of Delaware. Jurors awarded Densify, formerly known as Cirba Inc., $236 million in damages finding that VMware willfully infringed two Densify patents, including U.S. Patent Nos. 8,209,687 and 9,654,367, which cover virtualization technology that enables multiple computer systems to run on a single server.

"As we maintained throughout trial, VMware unlawfully used Densify's intellectual property for its own gain," said Courtland Reichman, lead counsel for Densify. "We are very pleased with the jury's verdict and consider it not only a victory for Densify, but a victory for all technology companies

L. Meier Decl., Ex. 4, p. 91 of 275

who risk being unfairly squeezed out of the market by larger competitors who infringe their valuable inventions."

Along with Mr. Reichman, the Densify trial team included Reichman Jorgensen partners Christine E. Lehman, Khue V. Hoang, Shawna Ballard, and Jennifer P. Estremera, and firm associates Wesley L. White, Kate Falkenstien, Ariel C. Green, Michael G. Flanigan, Leaf Williams, Connor S. Houghton, and Joachim B. Steinberg, along with co-counsel Kenneth L. Dorsney of Morris James LLP, Gary J. Toman of Weinberg Wheeler Hudgins Gunn & Dial LLC, and Peter J. Ayers of the Law Office of Peter J. Ayers, PLLC.

The case is *Cirba Inc. et al. v. VMware Inc.*, case number 1:19-cv-00742, in the U.S. District Court for the District of Delaware.

Reichman Jorgensen LLP is an elite national trial firm that handles high-stakes commercial litigation and intellectual property disputes. The firm is majority women-owned and rejects the billable hour in favor of fee arrangements that align client interests. Reichman Jorgensen's attorneys are diverse, exceptionally credentialed, and passionate about trial advocacy. From offices in Silicon Valley, New York, Washington, D.C., and Atlanta, the firm tries cases and argues appeals throughout the country. For more information, visit www.reichmanjorgensen.com.

For more information, please contact Jennifer Estremera at (650) 623-1407 or jestremera@reich-manjorgensen.com.

SOURCE Reichman Jorgensen LLP

Related Links

http://www.reichmanjorgensen.com

L. Meier Decl., Ex. 4, p. 92 of 275

4. *United States Automobile Association v. Wells Fargo & Co.,* Case No. 2-18-cv-00245 (E. Dist. Texas, November 6, 2019)

<u>NEWS</u>

NEWS

# USAA claims $200M victory in remote deposit patent suit against Wells Fargo

Nov. 7, 2019

USAA announced that it was awarded $200 million in a U.S. District Court jury trial in Marshall, Texas, involving a patent infringement case over Wells Fargo involving its remote deposit capture technology.

L. Meier Decl., Ex. 4, p. 94 of 275

USAA originally filed suit in June 2018 alleging Wells Fargo Mobile Deposit infringed on certain USAA patents for remote check capture.

"The verdict acknowledged the value of USAA's innovation on behalf of members," Nathan McKinley, USAA vice president of corporate development, said in a company release. "We hope the industry acknowledges this verdict as further evidence of the enforceability of these patents."

He said the company's goal was to be reasonably compensated for the benefits that it believes the industry received for the technology.

"Wells Fargo strongly disagrees with this jury verdict and does not believe it has infringed upon USAA's patent rights," the bank said in an emailed statement. "We believe this is an industry issue involving numerous other banks that license remote deposit capture technology from the same vendor, not USAA."

The bank said it is considering its options on the verdict and trial. The bank said the verdict has no impact on the continued use of remote deposit capture and further development of new products.

Remote deposit capture allows bank customers to take a digital photo of a check and deposit that image into their bank account just as if they were making a deposit at an ATM or branch. USAA said the technology is currently used by 87 million bank customers in the U.S.

A separate suit regarding additional patents for the same technology was filed against Wells Fargo in August 2018 and is scheduled for trial in 2020, according to the release.

*Cover image: USAA*

Regulation / Legislation

**RESOURCES**

**TRENDING**

**TOP STORIES**

L. Meier Decl., Ex. 4, p. 95 of 275

5. *United States Automobile Association v. Wells Fargo & Co.*, Case No. 2:18-CV-00366 (E.Dist. Tex., January 13, 2020)

https://www.marshallnewsmessenger.com/news/usaa-scores-102-million-verdict-in-second-wells-fargo-case/article_d79a67fc-34d6-11ea-be3a-2767418ac037.html

# USAA scores $102 million verdict in second Wells Fargo case

Robin Y. Richardson ryrichardson@marshallnewsmessenger.com
Jan 12, 2020

The United Services Automobile Association (USAA) has succeeded again against Wells Fargo in ongoing patent infringement litigation over remote check deposit technologies used in mobile banking systems.

A federal East Texas jury in Marshall's federal court ordered Wells Fargo — the nation's fourth largest bank — to pay $102,792,510 in damages, which is the exact dollar amount the plaintiff was seeking in the case.

The damages cover infringement beginning on Aug. 17, 2018, and through the date of the trial.

The jury also determined that Wells Fargo willfully infringed the two patents-in-suit.

L. Meier Decl., Ex. 4, p. 97 of 275

The verdict comes exactly two months after USAA scored a $200 million verdict in a patent infringement trial against Wells Fargo, held in Marshall's Federal Building and United States Courthouse, in November.

In the latest case, USAA, a reciprocal interinsurance exchange for military service members — claimed Wells Fargo infringed two patented inventions, related to consumer remote deposit technology.

"The patents are, generally speaking, directed to improved computing systems that enable commercially-viable remote check deposit systems, including those used by Wells Fargo, for example, by determining and validating the routing number on a check, converting the file format of a check image, generating a log file containing useful information about the check, converting the file format of a check image, generating a log file containing useful information about the check or its

L. Meier Decl., Ex. 4, p. 98 of 275

image, and/or assisting the user in taking a high-quality check image, for example by instructing the user regarding the proper distance away from the check to hold the camera," the lawsuit states.

USAA claimed that Wells Fargo released its remote deposit capture product years after USAA had implemented its system, and refused to license USAA's product when approached about it in 2017.

"Wells Fargo has generated $1.2 billion in profit from the use of this system. We'll be asking for no less than 85 cents per successful mobile deposit," USAA's attorney, Jason Sheasby, of Irell & Manella law firm of Los Angeles, California, said in opening statements, noting that equates to $102,792,510 in damages that they desired.

"Wells Fargo had the right to use our ideas, but the moment our patent was granted, they had two options — vacate or ask permission," said Sheasby.

Wells Fargo's attorney Danielle Williams, of Winston & Strawn LLP, of Charlotte, North Carolina argued that the patents were a continuation of "some old, earlier" filed applications from the original patents filed on Halloween 2006.

L. Meier Decl., Ex. 4, p. 99 of 275

"The law allows USAA to file application of these old, original applications, but only if… to get the benefit of the Oct. 31, 2006 date, the original application has to include specifications of the invention claimed in the 2018 application," Williams argued.

"The evidence will show the claims in the 2018 patent, for the first time, talked about using a mobile device for check deposit," she contended. "The old 2006 specification only described using a desktop or laptop computer connected to a separate scanner or camera."

"In 2006 USAA didn't write down what it is now claiming it's invention is, so it's 2018 patents are invalid," Williams argued.

In the end, jurors determined that Wells Fargo did not prove its claims of invalidity.

U.S. District Court for the Eastern District of Texas Chief Judge Rodney Gilstrap served as the presiding judge in the case.

Robin Y. Richardson

6. *Frontline Processing Corp. v. Global Payments, Inc.*, Case No. 15CV6007 (Dekalb County, Georgia, September 23, 2019)

# JURY AWARDS $135 MILLION TO ISO IN BREACH-OF-CONTRACT LAWSUIT AGAINST GLOBAL PAYMENTS

👤 Kevin Woodward    🕐 October 2, 2019

📁 Acquiring, Competitive Strategies, Law and Regulation, Transaction Processing

Global Payments Inc. may be on the hook for more than $135 million following a jury verdict in a breach-of-contract lawsuit filed by an independent sales organization against the Atlanta-based processor.

A jury in the Superior Court of DeKalb County in Georgia found that Global Payments breached parts of its merchant-service agreement with Frontline Processing Corp., a Bozeman, Mont.-based ISO. The jury on Sept. 23 awarded the ISO more than $24 million in direct damages and $109.8 million in consequential damages. It also awarded Frontline more than $1 million to cover its costs and attorney fees. Judge Linda W. Hunter signed the judgment Sept. 30.

Global Payments intends to appeal the decision. "We believe this case is completely without merit and will appeal it immediately," says a statement from the processor to *Digital Transactions News*. "The outcome is inconsistent with the facts and well-settled law, and we fully expect to prevail on appeal. We will not stop until this gross miscarriage of justice is reversed."

Frontline filed the suit in 2015 after Global Payments withheld funds to cover its legal costs in a lawsuit the **Consumer Financial Protection Bureau** brought against the processor and two ISOs, Frontline and Pathfinder Payment Solutions Inc., for allegedly providing payment services to malicious merchants. That **case** was dismissed in 2017.

Pathfinder was dismissed by the DeKalb County court as a plaintiff in 2018 when it could not provide an attorney to represent it, says Joe Gleason, Frontline co-counsel and partner at Atlanta-based Gleason Law LLC.

The dispute between Frontline and Global Payments actually preceded the CFPB action, Gleason tells *Digital Transactions News*. In 2013, Frontline and Global Payments were negotiating to extend their

contract, but Global Payments wanted to add terms that Frontline was not willing to agree to, Gleason says.

In 2014, after shopping around, Frontline agreed to a similar deal with First Data Corp. and told Global Payments it would stay if it could match First Data's pricing. "Global did not match the pricing," Gleason says.

Under Frontline's agreement with Global Payments, merchants that Frontline refers to the processor are portable. Global Payments would not allow that, Gleason says, making it one of the breach claims.

"Then the CFPB case comes along and becomes a convenient excuse to destroy Frontline by withholding Frontline's funds, by withholding merchant-reserve funds, by locking Frontline out of Global's computer systems," Gleason says. That effectively cut Frontline out of the picture, he says, placing Global in direct dealings with the referred merchants, another breach allegation.

"In our view, the breach-of-contract cases did not start with the CFPB lawsuit," Gleason says. "Instead, it was just one more step."

Frontline contended that neither the merchant-services agreement nor referral agreement the ISOs had with Global Payments allowed the processor to "deduct as expense or withhold from compensation owed to Pathfinder or Frontline Global's legal fees incurred in defending itself in the CFPB action."



L. Meier Decl., Ex. 4, p. 103 of 275

7. *Trinity East Energy, LLC v. The City of Dallas*, Cause No. DC-14-01443 (Dallas County Texas, February 27, 2020)

# Judge rules Dallas owes gas driller $44.5 million in damages and interest

By **The Texas Monitor Staff** - March 10, 2020

A judge ruled that Dallas owes a gas driller $44.5 million and counting, for parkland drilling right that were granted but later denied, The Dallas Morning News reported.

Judge Craig Smith ruled that the city owes Trinity East Energy $33.6 million in damages and $10.9 million in interest, with an additional $4,608 in interest accruing every day that bill isn't paid.

A jury found in February after a two-week trial that the city was liable for negligent misrepresentation, statutory fraud and a regulatory taking. Jurors recommended the city pay

L. Meier Decl., Ex. 4, p. 105 of 275

damages of between $23 million and $33 million. Smith opted for the maximum.

Trinity East paid the city $19 million in 2008 for drilling rights on the easternmost edge of the Barnett Shale on about 22 acres in northwest Dallas, but the Dallas City Council in 2013 declined to approve the permits needed. The company sued in 2014.

Trinity East attorney Art Anderson told the Morning News, "We're pleased that the court judgment was in conformance with the jury's verdict."

Interim City Attorney Chris Caso didn't immediately respond to the newspaper's request for comment so it's unclear if the city will appeal the verdict, attempt to settle or pay the $44.5 million.

L. Meier Decl., Ex. 4, p. 106 of 275

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | |
|---|---|
| RODGER MAY, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>MK SALVAGE VENTURE LLC; a Washington limited liability company; BEAR ENTERPRISES LLC, a Washington limited liability company, and PETER KUTTEL, an individual.<br><br>        Defendants. | CAUSE NO: 19-2-10613-1<br><br>DECLARATION OF RODGER MAY IN SUPPORT OF MOTION FOR REASONABLENESS DETERMINATION |

I, Rodger May, declare under penalty of perjury of the laws of the State of Washington that the following is true and correct to the best of my knowledge, information and belief, and that I am over 18 years of age:

1.     I am the Plaintiff and submit this Declaration in support of *Plaintiff's and Defendants' Joint Motion for Determination of Reasonableness of Covenant Judgment Settlement.* I make this declaration on personal knowledge and I am competent to testify to the matters stated herein.

2.     The background of the dispute and the events leading up to the subject covenant judgment settlement agreement, as well as copies of many of the pertinent

DECLARATION OF RODGER MAY IN
OPPOSITION TO SUMMARY JUDGMENT- 1

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

documents, are set forth in the Recitals to the "Restated and Amended Settlement Agreement" attached to the joint motion. I stipulate to them for purposes of this Motion, as well.

3. As is stated in the Recitals of our Restated and Amended Settlement Agreement, this lawsuit arises from Defendants' refusal to allow me access and use of Intellectual Property that had been created in Defendant MK Salvage Ventures LLC's previous gold salvage operations on the *SS Islander* wreckage near Juneau, Alaska.

4. My primary goal in filing this lawsuit in April of 2019 was to obtain the right to use the Intellectual Property in further salvage efforts with our court-appointed salvage partner, Ocean Mar, Inc. ("OMI.") As stated in those summaries, I believed and understood that the right to use the Intellectual Property was part of my agreement with Defendant Bear Enterprises LLC and its primary owner, Defendant Peter Kuttel, when we negotiated a dissolution of our business relationship in Defendant MK Salvage Venture LLC. I believed the language and intent of our agreement was that by receiving all rights, title and interest of MK Salvage Venture to conduct further salvage operations with OMI, this would clearly include the right to use the Intellectual Property that had been generated on our previous salvage efforts.

5. I requested access to the Intellectual Property soon after signing the corporate resolutions in November of 2016, but was repeatedly denied any use or access by Bear Enterprises and Mr. Kuttel.

6. I viewed the Intellectual Property as a critical part of any future salvage operations. We had spent over $5 million during our previous salvage operations generating the Intellectual Property and other salvage assets, which contained valuable information about the location of the *SS Islander* wreck, the surrounding area and other aspects of this very complicated salvage operation. Without this information, I believed I would be forced to

DECLARATION OF RODGER MAY IN
OPPOSITION TO SUMMARY JUDGMENT- 2

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

essentially start from scratch and not have the benefit of using the valuable information, charts and data that we had already spent so much money to create.

7.      I was aware that OMI's contract rights with the London-based insurers who owned any remaining *SS Islander* gold cargo had recently expired, but was hopeful that once I received the Intellectual Property, I would be able to work with OMI and the insurers to renew the contract rights and return to the site for further exploration.

8.      Shortly after we filed suit in April 2019, Mr. Ted Jaynes – the owner of OMI – passed away. At about the same time, the Alaska court ordered that the OMI salvage rights were terminated and were awarded to  Tyche High Seas Capital Corp.,  a Florida-based company.

9.      With the OMI contract formally terminated and the salvage rights awarded to a third-party, the focus of my lawsuit shifted to my alternative claim for the economic damages I suffered by being deprived of my contract right to use the Intellectual Property in future salvage operations with OMI.

10.      My damages included the lost opportunity to conduct salvage operations and to recover what could be several hundreds of millions of dollars (or more) of additional gold from the *SS Islander* wreckage. I was further damaged by the loss of my ability to market my existing salvage rights to other investors going forward.

11.      The expert witnesses we retained for purposes of trial prepared an analysis of my damages based on the amount of gold likely still available for salvage around the *SS Islander* wreckage and the fair value of my losses due to the denial of my right to use the IP in future operations. *See Zoretic Dec., Exhibit D.* Fred Holabird, who had been involved in many shipwreck explorations over his long career and had helped with the gold and artifacts recovered from the *SS Islander* wreckage, submitted his opinion that there was likely over $530 million worth of gold still remaining on the ocean floor in and around the *SS Islander*.

DECLARATION OF RODGER MAY IN
OPPOSITION TO SUMMARY JUDGMENT- 3

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

See *Disclosures of Expert Opinions*, p. 23. Using these projections, our economic loss expert Neil Beaton was prepared to testify that my share of the OMI contract rights as assignee of MK Salvage with use of the Intellectual Property was worth at least $60 million. *See Disclosures of Expert Opinions*, p. 23.

12.     I was directly involved in the research and exploration of the *SS Islander* shipwreck and believe these opinions to have been very conservative. I researched the history of the *SS Islander* at the outset of our salvage operations in 2012 when I was considering invest in this project. My research led me to believe there was closer to $1 billion worth of gold or even higher available for recovery, which played heavily into my willingness to invest millions of dollars at the outset.

13.     Mr. Jaynes shared this belief, so we structured the OMI contract (at Section 2) to include profit-sharing provisions specifying the amounts MK Salvage would receive for recoveries up to and exceeding $1.2 billion. MK Salvage was entitled to recover up $230 million in such event.

14.     A major question was whether we would be able to locate the *SS Islander*. It was a substantial achievement when we successfully located the *SS Islander* wreckage in our first voyage in August 2012 and pulled up a steel-wrapped transport box containing two bags of gold dust valued at approximately $1.5 million. This was confirmation to me that the *SS Islander* was likely carrying large amounts of gold as had been documented in the historical records discussed in Mr. Holabird's background testimony and opinions.

15.     While we intended to use these conservative expert opinions in our case, additional and perhaps better proof of my damages would have been if Tyche, the company appointed as the new salvage operator, eventually succeeded in finding more gold than Mr. Holabird's estimates. My damages would have been substantially higher than the conservative $60 million stated by Mr. Beaton.

DECLARATION OF RODGER MAY IN
OPPOSITION TO SUMMARY JUDGMENT- 4

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

16.     This was a wild card that raised the possibility of a wide range of damages in this case, including the possibility that my claim might skyrocket up to the full $230 million amount I would have been entitled to recover as assignee of MK Salvage's rights under the OMI contract.

17.     The importance and value of the Intellectual Property in future operations has been further confirmed by Tyche's interest in using it for future operations. Tyche contacted Bear Enterprises and me in late 2019 about the possibility of partnering with our group to use the Intellectual Property in their future operations. I had not obtained the right to use the Intellectual Property, so I was not in a position to reach an individual agreement with Tyche at that time.

18.     Tyche has conducted at least one salvage operation in late 2019, but were not able to locate the *Islander* wreckage. They have recently confirmed their interest in partnering with me on future operations, with substantial consideration if the Intellectual Property is included. Like OMI and MK Salvage, they also wish to set contingencies for recovery of amounts that could reach upwards of $1 billion or more.

19.     With the case approaching trial in April of 2021, the parties conducted initial settlement discussions in the summer of 2020. We learned that Defendants had tendered my claims to their insurer, who had denied any defense or indemnity obligation.

20.     I was willing to authorize negotiation of a covenant judgment settlement rather than explore a conventional settlement because the high dollar amount of my claim, and the strength of our case, would require a settlement offer from the Defendants in the tens of millions of dollars for me to even begin negotiations. A stipulated covenant judgment for a reasonable amount with an assignment of Defendants' insurance claims seemed to be the only realistic path forward to avoid trial.

DECLARATION OF RODGER MAY IN
OPPOSITION TO SUMMARY JUDGMENT- 5

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

21.    The negotiations of the current settlement agreement took place over a four-month period, from July to November. Many offers and counteroffers were exchanged and negotiated on the agreement's various components, including the covenant judgment amount, before we were finally able to reach the subject settlement in November 2020, and later amended and restated on December 11, 2020.

22.    I believe the $30 million covenant judgment settlement is not only reasonable, but a substantial reduction from my conservative expert-backed claims of $60 million, which likely could greatly exceed that amount by the time we reached trial as set forth above.

23.    The $30 million amount also accounts for fact that the entry of a stipulated covenant judgment is no guarantee of success. As the assignee of Defendants' insurance claims, I will need to incur substantial legal expense and take on the risk of pursuing Defendants' bad faith claims to recover on the stipulated judgment.

24.    I believe the $30 million judgment amount and other terms are a reasonable compromise and settlement of this complex and high-stakes commercial dispute.

Executed on this 19 day of March, 2021 in Kapalua, Hawaii.

_____
Rodger D. May

DECLARATION OF RODGER MAY IN
OPPOSITION TO SUMMARY JUDGMENT 6

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 112 of 275

1
2
3
4
5
6       SUPERIOR COURT OF THE STATE OF WASHINGTON
7                    COUNTY OF KING
8
9   RODGER MAY,                          Case No. 19-2-10613-1 SEA

10                  Plaintiff,           **DECLARATION OF PETER J. KUTTEL**
                                         **IN SUPPORT OF MOTION FOR**
11          vs.                          **REASONABLENESS**
                                         **DETERMINATION**
12  MK SALVAGE VENTURE LLC, BEAR
    ENTERPRISES LLC, and PETER KUTTEL,
13
                    Defendants.
14

15

16          I, Peter J. Kuttel, declare the following under penalty of perjury under the laws of

17  Washington:

18          1.      I am a defendant in this action.

19          2.      I make this declaration on personal knowledge, I am over 18 years of age,

20  and I am competent to testify to the matters stated herein.

21          3.      I own the controlling interest in defendant Bear Enterprises LLC.  Bear

22  Enterprises in turn owns 50% of defendant MK Salvage Venture LLC ("MKSV").  The

23  other 50% of MKSV is owned by plaintiff Rodger May.

24          4.      The background of the dispute and the events leading up to the covenant

25  judgment settlement agreement are set forth in the Recitals to the Restated and Amended

**DECLARATION OF KUTTEL IN SUPPORT OF**          McGee Law Offices pllc
**MOTION FOR REASONABLENESS**                    15711 NE 143rd Place
**DETERMINATION-1-**                             Woodinville, Washington 98072
425-368-2321 ● fax 425-368-2322

Settlement Agreement attached to the joint motion for determination of reasonableness. I further stipulate to these statements of fact for purposes of this motion.

5.     In October 2019, on behalf of all defendants, I directed my insurance broker to tender defense and indemnity of Mr. May's claims to defendants' insurance carrier, Great American Insurance Company of New York.  All defendants (and plaintiff May) were named insureds under the policy.

6.     My deposition, given as the designee of Bear Enterprises under CR 30(b)(6), was conducted on November 5, 2019.

7.     Great American sent a letter dated November 14, 2019, denying any duty to defend or indemnify defendants against the lawsuit filed by Mr. May.  A true and correct copy of that letter is attached as Exhibit A to Mr. McGee's declaration in support of this motion.

8.     Great American's denial of insurance coverage and refusal to defend the lawsuit left me and my company, Bear Enterprises, exposed to Mr. May's claims and forced to fund the litigation going forward.

9.     I attended the December 6, 2019, summary judgment hearing before Judge Cahan.  I was very disappointed when Judge Cahan denied our motion for summary judgment a few days later.  Because we strongly rejected all of Mr. May's claims, we saw settlement on the merits as extremely unlikely and thought the case would have to proceed to trial on the merits.

10.    The litigation of Mr. May's motion to disqualify both of defendants' lawyers, discovery, and summary judgment had already been very time-consuming and expensive.   It became clear as the variety of discovery subjects multiplied and the coronavirus pandemic disrupted proceedings that the case was likely to drag on for many months or years and cost more than $1 million to prepare for and take through

**DECLARATION OF KUTTEL IN SUPPORT OF MOTION FOR REASONABLENESS DETERMINATION-2-**

McGee Law Offices PLLC
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 ● fax 425-368-2322

1  trial.

2        11.    In April 2020 Mr. May disclosed expert opinions indicating he would be

3  seeking at least $60 million from defendants if the case proceeded to trial. While I

4  strongly disagreed with the factual assumptions and opinions of the experts, I realized

5  that Mr. May's claims, if successful, would pose serious financial consequences to Bear

6  Enterprises and me. Defendant MKSV was no longer in business following the break-

7  up of the company in November 2016 and had no financial assets to satisfy any judgment

8  that might be entered in this case.

9        12.    Bear Enterprises is an ongoing business enterprise, and both Bear

10 Enterprises and I have substantial assets. However, a judgment for even a fraction of

11 Mr. May's claimed amount would be damaging to Bear Enterprises and my own

12 financial liquidity.

13       13.    Because I continued to believe that Mr. May's claims were devoid of merit,

14 I was deeply reluctant to offer any significant amount in a conventional settlement, but

15 also realized that Mr. May would demand a very substantial cash payment to resolve the

16 dispute.

17       14.    Mr. McGee reported in May 2020 that Mr. Zoretic had raised the possibility

18 of settling on the basis of a covenant judgment in return for an assignment of defendants'

19 claims against Great American. While I continued to believe in the merits of our defenses

20 and counterclaims, as a businessman I concluded that it made sense to allow my

21 attorneys to enter discussions with Mr. May's counsel about the possibility of a covenant

22 judgment settlement.

23       15.    The negotiations began in earnest in July 2020 and dragged on for several

24 months, with dozens of offers and counteroffers on various issues, including the

25 covenant judgment amount. This negotiation was conducted at arms-length through

**DECLARATION OF KUTTEL IN SUPPORT OF**
**MOTION FOR REASONABLENESS**
**DETERMINATION-3-**

McGee Law Offices pllc
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 ● fax 425-368-2322

counsel and was a hard-fought negotiation that seemed several times to have failed.

16.     After many discussions and overtures between counsel, we finally reached agreement on the covenant judgment settlement before the Court.

17.     I am satisfied that we obtained the best terms possible for a covenant judgment settlement that spared us from the substantial expense of taking the case through trial and the exposure to a possible adverse judgment of over $60 million.

Dated this ____ day of March 2021, in Seattle, Washington.

_____

Peter J. Kuttel

**DECLARATION OF KUTTEL IN SUPPORT OF MOTION FOR REASONABLENESS DETERMINATION-4-**

McGee Law Offices pllc
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 ● fax 425-368-2322

L. Meier Decl., Ex. 4, p. 116 of 275

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | |
|---|---|
| RODGER MAY, an individual, | CAUSE NO: 19-2-10613-1 |
| Plaintiff, | |
| v. | DECLARATION OF MICHAEL T. ZORETIC IN SUPPORT OF MOTION FOR REASONABLENESS DETERMINATION |
| MK SALVAGE VENTURE LLC; a Washington limited liability company; BEAR ENTERPRISES LLC, a Washington limited liability company, and PETER KUTTEL, an individual. | |
| Defendants. | |

I, Michael T. Zoretic, declare under penalty of perjury of the laws of the State of Washington that the following is true and correct to the best of my knowledge, information and belief, and that I am over 18 years of age:

1.     I am the litigation counsel of record for Plaintiff Rodger May in this dispute over the contract salvage rights to the *SS Islander* shipwreck, which occurred in 1901 off the coast of Juneau, Alaska.

2.     I submit this Declaration in support of *Plaintiff's and Defendants' Joint Motion for Determination of Reasonableness of Covenant Judgment Settlement.* I make this declaration on personal knowledge and I am competent to testify to the matters stated herein.

3.     I graduated *cum laude* from University of Puget Sound School of Law (Seattle

DECLARATION OF MICHAEL T. ZORETIC IN
SUPPORT OF MOTION FOR
REASONABLENESS - 1

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

University) in 1991, where I was published member of Law Review. I passed the Washington State Bar in 1991 and have spent the last 30 years in private practice.

4.     I am the founding member of Zoretic Law, PLLC, which I opened in June 2013. Prior to that, I was an equity partner at the Ashbaugh Beal law firm in downtown Seattle, where I was the Chair of the firm's Commercial Litigation Group.

5.     Zoretic Law is based in Pateros, Okanogan County, Washington with, until recently, a satellite office in downtown Seattle.

6.     Throughout my career, I have handled – and continue to handle –litigation cases in the Puget Sound area and across the State of Washington in federal, state and administrative tribunals.

7.     My practice includes a wide range of complex commercial disputes, insurance matters, and real estate litigation, with an emphasis in construction law and disputes involving the development and ownership of real property.

8.     I am an AV-rated lawyer by Martindale-Hubbell and have been selected a Washington SuperLawyer for more than ten years.

9.     I was retained to represent Rodger May in late 2018 in his dispute with Bear Enterprises and its owner, Peter Kuttel, over May's claims to intellectual property in the possession of their company, MK Salvage Venture LLC. May and Bear Enterprises are the two members of MKSV, with each owning 50% of the company.

10.     The background of the dispute and the events leading up to the subject covenant judgment settlement agreement are set forth in the Recitals to the "Restated and Amended Settlement Agreement" attached to the joint motion. Plaintiff May stipulates to them for purposes of this Motion, as well. Copies of pertinent documents referenced in the Recitals are attached to the Settlement Agreement.

DECLARATION OF MICHAEL T. ZORETIC IN
SUPPORT OF MOTION FOR
REASONABLENESS - 2

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

11.   This declaration provides additional information about my preparation of Plaintiff's claims and the negotiations behind the subject settlement, two of the factors the Court is to consider under the *Besel v. Viking Ins. Co.*, 146 Wn.2d 730,736 (2002) reasonableness test.

12.   After being retained, I conducted an extensive investigation into the background and legal claims prior to initiating the current lawsuit in April of 2019. This was an extensive project as the history of the dispute dated back to 2012 when Rodger May and Bear Enterprises (owned primarily by Peter Kuttel) formed MK Salvage Venture LLC to conduct salvage operations on the *SS Islander* wreckage with Ocean Mar, Inc. ("OMI").

13.   As part of my initial investigation, I reviewed the subject contracts, extensive emails, and other communications among the parties relating to the formation of the company, and the preparation of the salvage operations undertaken by MK Salvage and OMI.

14.   The core of the dispute was centered on May and Bear Enterprises' agreement (or lack thereof) in 2016 when they decided to split up MK Salvage Ventures assets as to who was allowed to use and possess the "Intellectual Property" that had been created during the prior salvage operations. The negotiations for the break-up of the company and its assets took place over the course of more than a year, requiring the review of hundreds (if not thousands) of pages of material.

15.   Given the large amount of information and complex issues, it took me several weeks to gather pertinent records, review the communications, agreements and other related documents, and also to conduct legal research into the various potential claims and defenses.

14.   I authored and sent a lengthy demand letter dated March 28, 2019 to Mr. Kuttel and Bear Enterprises' counsel, Ms. Vi Jean Reno. A true and correct copy is attached as ***Exhibit A***.

DECLARATION OF MICHAEL T. ZORETIC IN
SUPPORT OF MOTION FOR
REASONABLENESS - 3

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

15.     Following correspondence back and forth between myself and Ms. Reno, it became clear that we were not going to reach an early resolution of the dispute.

16.     I initiated this action on April 17, 2019 by filing the attached Complaint, which asserted claims for declaratory and injunctive relief, breach of contract, conversion and a derivative claim on behalf of MK Salvage Venture. *See Docket Entry #1*, and attached **Exhibit B**.

17.     Defendants filed their counterclaims, asserting that May had released all claims against Defendants and that he owed indemnity for the lawsuit. *See Docket Entry #19 & 21*.

18.     Ms. Reno appeared as counsel for Bear Enterprises and Mr. Kuttel. An initial matter of contention was the ability of Ms. Reno to act as counsel for these defendants, given her alleged previous and ongoing representation of the company, which was owned 50/50 by Mr. May. Ms. Reno withdrew as counsel after I filed a motion to disqualify on September 20, 2019. *See Docket Entry #34 (Motion); Docket Entry #66 (Notice of Withdrawal & Substitution of Counsel)*.

19.     I also objected to and requested the Court to disqualify Mr. Terence K. McGee, who had appeared as counsel for MK Salvage Venture. The court later denied that Motion and entered a ruling authorizing Mr. McGee to continue representation of MK Salvage Venture and to receive direction from Mr. Kuttel. *See Docket Entry #79 (11/05/19)*.

20.     The parties each issued written discovery in the early fall of 2019, which resulted in the production of thousands of pages of documents by both sides.

21.     Defendants filed a motion for summary judgment on August 23, 2019 (*Docket #26)* that was eventually heard on December 6, 2019 by our then-assigned trial Judge, the Hon. Regina Cahan.

DECLARATION OF MICHAEL T. ZORETIC IN
SUPPORT OF MOTION FOR
REASONABLENESS - 4

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

22. I conducted the depositions of Peter Kuttel (as the CR 30(b)(6) representative of Bear Enterprises) and Vi Jean Reno on November 5 and 6, 2019.

23. I then prepared and submitted on November 20, 2019 a detailed response brief with lengthy declarations of myself and Rodger May setting forth the facts and supporting arguments as to why the summary judgment motion should be denied. *See Docket Entry #81, 82, & 83.*

24. Oral argument was heard on December 6, 2019. Counsel for the parties' made extended presentations. I submitted a link to a video of the salvage operations that can still be viewed at: https://www.youtube.com/watch?v=Ep73SY-hwX4. I also included a slide show presentation of the key facts and legal arguments in support of our case. *See* attached **Exhibit C.**

25. Judge Cahan had clearly read the materials and asked a number of questions of both sides. Judge Cahan stated at the conclusion of the hearing she was likely going to deny the motion to dismiss May's claims, but wanted to take Defendants' motion for summary judgment on their counterclaim under advisement. *See Docket Entry #90.* Judge Cahan then issued a written ruling on December 9th denying Defendants' motion its entirety. *See Docket Entry #91 & 92.*

26. By denying Defendants' motion for summary judgment, it became apparent that the case would likely proceed to trial on the merits, at great expense to both Plaintiff and the Defendants.

27. The parties attempted to schedule the deposition of Rodger May in January of 2020, but his deposition was postponed due to scheduling conflicts. The Coronavirus pandemic intensified in March, resulting in drastic restrictions on court hearings and in-person depositions. This resulted in further delays of Mr. May's deposition.

DECLARATION OF MICHAEL T. ZORETIC IN
SUPPORT OF MOTION FOR
REASONABLENESS - 5

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

28. As was discussed in the summary judgment proceedings, the focus of the lawsuit changed after filing when OMI lost its rights to continue salvage operations, which were instead awarded to Tyche High Seas Capital, Ltd. While Plaintiff May had originally hoped to receive the rights to use the Intellectual Property in time to continue salvage operations with OMI as the court-approved salvors, the case shifted to a claim for damages suffered by Mr. May as a result of the lost opportunity to use the Intellectual Property with OMI.

29. Following the summary judgment ruling, I proceeded to work with our team of experts on the assessment of May's damages. On April 17, 2020, I produced Plaintiff May's expert witness disclosures, which included the expected testimony and opinions of Plaintiff's damages experts. A true and correct copy is attached as **Exhibit D**. The damages theory evaluated by these experts was that Mr. May had a contractual and marketable right to continue salvage operations with OMI using the Intellectual Property generated in previous expeditions. Using a benefit of the bargain analysis, we had our expert evaluate the fair value of May's contract interest with OMI had he been granted use of the Intellectual Property.

30. We first had gold salvage expert Fred Holabird, a nationally-known expert on golf salvage expeditions who had also been involved in the MK Salvage operations – provide his opinions on the amount of gold that was likely carried on the SS Islander, the amounts that have been removed in previous expeditions, and the remaining amounts still likely available for recovery. Based on an extensive review of the historical records, Mr. Holabird was prepared to testify that between $539 million and $620 million of gold (current value) likely remains available. *See Supplemental Disclosure at p. 15.*

31. We then had valuation expert Neil Beaton use these assumptions to derive a fair value of Mr. May's rights to recovery under the OMI contract, with a weighted analysis using different recovery assumptions. Mr. Beaton reached the conclusion that Mr. May's

DECLARATION OF MICHAEL T. ZORETIC IN
SUPPORT OF MOTION FOR
REASONABLENESS - 6

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

contract rights were worth at least $60 million. *See Supp Disclosure at p. 23*. This was the baseline damages we intended to seek from Defendants as the case proceeded to trial.

32.     With that said, the damages suffered by Mr. May could also be ascertained if Tyche, the new salvor, was successful in future salvage operations. The amount of damages if Tyche had recovered more than the amounts presumed in our expert opinions could thus have led to a much higher damage claim.

33.     Opposing counsel and I had attempted to initiate settlement negotiations and potentially a mediation following the summary judgment motion and again after I submitted our expert opinions on damages. However, it was clear that Mr. May was demanding a very substantial settlement in the tens of millions of dollars and that Defendants would not be willing (or perhaps able) to offer anything remotely close to what Mr. May and I believed to be a reasonable settlement value of his claims.

34.     In June of 2020, I learned through discovery that Mr. Kuttel had tendered defense and indemnity of May's claims to Bear Enterprises' insurance carrier, Great American Insurance Group in October of 2019, but had been denied defense or indemnity by Great American's letter dated November 14, 2019.

35.     Beginning in July of 2020, we engaged in extensive back-and-forth negotiations of the terms of the present settlement agreement. Over the course of the next four (4) months, the parties exchanged over a dozen detailed settlement offers and counteroffers. As the discussions progressed, I conducted most of these negotiations with Mr. McGee, who was lead counsel in conducting these negotiations on behalf of the Defendants.

36.     I have been practicing law for thirty years and have negotiated literally hundreds of settlements in that time. This negotiation was undoubtedly the longest and most involved process of any I can recall.

DECLARATION OF MICHAEL T. ZORETIC IN
SUPPORT OF MOTION FOR
REASONABLENESS - 7

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

37.     We finally reached our original Settlement Agreement on November 13, 2020. The agreement was amended on December 11, 2021 in the form of a "Restated and Amended Settlement Agreement," which is the form submitted for the Court to approve as reasonable.

38.     Our joint brief discusses the applicable factors for determining reasonableness of a covenant judgment under *Besel v. Viking Ins. Co.*, 146 Wn.2d 730,736 (2002).   My statements herein are intended to support the Court's consideration of those factors.

39.     One of the factors (No. 8) is the amount of preparation of the Plaintiff's case. As I have laid out above, I have spent a considerable portion of my legal practice since late 2018 preparing and litigating this case.  In all, I have spent over 700 hours working on this case since my first involvement through the date of settlement, spanning the initial investigation of the case, filing the lawsuit, conducting discovery, responding to summary judgment, preparing expert witness testimony and negotiation the settlement before the court.

40.     It is my belief and opinion, based on my knowledge of the case and my experience of over 30 years as a lawyer, that the terms of this covenant judgment settlement were negotiated in good faith and represent a reasonable settlement of this lawsuit.   In particular, the $30 million stipulated covenant judgment represents a reasonable compromise of Plaintiff's claimed damages (totaling at leas $60 million) and is otherwise reasonable based on the applicable factors set forth in *Besel v. Viking Ins. Co.*, 146 Wn.2d 730,736 (2002).


Executed on this 29th day of March, 2021 in Pateros, Washington.

_Michael T Zoretic_

_____

Michael T. Zoretic, Esq.

DECLARATION OF MICHAEL T. ZORETIC IN
SUPPORT OF MOTION FOR
REASONABLENESS - 8

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

# ZORETIC DEC. ON REASONABLENESS

# EXHIBIT A


**ZORETIC LAW**

March 28, 2019

***By Email (vjreno@RenoLawSea.com) and Certified U.S. Mail***

Ms. Vi Jean Reno
1420 5th Ave., Suite 3000
Seattle, WA 98101

RE:  MK Salvage Venture LLC
     Demand for Release of Intellectual Property

Dear Ms. Reno:

Rodger May has retained me to represent him in matters relating to MK Salvage Venture LLC and Peter Kuttel. I understand you have previously dealt with Kristofer Larson on this subject, but please direct all future communications to me by email and/or my Pateros postal address.

As will be noted below, I understand you have been directly involved in the MK Salvage matter since its inception. However, based on my review of the relevant contracts, resolutions and communications between you and Mssrs. May and Larson, I believe it will be helpful to provide the following background for the demand for release of information contained in this letter.

**BACKGROUND**

For many years, Mr. Ted Jaynes has engaged in efforts to salvage the remains of the "S/S Islander," a commercial vessel that sunk off the coast of Alaska in 1901 and alleged to contain substantial amounts of gold and other treasure. Mr. Jaynes pursued this venture through his company Ocean Mar, Inc. and related entities ("Ocean Mar").

Ocean Mar obtained the legal rights to salvage the S/S Islander through the court proceedings in Alaska federal district court entitled *Yukon Recovery, L.L.C. v. Certain Abandoned Property, in rem, Defendant; Ocean Mar, Inc.,* 3:96-cv-0270 (Consol.). Following the district court's August 28, 1998 Order granting his company salvage rights and subsequent rulings, Ocean Mar then sought outside investors to fund and manage the salvage operations.

**215 Pateros Mall / P.O. Box 427 / Pateros, WA 98846**
**701 Fifth Ave. Suite 4200 / Seattle, WA 98104**
**mike@zoreticlaw.com**

NCW Tel. 509.923.9529
Seattle/Cell 206.465.8109
www.zoreticlaw.com

### MK Salvage Venture

Rodger May and Peter Kuttel were interested in pursuing this opportunity. On March 28, 2012, Mr. May and Mr. Kuttel (through his wholly-owned entity Bear Enterprises, LLC) formed MK Salvage Venture LLC ("MK Salvage"). The purpose of MK Salvage was to serve as the entity by which they would participate with Ocean Mar in salvaging the SS Islander. Mr. May and Bear Enterprises were equal 50/50 members. As you are aware, you acted as counsel to MK Salvage in forming the corporation and drafting the Operating Agreement executed by the members.

### OMI Contract

On March 28, 2012, MK Salvage entered into a "Financing and Salvage Management Agreement" with Ocean Mar (herein, "the OMI Contract") governing MK Salvage's participation and funding of Ocean Mar's salvage operations relating to the SS Islander. See attached **Exhibit A.**[1]

The OMI Contract was set up to allow MK Salvage to both fund and manage future salvage operations. The Recitals, Section A states:

> Ocean Mar wishes to engage MK to finance and manage the Salvage. In its role as the financier and manager of the Salvage, MK will contract with and pay the entities and individuals that will assist with the Salvage. MK will have operational control of the Salvage subject to the limitations and conditions herein.

Section 4 – Salvage and Recovery Operations further provides: "MK will consult in good faith with its team of experts, which will include Ted Jaynes, before making operational decision with regard to the Salvage; however, MK will have final say on all operational matters related to the Salvage."

### Intellectual Property

Section 3 of the OMI Contract created a contractual security interest in favor of MK Salvage over certain described intellectual property of Ocean Mar to be generated during the future salvage operations funded by MK Salvage,

---

[1] You also represented MK Salvage, the entity, in the negotiation and drafting of the OMI Contract. See Paragraph 13.

[2] The vessel was valued at approximately $750,000.

[3] You drafted the Distribution Agreement and other documents relating to MK Ventures discussed herein, ostensibly acting as counsel for Mr. Kuttel, although it appears you were also representing the entity itself during all material times. Mr. Larson represented Mr. May in reviewing and approving the documents.

[4] Section 2(a)(i) states in full: "In consideration for MK's covenants and obligations set forth herein, Ocean Mar agrees to make the following payments: (a) Subject to approval of the Recovery Plain

"including, without limitation, computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc." (the "Intellectual Property").

Section 3 further provides that the Intellectual Property was to be downloaded to a media disc on a daily basis and held by the Cairncross & Hempelmann, P.S. law firm ("C&H") in escrow pursuant to the terms of an "escrow agreement" until the security lien is satisfied or otherwise released following MK Salvage's receipt of its initial investment, plus twelve percent interest.

### Salvage Operations and Creation of Intellectual Property

The parties to the OMI Contract conducted salvage operations on the SS Islander from 2012 through 2014. The salvage operations resulted in the recovery of some gold bullion, but of less value than MK Salvage's Initial Investment.

MK Salvage spent approximately five million dollars managing the salvage operations. An enormous amount of Intellectual Property (as described in Section 3 of the OMI Contract) was generated during this process, which included computer data, photographs, videos, imaging, maps, surveys, readings, logs, journals, media discs, etc.

It appears the Intellectual Property was initially downloaded onto a computer disk, however, I understand it was only held by C&H for a short time. However, by agreement of the parties, the Intellectual Property, including the original source material and the computer discs, were later stored at MK Salvage's then primary headquarters, located in Bear Enterprises' office at 4209 21st Avenue W., Suite 400, Seattle, Washington.

### Distribution of Assets of MK Salvage

May and Bear Enterprises thereafter decided to cease their joint involvement in the salvage operations. In 2016, May and Bear Enterprises began winding up the affairs of MK Salvage, including a distribution of its known assets. Mr. May was assisted by his counsel, Kristofer Larson, during this process. You represented Bear Enterprises and also took actions on behalf of the MK Salvage entity, including drafting of corporate documents.

In November 2016, May and Bear Enterprises executed a "Record of Action of MK Salvage Venture LLC to Distribute All Known Assets" ("Distribution Agreement.") See attached *Exhibit B*. Section 1 of the Distribution Agreement purports to identify the only known assets of the company. Section 1(a) states the following:

> The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the OMI contract") dated March 29, 2012, as amended...

Section 2(a) of the "Distribution Agreement" provides that the above-described rights will be distributed to Mr. May.

Section 3 provides that MK Salvage "hereby assigns all of its right title and interest in the salvage contract rights described in 1(a) and 1(c), above, to Rodger D. May..."

The only known assets to be distributed to Bear Enterprises were a marine vessel (Section 1(d)),[2] one-half of the reimbursement rights contained in Section 2 of the OMI Contract (Section 1(c)), and a share of the company's bank account funds (Section 1(f)). The language provides that Bear Enterprises retained no rights in any future salvage operations, the Intellectual Property or the OMI Contract, other than reimbursement rights.[3]

On or about the same date, May and Bear Enterprises executed a document entitled "Assignment of MK Salvage Venture LLC Assets" ("the Assignment Agreement.") See attached **Exhibit C.** The Assignment Agreement provides in Section 1 that MK Salvage "hereby unconditionally sells, assigns, and transfers to Rodger May 100% of any and all rights, title, and interest it has in the following:

> The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the [OMI Contract]....

Section 2 of the Assignment Agreement further provides that MK Salvage:

> unconditionally sells assigns, and transfers, equally to Rodger D. May and Bear Enterprises, LLC, the right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under ¶2(a)(i).[4] Any rights to other salvage recovery proceeds under ¶2 of the OMI contract are hereby assigned to Rodger D. May solely.

Dissolution of MK Salvage

At the same time, Mr. May and Bear Enterprises also executed a document entitled "Record of Action of MK Salvage Venture LLC to Dissolve Company"

---

[2] The vessel was valued at approximately $750,000.

[3] You drafted the Distribution Agreement and other documents relating to MK Ventures discussed herein, ostensibly acting as counsel for Mr. Kuttel, although it appears you were also representing the entity itself during all material times. Mr. Larson represented Mr. May in reviewing and approving the documents.

[4] Section 2(a)(i) states in full: "In consideration for MK's covenants and obligations set forth herein, Ocean Mar agrees to make the following payments: (a) Subject to approval of the Recovery Plain (defined below) by the Court, Ocean Mar will pay to MK: (i) an amount equal to the Recovery Investment...."

("the Dissolution Agreement"). See attached **Exhibit D.** Section 2 of that document states:

> MK Salvage Venture LLC has, in accordance with RCW 25.15.305, distributed all of the assets it holds to its two members, equally, except that it will retain its sole checking account at Wells Fargo Ban, Account No. 3139238962, in order to pay the Company's final expenses, such as income tax, insurance and tax preparation fees and costs. The division of the Company assets is as set forth in a separate Record of Action of this same date. After the 2016 taxes and preparation fees and any other routine expenses have been paid, any amount remaining in that bank account will be distributed to its two members equally.

Section 4 provides: "After the distribution of all assets and the payment of final expenses as set forth in ¶ 2 above, MK Pacific (sic) LLC authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the Washington Secretary of State a Certificate of Dissolution."

MK Salvage thereafter ceased operations, by the above resolutions held no assets, and conducted no business other than the winding down of the company through payment of expenses, and other matters as provided in Exhibit D. Final tax returns for 2016 and 2017 were filed and all remaining funds from the checking account were distributed.

It does not appear, however, that a Certificate of Dissolution was issued as was agreed to by the parties. Instead, according to the Secretary of State's records, the company was administratively dissolved on August 3, 2018. See attached **Exhibit E.**

Your office reinstated the Company on or about August 6, 2018, without notifying Mr. May or Mr. Larson. See attached **Exhibit F.**[5]

<u>Bear Enterprises' Retention of the Intellectual Property.</u>

Following the execution of these agreements, Bear Enterprises (and Mr. Kuttel) have continued to retain possession and/or control of the Intellectual Property at Bear Enterprises' office located at 4209 21st Ave. W, Suite 400 in Seattle.

MK Salvage spent five million dollars on the initial salvage operations, which resulted in the generation of vast amounts of information relating to the location, condition and surround ocean floor environment of the SS Islander wreckage. The Intellectual Property is vital to Ocean Mar's and Mr. May's continued salvage operations as it contains important confidential and

---

[5] During this process, you also appear to have changed the "principal office" of MK Salvage from Bear Enterprises' office to your law firm address at 1420 Fifth Ave., Suite 3000 in Seattle. See **Ex. G.**

proprietary information relating to the location of the S/S Islander and its surroundings.

Mr. May has been attempting to gain access to the Intellectual Property since January of 2016. In July of 2017, Mr. Larson sent you an email demanding that Bear Enterprises and/or Mr. Kuttel relinquish possession of the Intellectual Property so that Mr. May, in cooperation with Ocean Mar, could utilize it in performance of the additional salvage efforts. As discussed below, Bear Enterprises and Mr. Kuttel have refused to relinquish the IP to either Mr. May or Ocean Mar.

As Mr. Larson has previously stated, the right to use and possess the IP has been granted to Mr. May under the express and unambiguous language of the Distribution Agreement. Your clients' continued physical possession and failure to convey and/or return the Intellectual Property is a wrongful deprivation of Mr. May's property and contractual rights therein. Bear Enterprises' failure to relinquish the Intellectual Property has wrongfully interfered with Mr. May's ability to move forward with the salvage operations, jeopardizing the recovery of what could be millions of dollars worth of additional gold bullion.

Response to Arguments

I have reviewed your letter to Mr. Larson dated July 26, 2017, with its attachments. *See* attached *Ex. H*. In that letter, you agree that MK Salvage owns a "possessory lien" on Ocean Mar's Intellectual Property. Your letter appears to claim that MK Salvage still owns the possessory lien right and therefore relinquishing it (to Mr. May or Ocean Mar) would "significantly impair MK's lien rights and jeopardize MK's collateral."

To be clear, we are not demanding that Bear Enterprises turn over the Intellectual Property to Ocean Mar. It should be provided to Mr. May, to be kept in his possession and control for use in future salvage operations.

With that point clarified, I further understand from your letter that you are claiming (1) MK Salvage never assigned the Intellectual Property to Mr. May as part of the salvage rights, (2) that it instead was part of the "initial investment repayment rights" that was distributed to Rodger and Bear Enterprises, and (3) therefore is appropriately being held by the company at its headquarters.

These arguments are incorrect on several levels:

First, the only reasonable interpretation of Distribution Agreement and other corporate documents is that Mr. May's receipt of the company's "salvage rights" necessarily included the right to use the Intellectual Property. The information and data contained in the Intellectual Property were created during the prior salvage operations and it only stands to reason that this critical information would be used in any future salvage efforts. The resolution documents provided

no basis for carving out the "Intellectual Property" from the "salvage rights" expressly assigned to Mr. May. If you or Mr. Kuttel had expressly stated that the Intellectual Property would not be part of the salvage rights, Mr. May would have objected, as it would clearly impair his ability to go forward.

Second, MK Salvage itself has absolutely no rights to retain any property, including the Intellectual Property. MK Salvage ceased to own any assets as "all known assets" of the company were divided and assigned to either Mr. May or Mr. Kuttel in the Distribution Agreement. Under the Dissolution Agreement, MK Salvage is in the process of winding up and was supposed to have been dissolved in 2017.[6] MK Salvage is no longer the owner of any assets, and is not actively conducting business from Bear Enterprises' office or any other location.[7]

Third, nothing in the language of the Distribution Agreement can be read to create a jointly-held remaining right in the Intellectual Property between Mr. May and Bear Enterprises. The only asset distributed to both Mr. May and Bear Enterprises is the "right to reimbursement" under the OMI contract as "defined in Section 2(a)(i)" of the OMI Contract. While the Intellectual Property was created as a "security interest" to secure MK Salvage's rights to reimbursement, the language in the OMI contract granting this interest is contained in Section 3, not Section 2(a)(i). Section 2(a)(i)'s right to reimbursement does not address the Intellectual Property. If you, as the primary drafter of the language, had intended differently, you should have added language reserving the joint rights created in Section 3.

Fourth, even if the Intellectual Property was not assigned exclusively to Mr. May, Bear Enterprises (and Mr. Kuttel) have no reasonable basis for claiming that the Intellectual Property should be held in Bear Enterprises' office. At best, Bear Enterprises would have a joint ownership in the "security interest" created in the OMI contract. That limited right would <u>not</u> include the sole right to retain exclusive possession of the Intellectual Property. Mr. May, on the other hand, has the need and legitimate right to take possession of the information as part of his future salvage operations. He is entitled to immediate possession of the Intellectual Property on contractual, legal and equitable grounds.

## <u>DEMAND FOR RELEASE OF THE INTELLECTUAL PROPERTY</u>

By this letter, Mr. May is giving Bear Enterprises one last chance to turn over the Intellectual Property prior to seeking judicial relief. If I am do not receive confirmation by **Friday, April 12, 2019** that Bear Enterprises is making the Intellectual Property available for release, I have been directed to file a lawsuit seeking return of the Intellectual Property and asserting all applicable claims and

---

[6] I note that you, purporting to act as counsel for MK Salvage, reinstated the Company in August of 2018. You did so without notifying Mr. May (or Mr. Larson). Your reasons for reinstating the Company are not yet clear, but it appears you may have done so as part of a scheme to preserve your argument that the dissolved entity somehow is still entitled to hold the Intellectual Property.

[7] You also did not seek or obtain Mr. May's approval to move the "principal office" to your law firm.

seeking all available relief available under the parties' contracts and Washington law. A copy of Mr. May's draft Complaint is attached hereto as *Ex. I*, which I will file and cause to be served if a satisfactory response is not received by April 12th.

In addition, even after receiving the Intellectual Property, Mr. May reserves all rights in the event your clients' improper retention of the Intellectual Property has caused the loss of any salvage opportunities, or if the continuing refusal to turn over the Intellectual Property has allowed others to salvage the SS Islander remains.

## CONCLUSION

I am sending this letter to you as Bear Enterprises and Mr. Kuttel's identified legal representative. However, as discussed herein, you have had direct and continued involvement in this matter since its inception, and will undoubtedly be a material and necessary fact witness in the event we are forced to commence litigation. Given the likely application of RPC 3.7 if we are able to resolve this matter, Mr. Kuttel may wish to retain new counsel going forward.[8]

Sincerely,

Michael T. Zoretic

Attachments

cc:     Rodger May
        Kristofer Larson

---

[8] I should further alert you that my review of the background documents in this case reveals a number of possible conflicts of interest relating to your overlapping representation of the MK Salvage entity and its members, with no conflicts disclosure provided or waiver obtained. I am aware that Mr. May and Mr. Kuttel have also been involved in a lawsuit over a related debt, in which you represented Mr. Kuttel. We view this as different issue than the demand for return of the Intellectual Property stated herein, but Mr. May continues to reserve all of his rights in this regard, including claims for damages.

# ZORETIC DEC. ON REASONABLENESS

# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| RODGER MAY, an individual, | CAUSE NO: 19-2-10613-1 |
| Plaintiff, | PLAINTIFF'S COMPLAINT |
| v. | |
| MK SALVAGE VENTURE LLC; a Washington limited liability company; BEAR ENTERPRISES LLC, a Washington limited liability company, and PETER KUTTEL, an individual. | |
| Defendants. | |

Plaintiff Rodger May, by and through his undersigned attorney, alleges for his Complaint the following:

## **PARTIES**

1.      Plaintiff Rodger May ("May") is an individual residing in King County, Washington.

2.      Defendant MK Salvage Venture LLC ("MK Salvage") is a Washington limited liability company headquartered and doing business in King County, Washington.

3.      Defendant Bear Enterprises LLC ("Bear Enterprises") is a Washington limited liability company headquartered and doing business in King County, Washington.

COMPLAINT - 1

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

4.    Defendant Peter Kuttel ("Kuttel") is an individual residing in King County, Washington. Katella is, and at all times has been, a managing member of Bear Enterprises, along with his company PJK Investments, Inc.

## JURISDICTION/VENUE

5.    Jurisdiction and venue lie in King County, Washington under RCW 4.12.010 and 4.12.020 because the personal property at issue and the causes of action herein arose in King County, Washington.

## BACKGROUND

6.    Ocean Mar (Washington) Inc. ("Ocean Mar") is a foreign corporation, organized and formed under the laws of Delaware, and licensed to conduct business in the State of Washington.

7.    For many years, Ocean Mar and its related entities have engaged in efforts to salvage the remains of the "S/S Islander," a commercial vessel that sunk off the coast of Alaska in 1901, alleged to contain gold and other treasure.

8.    Ocean Mar obtained the legal rights to salvage the S/S Islander through the court proceedings in Alaska federal district court entitled *Yukon Recovery, L.L.C. v. Certain Abandoned Property, in rem, Defendant; Ocean Mar, Inc.*, 3:96-cv-0270 (Consol.), culminating in a 2012 court-approved salvage plan.

9.    Ocean Mar sought outside investors to fund the salvage operations.

10.    May and Bear Enterprises formed MK Salvage as a Washington Limited Liability Company on March 28, 2012 to serve as the entity by which they would participate with Ocean Mar in salvaging the SS Islander.

11.    Rodger May and Bear Enterprises are, and at all times have been, the only members of MK Salvage, each owning fifty percent of the entity.

COMPLAINT - 2

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

12.     On March 28, 2012, MK Salvage entered into a contract with Ocean Mar entitled, "Financing and Salvage Management Agreement" (herein, "the OMI Contract") governing MK Salvage's participation and funding of Ocean Mar's salvage operations relating to the SS Islander. A true and correct copy of said agreement is attached hereto as **Exhibit A** and incorporated as if fully stated herein.

13.     Under the OMI Contract, MK Salvage agreed to and was to manage the salvage operations, in cooperation with Ocean Mar. MK Salvage was also to provide funding for operations in the amount of $5 million ("the Initial Investment"), subject to certain reimbursement rights as stated therein.

14.     Section 3 of the OMI Contract created a contractual security interest in favor of MK Salvage over certain described intellectual property of Ocean Mar to be generated during the future salvage operations funded by MK Salvage, "including, without limitation, computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc." (herein, the "Intellectual Property.")

15.     Section 3 further provides that the Intellectual Property was to be downloaded to a media disc on a daily basis and held by the Cairncross & Hempelmann, P.S. law firm ("C&H") in escrow pursuant to the terms of an "escrow agreement" until the security lien is satisfied or otherwise released following MK Salvage's receipt of its initial investment, plus twelve percent interest.

16.     The parties to the OMI Contract conducted salvage operations on the SS Islander from 2012 through 2014.

17.     The salvage operations resulted in the recovery of some gold bullion, but of less value than MK Salvage's Initial Investment.

COMPLAINT - 3

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

18.     Intellectual property (as described in Section 3 of the OMI Contract) was generated during these salvage operations, which included computer data, photographs, videos, imaging, maps, surveys, readings, logs, journals, media discs, etc.    Upon information and belief, the Intellectual Property was downloaded onto a computer disc and provided to C&H.

19.     The Intellectual Property, including the original source material and the computer discs, were later stored by the parties' agreement at MK Salvage's then primary headquarters, located at Bear Enterprises' office at 4209 21st Avenue W., Suite 400, Seattle, Washington.

20.     May and Bear Enterprises decided to cease their joint involvement in the salvage operations.  In 2016, May and Bear Enterprises began winding up the affairs of MK Salvage, including a distribution of its known assets.

21.     In November 2016, May and Bear Enterprises executed a "Record of Action of MK Salvage Venture LLC to Distribute All Known Assets" attached hereto as **Exhibit B** and incorporated as if fully set forth herein.

22.     Section 1 of the Record of Action purports to identify the only known assets of the company.  Section 1(a) identifies the following:  "The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the OMI contract") dated March 29, 2012, as amended..."

23.     Section 2 a. the Record of Action provides that the above-described rights will be distributed to May.

24.     Section 3 provides that MK Salvage "hereby assigns all of its right title and interest in the salvage contract rights described in 1(a) and 1(c), above, to Rodger D. May..."

COMPLAINT - 4

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

25.     The only known assets to be distributed to Bear Enterprises were a marine vessel (Section 1(d)), one-half of the reimbursement rights contained in Section 2 of the OMI Contract (Section 1(c)), and a share of the company's bank account funds (Section 1(f)).

26.     Bear Enterprises retained no rights in any future salvage operations, the Intellectual Property or the OMI Contract, other than reimbursement rights.

27.     On or about the same date, May and Bear Enterprises executed a document entitled "Assignment of MK Salvage Venture LLC Assets," a true and correct copy of which is attached hereto as **Exhibit C** and incorporated as if fully set forth herein.     The Assignment provides in Section 1 that MK Salvage "hereby unconditionally sells, assigns, and transfers to Rodger D. May 100% of any and all rights, title, and interest it has in the following:   "The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the [OMI Contract]...."

28.     Section 2 of the Assignment further provides that MK Salvage:

> unconditionally sells assigns, and transfers, equally to Rodger D. May and Bear Enterprises, LLC, the right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under ¶2(a)(i). Any rights to other salvage recovery proceeds under ¶2 of the OMI contract are hereby assigned to Rodger D. May solely.

29.     May and Bear Enterprises also executed a document entitled "Record of Action of MK Salvage Venture LLC to Dissolve Company," a true and correct copy of which is attached hereto as **Exhibit D** and incorporated as if fully set forth herein.   Section 2 of that document states:

> MK Salvage Venture LLC has, in accordance with RCW 25.15.305, distributed all of the assets it holds to its two members, equally, except that it will retain its sole checking account at Wells Fargo Ban, Account No. 3139238962, in order to pay the Company's final expenses, such as income tax, insurance and tax preparation fees and costs. The division of the Company assets is as set forth in a separate Record of Action of this same date.   After the 2016 taxes and preparation fees and any other

COMPLAINT - 5

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

routine expenses have been paid, any amount remaining in that bank account will be distributed to its two members equally

30.     MK Salvage thereafter ceased operations, held no assets, and conducted no business other than the winding down of the company through payment of expenses, as provided in Exhibit D.

31.     Despite having no interest in the Intellectual Property or the security interest therein, Bear Enterprises and/or its member Peter Kuttel have wrongfully, improperly and without authorization continued to retain possession and/or control of the Intellectual Property at Bear Enterprises' office.

32.     The Intellectual Property is important, if not critical, to Ocean Mar and May continued salvage operations as it contains important confidential and proprietary information relating to the location of the S/S Islander and its surroundings.

33.     May has demanded that Bear Enterprises and/or Kuttel relinquish possession of the Intellectual Property so that May (in conjunction with Ocean Mar) could utilize it in performance of additional salvage efforts.

34.     Bear Enterprises and Kuttel have refused to relinquish the IP to May or any other entity associated with May.

35.     Defendants' continued possession and failure to convey and/or return the Intellectual Property to May is a wrongful deprivation of May's property and contractual rights.

36.     Defendants' failure to relinquish the Intellectual Property has wrongfully interfered with May's ability to move forward with the salvage operations, jeopardizing the recovery of what could be millions of dollars worth of additional gold bullion.

///
///

COMPLAINT - 6

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

**FIRST CAUSE OF ACTION:**

**DECLARATORY RELIEF**
**(against MK Salvage and Bear Enterprises)**

37.    Plaintiff seeks declaratory relief under Washington's Uniform Declaratory Judgment Act, RCW 7.43 to determine the parties' respective rights to use and possession of the Intellectual Property and further enjoining Defendants' continued wrongful possession of the same.

38.    The Court has authority to enter a declaratory judgment.  RCW 7.24.010; CR 57. Declaratory judgment is appropriate where:

> A person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statue, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

RCW 7.24.020.

39.    Declaratory judgment is appropriate here to determine the Plaintiff and/or Defendants' property rights and interests under the agreements described herein.

40.    Plaintiff May alleges that he, as the sole assignee of MK Salvage's "rights, title and interest" in the salvage rights under the OMI Contract, and therefore is the legal and/or equitable owner of MK Salvage's lien rights in the Intellectual Property.  In addition, Plaintiff May alleges that he has the contractual, equitable and legal right as assignee of MK Salvage's interests to have unfettered access to the Intellectual Property for purposes of conducting the future salvage operations.

41.    Plaintiff alleges further that Defendants' have no contractual, equitable, possessory or statutory right to retain the Intellectual Property and their continued possession thereof will cause damage and/or otherwise violate Plaintiff's rights and interests therein.

COMPLAINT - 7

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

42. Plaintiff therefore requests the Court declare that Defendants' continued possession and/or refusal to convey the Intellectual Property to Plaintiff is in violation of Plaintiff's contractual rights in the agreements described above, and any other such declaratory relief deemed appropriate under the circumstances.

### SECOND CAUSE OF ACTION:

**INJUNCTIVE RELIEF**
**(against all Defendants)**

43. The Court has authority to order injunctive relief to enforce a declaratory judgment. RCW 7.24.80; RCW 7.24.190; CR 65. RCW 7.24.080 provides: "Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper." RCW 7.24.080.

44. RCW 7.24.190 provides:

The Court, in its discretion and upon such conditions and with or without such bond or other security as it deems necessary and proper. . .may restrain all parties involved in order to secure the benefits and preserve and perfect the rights of all parties to the court proceedings.

45. Injunctive relief is appropriate here to enforce Plaintiff's rights under the agreements and to protect the Plaintiff's property rights and interests in the Intellectual Property.

46. Plaintiff's efforts and ability to conduct additional salvage operations are being hampered by Defendants' failure to return the Intellectual Property and injunctive relief is appropriate and/or necessary to prevent further harm suffered by Plaintiff.

47. Defendants have no legal or equitable basis for retaining possession of the Intellectual Property.

48. Plaintiff therefore requests that the Court issue a temporary and/or permanent mandatory injunction requiring Defendants to convey the Intellectual Property to Plaintiff.

COMPLAINT - 8

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

## THIRD CAUSE OF ACTION:

### BREACH OF CONTRACT
### (against Bear Enterprises)

49.     Defendant Bear Enterprises' conduct, including its failure to convey the Intellectual Property as described herein, constitutes a continuing breach of the parties' agreements identified herein.

50.     Defendant Bear Enterprises' continued possession, control and/or use of the Intellectual Property is in violation of Plaintiff's rights under the OMI Contract, Exhibit A, and/or MK Salvage corporate resolutions contained in Exhibits B-D.

51.     Plaintiff has been damaged by Defendants failure to comply with the attached agreements, including but not limited to, not having the use and benefit of the Intellectual Property for purposes of additional salvage operations.

52.     Defendants' continued deprivation of Plaintiff's possession and use of the Intellectual Property has caused, and is continuing to cause, Plaintiff lost opportunity, including the right to salvage the remaining gold that may be located in the S/S Islander hull.

### FOURTH CAUSE OF ACTION:

### CONVERSION
### (against all Defendants)

53.     Defendants have wrongfully interfered with Plaintiff's possessory rights in the Intellectual Property.

54.     Defendants have refused to return the Intellectual Property to Plaintiff following the execution of the corporate resolutions (Exhibits B-D), without justification and/or authority.

55.     Plaintiff has suffered, and is continuing to suffer, loss of use and/or opportunity as a result of Defendant's interference.

COMPLAINT - 9

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

56.     Plaintiff is entitled to an award of damages for any and all injuries caused by said interference, including the inconvenience and lost use of Intellectual Property.

### FIFTH CAUSE OF ACTION

### DERIVATIVE CLAIM ON BEHALF OF MK SALVAGE
### (against Bear Enterprises)

57.     In the event the Court determines that the Intellectual Property was an unassigned asset of MK Salvage, Plaintiff May asserts the following derivative claim on behalf of the company.

58.     Plaintiff May is a member of MK Salvage.

59.     To the extent the rights to MK Salvage's security interest and/or lien in the Intellectual Property are an unassigned asset of the Company, MK Salvage has continuing rights thereto.

60.     If MK Salvage is the owner of the security interest in the Intellectual Property, it is required to allow Ocean Mar and/or May to utilize the Intellectual Property in future salvage operations.

61.     In such event, Plaintiff May hereby files a derivative action in MK Salvage's name against Bear Enterprises seeking return of the Intellectual Property, through May as its assignee and/or custodial agent so that it may be utilized by Ocean Mar and May in the future salvage operations.

62.     A demand of the other member, Bear Enterprises, to return the Intellectual Property has been made, and any demand for Bear Enterprises to cause the company to bring an action against Bear Enterprises would be futile.

### PRAYER FOR RELIEF

Plaintiff requests entry of judgment as follows:

COMPLAINT - 10

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1.     Declaring and affirming the validity of Plaintiff's rights and obligations under the agreements attached hereto, as well as any other contractual agreements established between the parties;

2.     Declaring that Plaintiff has the right to immediate possession, use and enjoyment of the Intellectual Property;

3.     Granting injunctive relief requiring Defendants to comply with their contractual obligations, to release the Intellectual Property to Plaintiff, and/or other injunctive relief as the Court deems appropriate:

4.     Awarding all general and special damages suffered by Plaintiff as a result of Defendants' breaches of the agreements attached hereto, as well as any other contractual agreements, and/or other tortious conduct.

5.     Awarding Plaintiff all costs and expenses of litigation, including all statutory and/or reasonable attorney's fees, as allowed under the agreements and/or Washington law, including RCW 19.108.040.

6.     For such other and further relief as the Court deems just and equitable.

DATED this 17th day of April, 2019.

ZORETIC LAW

By_____
   Michael T. Zoretic, WSBA #21221
   mike@zoreticlaw.com (email)
Attorney for Plaintiff

COMPLAINT - 11

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

# EXHIBIT A

# Financing and Salvage Management Agreement

This Financing and Salvage Management Agreement (**"Agreement"**), dated as of March 28, 2012, is by and between Ocean Mar (Washington) Inc. (**"Ocean Mar"**) and MK Salvage Venture, LLC (**"MK"**).

## RECITALS

A.     Pursuant to the express terms of the August 28, 1998 Order from the United States District Court for the District of Alaska (the **"Court"**), affirmed on appeal, Ocean Mar has been designated as the entity responsible for the operational and preservation aspects of the effort to salvage the SS Islander's wreckage and all gold and artifacts related thereto (the **"Salvage"**). Ocean Mar represents and warrants that Ocean Mar, Inc. referenced in the court documents and Ocean Mar (Washington), Inc. are one and the same entities and Ocean Mar (Washington), Inc. has full right and authority to enter into and perform under this Agreement.

B.     Ocean Mar anticipates the Salvage operation will commence as early as May 15, 2012.

C.     Ocean Mar wishes to engage MK to finance and manage the Salvage. In its role as the financier and manager of the Salvage, MK will contract with and pay the entities and individuals that will assist with the Salvage. MK will have operational control of the Salvage subject to the limitations and conditions herein.

D.     MK is prepared to provide up to $5,000,000 (the **"Recovery Investment"**) to fully finance the Salvage on the terms set forth herein.

## AGREEMENT

The parties agree as follows:

1.     **Financing of the Salvage**. MK agrees to:

(a)     Identify vendors and other subcontractors (collectively, **"Salvage Vendors"**) needed to accomplish the Salvage efforts;

(b)     Negotiate and enter into contracts with Salvage Vendors and pay amounts owed to such Salvage Vendors;

(c)     Engage Theodore P. Jaynes, the principal of Ocean Mar (**"Ted Jaynes"**) as a consultant pursuant to that certain Consulting Agreement attached hereto as Exhibit A, pursuant to which MK will pay Ted Jaynes (i) $15,000.00 upon execution of this Agreement, and (ii) $5,000 per month commencing on the later of May 15, 2012 or the date that Ted Jaynes, MK's

owners, employees, or Salvage Vendors first depart for Juneau, Alaska to begin the Salvage operations, provided further that the payment obligations under the Consulting Agreement cannot be terminated by MK for any reason unless MK terminates this Agreement; and

(d)    Engage Tetra Tech, Inc. as a subcontractor in connection with the Salvage operations.

As the manager of the Salvage, MK has the right to hire and fire any subcontractor.

2.    **Consideration for Funding**. In consideration for MK's covenants and obligations set forth herein, Ocean Mar agrees to make the following payments:

(a)    Subject to approval of the Recovery Plan (defined below) by the Court, Ocean Mar will pay to MK: (i) an amount equal to the Recovery Investment, or (ii) an amount equal to seven times the Recovery Investment but if and only if the value of the Salvage recovery proceeds is at least 15 times the amount of the Recovery Investment. Notwithstanding anything herein to the contrary, the total payment to MK under this Section 2(a) will not exceed $30,000,000. Examples of the possible distribution of proceeds pursuant to this Section 2(a) are set forth at Exhibit B hereto.

(b)    After payment of Ocean Mar's payment obligations to the Salvage Association in accordance with the Salvage Agreement (NO CURE NO PAY) "ISLANDER" (the "**SA Agreement**"), payment to the State of Alaska pursuant to the settlement with the State (the "**State Agreement**") [1], and after payment of the amounts required to be paid under Section 2(a) hereof, then fifty percent (50%) of any remaining Salvage recovery proceeds will be paid to MK, up to a maximum payment of $100 million. All liens and claims against the Salvage recovery proceeds (other than those related to or arising out of contracts to which MK is a party), if any, will be paid out of Ocean Mar's share of the Salvage recovery proceeds.

(c)    In the event the value of the Salvage recovery proceeds exceeds $1 billion then MK will be paid an additional fifty percent (50%) of the recovery proceeds from $1 billion to $1.2 billion, up to a maximum payment of $100 million.

(d)    The Recovery Plan that Ocean Mar will submit to the State and to SA for approval before filing with the Court will assume that their recoveries are net, not gross, i.e. subordinate to MK's Recovery Investment. However, MK acknowledges and agrees that the payments (and the order of payments) to be made by Ocean Mar hereunder are subject to approval of the Court. Notwithstanding anything in this Section 2 to the contrary, in the event that the Court does not approve the subordination of the Salvage Association's and the State of Alaska's claims to the recovery proceeds to MK's Recovery Investment (including the 15X multiple under this Section 2(a)), then payment of MK's Recovery Investment shall be subordinate to the claims of the Salvage Association and the State of Alaska.

---

[1] The SA Agreement requires payment of 25% of the recovery of insured gold. The State Agreement requires payment of 10% of the recovery of personal gold (as defined therein).

{01884280.DOC;9 }

3.     **Lien on Intellectual Property**. Ocean Mar hereby grants MK a security interest in and to all of Ocean Mar's intellectual property, including, without limitation, computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc. that is related to the salvage of the SS Islander and that is obtained or created during any of Ocean Mar's salvage recovery efforts funded by MK after the date hereof (the "**Intellectual Property**"). For sake of clarity, the Intellectual Property will not include any intellectual property created by Ocean Mar prior to the date of this Agreement. MK's security interest shall be evidenced by a lien on the Intellectual Property (the "**Lien**"). The Intellectual Property will be downloaded to a media disc on a daily basis and held by Cairncross & Hempelmann, P.S. in escrow pursuant to the terms of an escrow agreement ("**Escrow Agreement**") until the Lien is satisfied or otherwise released. The Lien will be released to Ocean Mar (or its successor in interest) when MK receives payment pursuant to this Agreement that is equal to or greater than the Recovery Investment plus interest at 12% per annum. Except for payments received by Ocean Mar with respect to revenues generated from the Media Rights (described in Section 5 below) which are not subject to MK's security interest or Lien, in no event shall Ocean Mar be entitled to revenues from the use of the Intellectual Property until MK receives payment in full.

4.     **Salvage and Recovery Operations**.

(a)     MK will consult in good faith with its team of experts, which will include Ted Jaynes, before making operational decisions with regard to the Salvage; however, MK will have final say on all operational matters related to the Salvage.

(b)     Ocean Mar, Inc. will be represented (by either Ted Jaynes personally or Jed Powell on his behalf) on the Salvage vessels at all times to ensure that the Salvage is conducted in full compliance with the Court approved Recovery Plan to be prepared by Cairncross & Hempelmann, P.S. (the "**Recovery Plan**"). Ocean Mar and MK will work with Cairncross & Hempelmann, P.S. attorneys to assemble a team of qualified experts to handle the logging, securing, storage, transportation, conversion, and ultimate distribution of gold and artifacts recovered during the Salvage. The parties agree and understand that the handling of all gold and artifacts from the point of recovery to the point of ultimate distribution will be in accordance with the State Agreement, the SA Agreement, and the requirements of the Court.

(c)     MK reserves the exclusive right to remove at any time any persons from the vessels located at the site of the Salvage operations in Juneau, Alaska if (i) such persons become continuously argumentative, combative, disruptive, or in any way consistently challenge the authority of Rodger May while Mr. May conducts onsite Salvage operations, or (ii) such persons' behavior causes or poses a serious risk to the safety of the crew and/or technology used at the site of the Salvage operations. Notwithstanding anything in this Agreement to the contrary, if Ocean Mar's on-board representative is removed from any vessel located at the site of the Salvage operations, MK agrees that Jed Powell, in consultation with Ted Jaynes, has the unfettered right to appoint any other person, including Jed Powell, to participate in the onsite Salvage operations and be on board such vessel or vessels in order to protect the interests of Ocean Mar, and MK agrees that such designated person cannot be removed from the vessels without Jed Powell's written approval.

L. Meier Decl., Ex. 4, p. 149 of 275

(d)     MK understands that persons and/or entities may have pirated some of the gold from the SS Islander in violation of contracts and/or NDAs with Ocean Mar. MK has the right to fund any action or lawsuit against such persons or entities in order to recover any stolen gold and artifacts. All funds expended by MK in connection with the action or lawsuit against such persons or entities shall be considered part of the Recovery Investment and subject to Section 2(a).

5.     **Media Rights and Revenues**.

(a)     MK and Ocean Mar want to contract with any and all available media entities the best available contracts for the exploitation of the media rights attending this adventure. These media rights shall be limited to the following: television, video, and feature and/or documentary film rights related to the Salvage operation (**"Media Rights"**). Notwithstanding the provisions of paragraph 3 herein, MK will have exclusive rights to negotiate and enter into media contracts for the licensing of the Media Rights on best terms available subject to final approval by Ocean Mar. Ocean Mar will not contact any of the media entities during the period in which MK is negotiating these contracts.

(b)     All revenues generated from the licensing of the Media Rights (**"Licensing Revenues"**) will be distributed as follows:

(i)     thirty-three percent (33.3%) of all Licensing Revenues will be paid to Ted Jaynes (Ted Jaynes agrees to pay the first $400,000 of such Licensing Revenues to Cairncross & Hempelmann, P.S. for past due legal fees);

(ii)     thirty-three percent (33.3%) of all Licensing Revenues will be paid to MK; and,

(iii)     thirty-three percent (33.3%) of all Licensing Revenues will be held in escrow by Cairncross & Hempelmann, P.S. pursuant to the terms of the Escrow Agreement. Any remaining escrowed Licensing Revenues shall only be released: (i) to an entity or person if MK and Ocean Mar jointly direct Cairncross & Hempelmann, P.S. to distribute such funds to that entity or person, or (ii) in equal amounts to MK and Ocean Mar one year from the date that the Licensing Revenues are first received by MK and Ocean Mar.

(c)     In the event this Agreement is terminated, MK shall be entitled to all Media Rights and its share of the Licensing Revenues for those media contracts entered into during the term of this Agreement. For media contracts that were in the process of negotiation but not finalized during the term of this Agreement, and for all Media Rights obtained after the termination of this Agreement in which MK and/or its principals, employees and agents were a part of the subject matter thereof, MK shall receive twenty-five percent (25%) of all Licensing Revenues therefrom.

6.     __Confidentiality__.

(a) MK acknowledges and agrees that all information, knowledge or data concerning or relating to the Salvage to which MK has been or shall become privy by reason of this Agreement, discussions or negotiations relating to this Agreement, or financing of the Salvage, whether orally or in writing, that has not already been publicly disclosed by Ocean Mar shall be considered confidential information of Ocean Mar (the "**Confidential Information**"). MK agrees that, except with the prior written permission of Ocean Mar, it shall at all times keep confidential and shall not use, divulge, furnish, publish or otherwise disclose or make accessible to anyone, or permit the use by others, any of the Confidential Information. To the extent any press release is to be published regarding the Salvage, MK and Ocean Mar will jointly agree on the content of such press release.

(b) Ocean Mar acknowledges and agrees that all the Intellectual Property will be kept confidential until such time as the Lien is released to Ocean Mar or its assigns. Ocean Mar also agrees to keep confidential the identity of MK and its owners and MK's contractual relationships with third parties; provided, however, that Ocean Mar may disclose MK's involvement in the Salvage to Ocean Mar's investors so long as MK's identity is not revealed to such investors.

7.     __Non-Competition__.     During the term of this Agreement neither party and/or its affiliates and assigns shall directly or indirectly, engage in, nor directly or indirectly finance, own any interest in, be employed by, or work for on a contractual basis any business or business entity which engages or intends or attempts to engage in, activities related to the Salvage.  And for a period of sixty (60) months after the termination of this Agreement or the financing relationship memorialized herein, regardless of the reason either may end, MK and its affiliates and assigns shall not, directly or indirectly, engage in, nor directly or indirectly finance, own any interest in, be employed by, or work for on a contractual basis any business or business entity which engages or intends or attempts to engage in, activities related to the Salvage, unless MK is engaged in the Salvage after foreclosing on the Lien. Ocean Mar and MK agree that an example of a company that would fall within the scope of this non-compete includes, without limitation, Yukon Recovery, Inc., a company that was previously involved in a dispute with Ocean Mar related to the rights to perform the Salvage. This dispute eventually led to litigation and was resolved solely in favor of Ocean Mar pursuant to the August 28, 1998 Order from Court.

MK acknowledges that the terms of this Agreement, including this __Section 7__, are reasonably necessary to protect Ocean Mar's legitimate business interests and are reasonably limited in scope and duration.

8.     __Injunctive Relief__.     MK and Ocean Mar mutually acknowledge that any violation by MK or Ocean Mar of any provision of this Agreement may cause the offended party (be it Ocean Mar or MK) substantial and irreparable injury. Therefore, MK and Ocean Mar agree that, upon a violation or threatened violation of any such Section, the offended party will be entitled, in addition to any other remedies it may have under this Agreement or at law, to seek injunctive and other equitable relief to prevent or curtail such violation.

9.     __Indemnification__. From and after the execution date of this Agreement, Ocean Mar shall indemnify, defend, save and hold harmless MK from and against any damage, liability, loss,

L. Meier Decl., Ex. 4, p. 151 of 275

expense or injury (including, without limitation, reasonable attorneys' fees and costs and expenses incident to any claim, suit action or proceeding) suffered by MK with respect to claims against Ocean Mar, Ted Jaynes, or their affiliates and assigns whether known or unknown, that exist as of the date of this Agreement. Ocean Mar's indemnification obligations hereunder only extend to claims for direct damages, not consequential, special, indirect, incidental, or punitive damages.

10.    **Insurance Requirements.** MK shall at all times during the term of this Agreement provide and maintain in effect those insurance policies and minimum limits of coverage as designated below, and any other insurance required by law in any jurisdiction where MK or its affiliates, contractors and assigns perform services related to this Agreement, with insurance companies authorized to do business in the jurisdiction where the work is to be performed and will comply with all those requirements as stated below. 50% of the cost of this insurance will be reimbursed to MK from Ocean Mar's recovery, if any, from the salvage. MK does not get a multiplier on insurance premiums paid.

(a)    Workers' Compensation insurance shall be provided by MK as required by any applicable law or regulation and, in accordance with the provisions of the laws of the nation, state, territory or province having jurisdiction over MK's employees. If any such applicable jurisdiction has a social scheme to provide insurance or benefits to injured workers, MK must be in full compliance with all laws thereof;

(b)    MK shall carry Commercial General Liability insurance covering all operations by or on behalf of MK or its affiliates and contractors arising out of or connected with this Agreement including coverage for bodily injury, death, property damage, personal and advertising injury, products liability, completed operations liability, claims by one insured against another insured, with limits of not less than $1,000,000 per occurrence. The "your work" exclusion in such insurance shall except damage caused by work done by a company of the insured. Such insurance must be on an "occurrence" basis and not "claims-made" basis;

(c)    MK shall carry Hull, Machinery, Equipment, and Dinghy insurance that covers the operation of its boats on domestic and international waters, including coverage for damage to the hull, or other parts of the boat and any injuries to the crew or other passengers on the boat, including persons that carry out diving services from the boat, with limits not less than $1,000,000 per occurrence;

(d)    MK shall carry Umbrella Liability and/or Excess Liability insurance for not less than $10,000,000 per occurrence in excess of the limits provided by MK's Commercial General Liability insurance policy. The Umbrella/Excess policy shall not contain an exclusion for contractual liability;

(e)    Ocean Mar, its subsidiaries and affiliates, and their respective officers, directors, employees and agents shall be named as Additional Insureds for the insurance policies required to be maintained by MK under this Agreement. The policies shall provide that MK's insurance shall be primary to and noncontributory with any and all other insurance maintained or otherwise

afforded to MK, its subsidiaries and affiliates, and their respective officers, directors, employees and agents;

(f) Certificates of Insurance or other formalized evidence of the coverages required above shall be furnished by MK to Cairncross & Hempelmann, P.S. when this Agreement is signed, or within a reasonable time thereafter, and within a reasonable time after such coverage is renewed or replaced. If reasonably requested by Ocean Mar, a certified copy of the actual policies with appropriate endorsements shall be provided to Ocean Mar. Any acceptance of insurance certificates by Ocean Mar shall not limit or relieve MK of the duties and responsibilities with respect to maintaining insurance assumed by it under this Agreement; and

(g) If MK does not comply with the insurance requirements of this Section 10, Ocean Mar may, at its option, provide insurance coverage to protect Ocean Mar and MK and charge MK for the cost of such insurance.

11. **Termination.** This Agreement may be terminated by MK at any time, without cause upon written notice to Ocean Mar. In the event of termination, MK's funding obligations shall cease, including obligations for payments under the Consulting Contract or for payments to any other consultants and subcontractors, and its rights to receive future proceeds from the salvage operations contemplated in this Agreement shall terminate, with the exception of its rights to a return of the Recovery Investment and future License Revenues as set forth in Sections 2, 3 and 5 herein which shall survive the term of this Agreement. In the event of termination of this Agreement for any reason, Sections 6 – 13 and 15-17 shall also survive termination of this Agreement.

12. <u>Notices</u>. All notices required or permitted to be given under this Agreement (collectively, including any Requests, **"Notices"**) shall be in writing. Notices may be served by certified or registered mail, postage paid with return receipt requested; by private courier, prepaid; or personally. Mailed notices shall be deemed delivered five days after mailing, properly addressed. Couriered notices shall be deemed delivered when delivered as addressed, or if the addressee refuses delivery, when presented for delivery notwithstanding such refusal. Personal delivery shall be effective when accomplished. Unless a party changes its address by giving notice to the other party as provided herein, notices shall be delivered to the parties at the following addresses:

(a) Notice to Ocean Mar: By notice to:

Ted Jaynes
c/o Cairncross & Hempelmann, P.S.
524 Second Ave., Suite 500
Seattle, WA 98104
Attn.: Jed Powell

(b) Notice to MK: By notice to:

MK Salvage Venture, LLC
4209 21st Avenue W.
Suite 400

{01884280.DOC;9 }

Seattle, WA 98199
Attn: Peter Kuttel and Rodger D. May

13.     **Independent Counsel.** MK acknowledges that this Agreement has been prepared on behalf of Ocean Mar by Cairncross & Hempelmann, P.S. and that MK has elected to retain Vi Jean Reno as its independent counsel in connection with the negotiation of this Agreement. Cairncross & Hempelmann, P.S. is not representing, nor acting on behalf of MK with regard to the formation of this Agreement.

14.     **Transfer Prohibited.** Neither this Agreement nor any of the rights of the parties hereto may be transferred or assigned by either party without the other party's prior written consent; provided, however, MK's rights under this Agreement may be assigned to any entity in which Rodger May and/or Peter Kuttel (i) own at least 51% of such entity's voting power, or (ii) Rodger May and/or Peter Kuttel are the CEOs/Presidents, managers, managing members or general partners. MK represents, warrants and covenants that Rodger May, Peter Kuttel and/or entities controlled by each of them, currently own and will continue to own at least 51% of the voting power of MK and that Rodger May and Peter Kuttel will continuously serve as the co-Operating Managers of MK with full authority and power to act for, and represent the interests of MK.

15.     **Choice of Law; Venue.** This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Washington, without giving effect to principles and provisions thereof relating to conflict or choice of laws, irrespective of the fact that any one of the parties is now or may hereafter become a resident of a different state. Venue for any action under this Agreement shall lie in the state and federal courts located in King County, Washington. In the event of a dispute between the parties concerning this Agreement or the subject matter thereof, the most prevailing party shall be entitled to recovery of its reasonable attorney's fees and costs incurred, regardless of whether suit was instituted or on appeal.

16.     **Waiver; Amendment.** This Agreement, and the terms and conditions hereof, may only be amended, terminated, or waived with the written consent of all of the parties hereto.

17.     **Miscellaneous.** This Agreement: (a) sets forth the entire agreement of Ocean Mar and MK with respect to the subject matter hereof; and (b) shall inure to the benefit of, and be binding upon, Ocean Mar, MK, and their respective heirs, legal representatives, successors, and assignees.

**[Remainder of Page Intentionally Left Blank; Signature Page Follows]**

Accepted and agreed to as of the date first written above.

**OCEAN MAR (WASHINGTON) INC.**

By: _____

Name: Theodore Jaynes

Title: President

Date: 3-29-12

**MK SALVAGE VENTURE, LLC**

By: _____

Name: _____

Title: _____

Date: _____

By: _____

Name: _____

Title: _____

Date: _____

L. Meier Decl., Ex. 4, p. 155 of 275

Accepted and agreed to as of the date first written above.

**OCEAN MAR (WASHINGTON) INC.**

By:

Name: Theodore Jaynes

Title: President

Date: 3-29-12

**MK SALVAGE VENTURE, LLC**

By:

Name: Rodger May

Title:

Date: 3-29-12

By:

Name:

Title:

Date:

{01884280.DOC;9 }

<u>**Exhibit A**</u>

<u>**Ted Jaynes Consulting Agreement**</u>

{01884280.DOC;9 }

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "**Agreement**"), dated as of March 28, 2012, is by and between MK Salvage Venture, LLC, a Washington limited liability company (the "**Company**") and Theodore P. Jaynes ("**Consultant**"). All terms not otherwise defined herein shall have the meaning ascribed thereto in that certain Financing and Salvage Management Agreement (the "**Financing Agreement**") by and between the Company and Consultant and dated of even date herewith.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Engagement of Consultant**.  The Company hereby engages Consultant to provide services to the Company, and Consultant hereby accepts such engagement, on the terms and conditions set forth herein.

2.    **Description of Services**.  Throughout the term of this Agreement, Consultant shall provide services (the "**Services**") to the Company on a variety of matters relating to the salvage and recovery of the S.S. Islander, as further described in the Financing Agreement (the "Salvage").  Subject to the rights of Ocean Mar and/or Consultant set forth in the Financing Agreement, including, without limitation, Section 4 of the Financing Agreement, the type and manner of services provided by Consultant shall be at the sole and absolute discretion of Company. Nothing herein shall limit Consultant's right to engage in activities outside the scope of this Agreement, provided that such activities are not inconsistent with the terms of this Agreement.

3.    **Compensation**.  Company will pay Consultant as follows:

       (a)    A onetime payment of $15,000 upon the date this Agreement is executed by the parties as more particularly set forth in the Financing Agreement.

       (b)    A flat fee of $5,000 per month as compensation for the Services beginning on May 1, 2012, or the date upon which Mr. Jaynes, Company's owners or employees, or any persons or entities hired by Company to assist with the Salvage operations first depart for Juneau, Alaska in connection with the Salvage.  Payment for such monthly fee shall be due within 10 days of the end of each completed month and shall be pro-rated with respect to any partially completed months. Company will not pay Consultant for his expenses incurred in connection with the Services.  Company's obligation to pay this monthly fee shall cease at such time as this Agreement terminates in accordance with the provisions of paragraph 4 herein.,

L. Meier Decl., Ex. 4, p. 158 of 275

4. **Term and Termination**.

(a)     This Agreement shall commence on March 28, 2012, and shall continue until the earlier of the date that (i) Company ceases to be involved with the Salvage through termination of the Financing Agreement or (ii) Ted Jaynes receives Salvage recovery proceeds as a result of the recovery of gold during the Salvage.

(b)     Upon the termination or expiration of this Agreement, the Company shall pay Consultant any fees owed prior to the date of termination.

5. **Duty of Full Disclosure**. Upon execution of this Agreement Consultant represents and warrants that he shall have a duty of full disclosure to the Company with respect to all aspects of the Salvage. The parties acknowledge that Consultant's knowledge of the Salvage operations is critical to the continuance of the Salvage and it is agreed that Consultant's duty of full disclosure is for the purpose of continuing operations in the event of Consultant's death or incapacity. The Company represents and warrants that all information received from Consultant shall not be deemed Intellectual Property (as defined in the Financing Agreement) of Company and shall be subject to the Confidentiality provisions and Non-Competition provisions of the Financing Agreement.

6. **Independent Contractor Status**. The parties agree that Consultant is an independent contractor and not an employee of the Company. Consultant is not entitled to worker's compensation, retirement, insurance or other benefits provided to employees of the Company, nor will the Company make deductions from the advisory fees for taxes, insurance, bonds or any other subscription of any kind, which shall be Consultant' sole responsibility. Consultant acknowledges that he is responsible for the payment of all personal taxes, fees and other assessments arising from providing the Services and shall otherwise comply with applicable laws, ordinances, regulations and other government requirements related thereto. The parties acknowledge and agree that neither party has the power or authority to act for, represent or bind the other in any manner, except as so authorized in writing by the Company or Consultant. This Agreement is expressly not intended to create a joint venture, partnership, agency, employment or other relationship.

7. **Miscellaneous**.

(a)     If court or alternative dispute resolution proceedings are required to enforce any provision of this Agreement, the substantially prevailing party shall be entitled to an award of reasonable costs and expenses of litigation or dispute resolution proceeding and any appeal, including reasonable attorneys' fees.

(b)     If any provision of this Agreement is held to be unenforceable as written, it shall be enforced to the maximum extent allowed by applicable law.

(c)     Neither this Agreement nor any of the rights, interests, or obligations under this Agreement will be assigned by any party without the prior written consent of the other party.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

(d)     This Agreement constitutes the entire agreement between the Company and Consultant, represents the final and complete expression of the parties' agreement on the subject matter hereof, and merges all prior and contemporaneous communications with respect to the subject matter hereof.  This Agreement may not be modified except by a subsequent written agreement signed by both parties.

(e)     This Agreement shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of Washington. Venue for any action under this Agreement shall lie in the state and federal courts located in King County, Washington.

(f)     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and together will constitute one and the same instrument.  A facsimile signature or an emailed signature shall have the same force and effect as an original signature.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

L. Meier Decl., Ex. 4, p. 160 of 275

## SIGNATURE PAGE TO CONSULTING AGREEMENT

The Company and Consultant have executed this Agreement as of the date first above written.

**COMPANY:**     **MK SALVAGE VENTURE, LLC**

By: _____

Name: _____

Title: _____

Date: _____


By: _____

Name: _____

Title: _____

Date: _____


**CONSULTANT:**     **THEODORE P. JAYNES**

L. Meier Decl., Ex. 4, p. 161 of 275

**Exhibit B**

**Recovery Distribution Examples**

Attached.

{01884280.DOC;9 }

| | | | |
|---|---|---|---|
| Investment Amount | $ 5,000,000.00 | | |
| | | | |
| Recovery Amount (15X) | | | |
| 15 | | $ | 75,000,000.00 |
| | | | |
| **Less:** | | | |
| Salvage Association | | | 18,750,000.00 |
| Rodger 7X or $30M Cap | | $ | 30,000,000.00 |
| **Distributable Proceeds** | | $ | 26,250,000.00 |
| | | | |
| Rodger May | | $ | 13,125,000.00 |
| Ocean Mar | | $ | 13,125,000.00 |

Table below works up to $4,285,714

| | | | |
|---|---|---|---|
| Investment Amount | $ 1,500,000.00 | | |
| | | | |
| Recovery Amount (15X) | | | |
| 15 | | $ | 22,500,000.00 |
| | | | |
| **Less:** | | | |
| Salvage Association | | | 5,625,000.00 |
| Rodger 7X or $30M Cap | | $ | 10,500,000.00 |
| **Distributable Proceeds** | | $ | 6,375,000.00 |
| | | | |
| Rodger May | | $ | 3,187,500.00 |
| Ocean Mar | | $ | 3,187,500.00 |

# EXHIBIT B

COME NOW all of the members of MK Salvage Venture LLC, (the "Company"), a Washington limited liability company consisting of Rodger D. May and Bear Enterprises LLC, and they unanimously resolve that:

1.    The only known assets of MK Salvage Venture LLC are:

    a.    The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the "OMI contract") dated March 29, 2012, as amended;

    b.    The right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under Paragraph 2(a)(i) of the OMI contract;

    c.    Any rights to other salvage recovery proceeds under Paragraph 2 of the OMI contract, except as set forth in the immediately preceding paragraph;

    d.    The protector vessel AU1, USCG Official No. 1199468, and appurtenances;

    e.    Ownership units of Gold Leaf Productions, LLC, an Alaskan limited liability company, Entity No. 1001005; and

    f.    Wells Fargo Bank Account No. 3139238962.

2.    The assets of MK Salvage Venture LLC will be distributed as follows:

    a.    To Rodger D. May, all assets as described in ¶ 1(a), ¶ 1(c), and ¶ 1(e) above, at no cost to him;

    b.    To Bear Enterprises LLC, the asset described in ¶ 1(d) above. Bear Enterprises LLC will pay $180,000 to Rodger D. May for this asset;

    c.    To Rodger D. May and Bear Enterprises LLC equally, the asset described in ¶ 1(b) above; and

    d.    The bank account identified in ¶ 1(f) above will be distributed in accordance with ¶ 7 below.

L. Meier Decl., Ex. 4, p. 165 of 275

3.  By this resolution, MK Salvage Venture LLC hereby assigns all of its right, title, and interest in the salvage contract rights described in ¶ 1(a) and ¶ 1(c), above to Rodger D. May, as well as the ownership units of Gold Leaf Productions, LLC to Rodger D. May. As of the date of execution of this Record of Action, and except as provided herein, Bear Enterprises LLC shall have no further right to gold recovered by Rodger D. May in any salvage efforts initiated by Rodger D. May.

4.  By this resolution, MK Salvage Venture LLC hereby assigns all of its right, title and interest in the reimbursement rights set forth in ¶ 1(b) above, to its two members equally: Rodger D. May and Bear Enterprises LLC.

5.  Peter J. Kuttel, as a representative of MK Salvage Venture LLC, shall execute a Coast Guard form of Bill of Sale (USCG Form 1340) in substantially the form attached, so as to transfer title of the vessel AU1 from MK Salvage Venture LLC to Bear Enterprises LLC.

6.  The members of MK Salvage Venture LLC shall execute a Release of Hold Harmless in substantially the form attached.

7.  MK Salvage Venture LLC has one bank account, located at Wells Fargo Bank, and this account is used to pay routine expenses. This account shall remain in place to cover any corporate tax liabilities and tax preparation expenses, plus vessel expenses until title has been transferred. After all expenses have been paid, any remaining account balance shall be distributed to the Company members equally.

8.  MK Salvage Venture LLC agrees that any applicable tax losses to which the Company is entitled shall be taken in tax year 2015.

9.  The Company's regular certified public accountants will be directed to prepare final tax returns for 2015 and 2016.

10.  Counsel for Rodger D. May and Peter J. Kuttel shall execute a Stipulation and Order of Dismissal, with prejudice and without costs to either party, of the lawsuit filed in King County Superior Court, Cause No. 16-2-00620-5 SEA, Kuttel v. May.

11.  After the distribution of all assets and the payment of all expenses as set forth above, MK Salvage Venture LLC authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the Washington Secretary of State and to the State of Alaska Department of Commerce, a Certificate of Dissolution.

*[ signature page follows ]*

Page 2

Dated this _____ day of August, 2016.

RODGER D. MAY

_L_____

Rodger D. May, Member
MK Salvage Venture LLC

BEAR ENTERPRISES LLC

_____

Bear Enterprises LLC, Member
MK Salvage Venture LLC
By: _____ PETER KUTTER _____
Its: _____ MEMBER _____

[SIGNATURE PAGE TO RECORD OF ACTION OF MK SALVAGE VENTURE LLC]

L. Meier Decl., Ex. 4, p. 167 of 275

# EXHIBIT C

### Assignment of MK Salvage Venture LLC Assets

COME NOW all of the members of MK Salvage Venture LLC, (the "Company"), a Washington limited liability company consisting of Rodger D. May and Bear Enterprises LLC, and they unanimously resolve that:

1. MK Salvage Venture LLC, pursuant to the Record of Action to Distribute Assets dated August ____, 2016, hereby unconditionally sells, assigns, and transfers to Rodger D. May 100% of any and all rights, title, and interest it has in the following:

- The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the "OMI contract") dated March 29, 2012, as amended;

- Ownership units of Gold Leaf Productions, LLC, an Alaskan limited liability company, Entity No. 1001005;

2. MK Salvage Venture LLC, pursuant to the Record of Action to Distribute Assets dated August ____, 2016, hereby unconditionally sells, assigns and transfers, equally, to Rodger D. May and Bear Enterprises LLC, the right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under ¶ 2(a)(i). Any rights to other salvage recovery proceeds under ¶ 2 of the OMI contract are hereby assigned to Rodger D. May solely.

3. This assignment is effective as of August __, 2016.

*[ signature page follows ]*

Page 1

Dated this _____ day of August, 2016.

RODGER D. MAY

_d_ —

Rodger D. May, Member
MK Salvage Venture LLC

BEAR ENTERPRISES LLC

Bear Enterprises LLC, Member
MK Salvage Venture LLC

By: PETER KUTTEL

Its: MEMBER.

# EXHIBIT D

### Record of Action of MK Salvage Venture LLC
### to Dissolve Company

COME NOW all of the members of MK Salvage Venture LLC, (the "Company"), a Washington limited liability company consisting of Rodger D. May and Bear Enterprises LLC, and they unanimously resolve that:

1.    MK Salvage Venture LLC is in the process of winding up all of its affairs and activities in accordance with RCW 25.15.297.

2.    MK Salvage Venture LLC has, in accordance with RCW 25.15.305, distributed all of the assets it holds to its two members, equally, except that it will retain its sole checking account at Wells Fargo Bank, Account No. 3139238962, in order to pay the Company's final expenses, such as income tax, insurance and tax preparation fees and costs. The division of Company assets is as set forth in a separate Record of Action of this same date. After the 2016 taxes and preparation fees and any other routine expenses have been paid, any amount remaining in that bank account will be distributed to its two members equally.

3.    Other than as set forth in ¶ 2 above, MK Salvage Venture LLC knows of no claims against the Company.

4.    After the distribution of all assets and the payment of final expenses as set forth in ¶ 2 above, MK Pacific LLC authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the Washington Secretary of State a Certificate of Dissolution.

Dated this _____ day of August, 2016.

**RODGER D. MAY**

_____
Rodger D. May, Member
MK Salvage Venture LLC

**BEAR ENTERPRISES LLC**

_____
Bear Enterprises LLC, Member
MK Salvage Venture LLC

By: _____ _Ph.iFa   KuTiRi_

Its: _____ _MEmBER_

# ZORETIC DEC. ON REASONABLENESS

# EXHIBIT C

*May v. Mk Salvage Venture, et al*

SUMMARY JUDGMENT RESPONSE

# SUMMARY JUDGMENT RULES

- The trial court should view all the facts — and all reasonable inferences from the facts — in the light most favorable to the nonmoving party. *Christensen v. Grant County, Hosp. Dist. No. 1*, 152 Wn.2d 299, 305 (2004)

- "Question of contract interpretation may be determined as a matter of law if it does not turn on the credibility of extrinsic evidence or ... a choice among reasonable inferences to be drawn from extrinsic evidence." *Donatelli v. D.R. Strong Consulting Engrs*, 179 Wn.2d at 107.

# Timeline

1901: SS ISLANDER SINKS OFF JUNEAU, AK CARRY DOZENS OF BOXES OF GOLD LONDON INSURERS PAY LOSS

2012: OCEAN MAR, INC. (TED JAYNES, PRES.) OBTAINS SALVAGE RIGHTS

# RODGER MAY AND PETER KUTTEL

- PREVIOUSLY FORMED MK PACIFIC, LLC

- INVOLVED IN MULTIPLE BUSINESS ENTITIES

- PETER KUTTEL OPERATES UNDER BEAR ENTERPRISES LLC

L. Meier Decl., Ex. 4, p. 177 of 275

# MK SALVAGE VENTURE LLC

- EARLY 2012: JAYNES APPROACHES MAY WITH OPPORTUNITY TO INVEST IN SS ISLANDER SALVAGE OPERATIONS

- MAY AND KUTTEL AGREE TO FORM NEW ENTITY FOR PROVIDING INVESTMENT AND MANAGEMENT OF OPERATIONS

# MK SALVAGE VENTURES LLC

# OPERATING AGREEMENT

5.3    Action by Members.    Except as otherwise specifically provided herein, all actions and decisions of the Members shall require the approval of Members holding more than seventy-five percent (75%) of the Units of the Company.    The Members may make any decision or take any action at a meeting, by conference telephone call, by written consent, by oral agreement or any other method it elects; provided that, at the request of any Member with respect to decision or action of the Members, such decision or action must be made or taken by written consent signed by the number of Members required to approve such decision or action.

L. Meier Decl., Ex. 4, p. 179 of 275

# OMI/MKSV FINANCING & MANAGEMENT AGREEMENT

- MK SALVAGE TO FUND SALVAGE OPERATIONS UP TO $5 MILLION

- PARTICIPATE AND MANAGE SALVAGE OPERATIONS WITH OMI

# OMI CONTRACT
# RECOVERY INVESTMENT

2.   **Consideration for Funding.**  In consideration for MK's covenants and obligations set forth herein, Ocean Mar agrees to make the following payments:

(a)   Subject to approval of the Recovery Plan (defined below) by the Court, Ocean Mar will pay to MK: (i) an amount equal to the Recovery Investment, or (ii) an amount equal to seven times the Recovery Investment but if and only if the value of the Salvage recovery proceeds is at least 15 times the amount of the Recovery Investment. Notwithstanding anything herein to the contrary, the total payment to MK under this Section 2(a) will not exceed $30,000,000. Examples of the possible distribution of proceeds pursuant to this Section 2(a) are set forth at Exhibit B hereto.

# RECOVERY DISTRIBUTION EXAMPLE

| | | |
|---|---|---|
| Investment Amount | | $ 5,000,000.00 |
| Recovery Amount (15X) 15 | $ | 75,000,000.00 |
| **Less:** | | |
| Salvage Association | $ | 18,750,000.00 |
| Rodger 7X or $30M Cap | $ | 30,000,000.00 |
| **Distributable Proceeds** | $ | 26,250,000.00 |
| Rodger May | $ | 13,125,000.00 |
| Ocean Mar | $ | 13,125,000.00 |

# OMI CONTRACT
# IP SECURITY INTEREST

3. **Lien on Intellectual Property.** Ocean Mar hereby grants MK a security interest in and to all of Ocean Mar's intellectual property, including, without limitation, computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc. that is related to the salvage of the SS Islander and that is obtained or created during any of Ocean Mar's salvage recovery efforts funded by MK after the date hereof (the "**Intellectual Property**"). For sake of clarity, the Intellectual Property will not include any intellectual property created by Ocean Mar prior to the date of this Agreement. MK's security interest shall be evidenced by a lien on the Intellectual Property (the "**Lien**"). The Intellectual Property will be downloaded to a media disc on a daily basis and held by Cairncross & Hempelmann, P.S. in escrow pursuant to the terms of an escrow agreement ("**Escrow Agreement**") until the Lien is satisfied or otherwise released. The Lien will be released to Ocean Mar (or its successor in interest) when MK receives payment pursuant to this Agreement that is equal to or greater than the Recovery Investment plus interest at 12% per annum. Except for payments received by Ocean Mar with respect to revenues generated from the Media Rights (described in Section 5 below) which are not subject to MK's security interest or Lien, in no event shall Ocean Mar be entitled to revenues from the use of the Intellectual Property until MK receives payment in full.

# OMI CONTRACT

## TRANSFER OF RIGHTS

14. **Transfer Prohibited.** Neither this Agreement nor any of the rights of the parties hereto may be transferred or assigned by either party without the other party's prior written consent; provided, however, MK's rights under this Agreement may be assigned to any entity in which Rodger May and/or Peter Kuttel (i) own at least 51% of such entity's voting power, or (ii) Rodger May and/or Peter Kuttel are the CEOs/Presidents, managers, managing members or general partners. MK represents, warrants and covenants that Rodger May, Peter Kuttel and/or entities controlled by each of them, currently own and will continue to own at least 51% of the voting power of MK and that Rodger May and Peter Kuttel will continuously serve as the co-Operating Managers of MK with full authority and power to act for, and represent the interests of MK.

# SALVAGE OPERATIONS IN 2012

- OMI/MK SALVAGE HIRE TETRA TECH TO HELP FIND THE SS ISLANDER

- TWO EXPEDITIONS TAKE PLACE

- MK SALVAGE INVESTS $5.5 MILLION FOR SALVAGE AND CREATION OF IP

- LOCATE BOX CONTAINING $1.3m GOLD

# SALVAGE VIDEO



# CHANGES TO ESCROW PROVISION

- Kutell, May and OMI agreed to a "course of conduct" that the IP could be used during the ongoing salvage operations and did not need to be downloaded to C&H until the salvage operations were complete. *Bear Dec., p. 61, 11-25, p. 64, ll. 1-12; p. 67 ll. 24-25; p. 68, ll 1-2.*

- May and Kuttel recognized that it was important to have access to the IP during the continuing operations. *Id. at p. 68, 11-16; May Dec., ¶8.*

L. Meier Decl., Ex. 4, p. 188 of 275

# REMOVAL OF IP FROM ESCROW

- November of 2015 - Jed Powell, OMI's attorney, delivers IP to MKSV/Bear's office.

- All parties were aware IP had been transferred from C&H (the Escrow Agent) and now was in the possession of MKSV, the secured creditor under the OMI Agreement.

L. Meier Decl., Ex. 4, p. 189 of 275

# POSSESSORY LIEN

- All agree MKSV thereafter had a <u>possessory</u> security interest, securing MKSV's rights to reimbursement of the remaining Recovery Investment.

- "MK has a powerful lien on that asset, a possessory lien of sorts...."

  <u>See</u> Vi Jean Reno letter to K. Larson 7/26/17 (*May Dec., Ex. I*)

# BREAK-UP OF MK COMPANIES

- By Late 2015 – May and Kuttel decide to end their business relationships

- Goal was to reach full resolution and close out all MK companies

**From:** Peter Kuttel [peter@bearenterprises.net]
**Sent:** Friday, December 04, 2015 2:26 PM
**To:** Daniel Leston
**Subject:** Re: Resolution of MK Pacific LLC - DRAFT 120315.doc

That is what we are doing with this resolution. There are items that cannot be distributed out yet. MK Canada is one. There is a pending lawsuit as noticed earlier that might yield a distribution. The process cannot be "distributed" or "taken care of" as we do not control it. If a favorable result is achieved it will result in a cash distribution to MK which in turn will be distributed to members per this resolution. At that point the investment is concluded. Tax returns can be filed as final and case is closed. This is not complicated. I am not interested in bidding for shares. This is a runoff as Rodger wanted. Culley is another.

Peter Kuttel

On Dec 5, 2015, at 00:11, Daniel Leston <Daniel@bearenterprises.net> wrote:

PJ,

Rodger wants all aspect of MK to be closed out. This includes:

MK salvage including the protector.
Bear trading.
MK Canada.

What he suggested is the we distribute out the stock and remaining shares of MK go to the highest bidder. He said he is aware of the December 8th deadline and suggest we take of this outstanding matter this weekend.

Dan

# MK SALVAGE'S "ASSETS"

- 1/15/15: MAY OFFERS $200K FOR MK SALVAGE ASSETS. _See_ May Dec., Ex. D:

Pardon me for not having all the trust in the world as I've been asking for my assets to be returned for the past year. My agreement was to pay the Bank of America debt by Friday, which I will do into escrow. In addition two hundred thousand dollars for the MK salvage assets. I have given Dan an easy way for you to be able to release the monies out of escrow by tomorrow. I just want to know that my assets are being returned from MK that are due to me and agreed by both parties no more no less. You control Dan and my assets which you have been holding. Please advise if you want the money to go to escrow and if you're planning on returning all of my millions in assets that you are wrongfully holding and causing me harm!! Last but not least the reimbursement of your Bank of America dad has never been at issue the only thing that is at issue is an amicable way to give you your Bank of America debt and me get my millions of dollars of assets. Escrow seems to be the only way since the trust seems to have been broken

# MAY REQUESTS TO REVIEW IP

- ## 1/19/16, May Dec., Ex. F:

**From:** Rodger May [rodgermay66@gmail.com]
**Sent:** Tuesday, January 19, 2016 12:21 PM
**To:** Daniel Leston
**Cc:** Jed Powell
**Subject:** Re: Illumagear - MK Pacific - tranche 2 funding update

As requested yesterday via email with no response. I need to review the mk salvage data ASAP which you have not responded to. We can't afford to lose anymore time on the salvage. Ted said that he went down just now and you would not make available, why??? He also stated that the data was not in the office, where in gods name is it?? It's 5 million worth of data, it should be under lock and key unless signed out to peter or myself for research!!!

Kindest regards

- 1/20/2016 – MAY AND BEAR REFER TO THE INTELLECTUAL PROPERTY AS AN "ASSET" OF THE COMPANY:

As far as the salvage assets go, of course the data are in the corporate offices, held in a secured manner. Regarding our refusal to allow Ted Jaynes to take the salvage data from the office, what right does he have to take (or copy, or even look at) that data? I think that the release of that data to an outside party like Jaynes has the effect of diminishing the value of the assets with no consideration. And I think that all corporate owners have the duty to maintain the value of all assets.

Dan

- *May Dec., Ex. G.*

# NOVEMBER 2016
# RECORD OF ACTIONS

- RECORD OF ACTION TO DISTIBUTE ALL KNOWN ASSETS

- ASSIGNMENT OF ASSETS

- RECORD OF ACTION TO DISSOLVE COMPANY

L. Meier Decl., Ex. 4, p. 196 of 275

# BIG PICTURE

- MAY AND BEAR AGREE TO IDENTIFY AND DISTRIBUTE "ALL KNOWN ASSETS OF MKSV"

- AGREE TO DISSOLVE COMPANY AFTER DISTRIBUTION OF ASSETS AND PAYMENT OF EXPENSES

- AGREE TO A "RELEASE OF HOLD HARMLESS"

# DIVISION OF "ASSETS"

- MAY TO RECEIVE MK'S SALVAGE RIGHTS UNDER OMI CONTRACT

- MAY AND BEAR TO EACH RECEIVE ½ OF RECOVERY INVESTMENT REIMBURSEMENT

- MAY ENTITLED TO ANY ADDITIONAL SALVAGE PROCEEDS

- BEAR TO RECEIVE PROTECTOR VESSEL

# DISTRIBUTE ALL KNOWN ASSETS

1. The only known assets of MK Salvage Venture LLC are:

   a. The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the "OMI contract") dated March 29, 2012, as amended;

   b. The right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under Paragraph 2(a)(i) of the OMI contract;

   c. Any rights to other salvage recovery proceeds under Paragraph 2 of the OMI contract, except as set forth in the immediately preceding paragraph;

   d. The protector vessel AUI, USCG Official No. 1199468, and appurtenances;

   e. Ownership units of Gold Leaf Productions, LLC, an Alaskan limited liability company, Entity No. 1001005; and

   f. Wells Fargo Bank Account No. 3139238962.

# MKSV DISTRIBUTES ALL IT OWNS

3. By this resolution, MK Salvage Venture LLC hereby assigns all of its right, title, and interest in the salvage contract rights described in ¶ 1(a) and ¶ 1(c), above to Rodger D. May, as well as the ownership units of Gold Leaf Productions, LLC to Rodger D. May. As of the date of execution of this Record of Action, and except as provided herein, Bear Enterprises LLC shall have no further right to gold recovered by Rodger D. May in any salvage efforts initiated by Rodger D. May.

4. By this resolution, MK Salvage Venture LLC hereby assigns all of its right, title and interest in the reimbursement rights set forth in ¶ 1(b) above, to its two members equally: Rodger D. May and Bear Enterprises LLC.

# CONDITIONS FOR DISSOLUTION

7.    MK Salvage Venture LLC has one bank account, located at Wells Fargo Bank, and this account is used to pay routine expenses. This account shall remain in place to cover any corporate tax liabilities and tax preparation expenses, plus vessel expenses until title has been transferred. After all expenses have been paid, any remaining account balance shall be distributed to the Company members equally.

8.    MK Salvage Venture LLC agrees that any applicable tax losses to which the Company is entitled shall be taken in tax year 2015.

9.    The Company's regular certified public accountants will be directed to prepare final tax returns for 2015 and 2016.

11.    After the distribution of all assets and the payment of all expenses as set forth above, MK Salvage Venture LLC authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the Washington Secretary of State and to the State of Alaska Department of Commerce, a Certificate of Dissolution.

# ASSIGNMENT OF ASSETS

1. MK Salvage Venture LLC, pursuant to the Record of Action to Distribute Assets dated August ___, 2016, hereby unconditionally sells, assigns, and transfers to Rodger D. May 100% of any and all rights, title, and interest it has in the following:

- The right to conduct further salvage efforts relating to the sunken S/S ISLANDER, as contained in the Financing and Salvage Management Agreement between MK Salvage Venture LLC and Ocean Mar, Inc. (the "OMI contract") dated March 29, 2012, as amended;

2. MK Salvage Venture LLC, pursuant to the Record of Action to Distribute Assets dated August ___, 2016, hereby unconditionally sells, assigns and transfers, equally, to Rodger D. May and Bear Enterprises LLC, the right to reimbursement of MK Salvage Venture LLC's Recovery Investment (as defined in the OMI contract) under ¶ 2(a)(i). Any rights to other salvage recovery proceeds under ¶ 2 of the OMI contract are hereby assigned to Rodger D. May solely.

L. Meier Decl., Ex. 4, p. 202 of 275

# DISSOLVE COMPANY

1. MK Salvage Venture LLC is in the process of winding up all of its affairs and activities in accordance with RCW 25.15.297.

2. MK Salvage Venture LLC has, in accordance with RCW 25.15.305, distributed all of the assets it holds to its two members, equally, except that it will retain its sole checking account at Wells Fargo Bank, Account No. 3139238962, in order to pay the Company's final expenses, such as income tax, insurance and tax preparation fees and costs. The division of Company assets is as set forth in a separate Record of Action of this same date. After the 2016 taxes and preparation fees and any other routine expenses have been paid, any amount remaining in that bank account will be distributed to its two members equally.

3. Other than as set forth in ¶ 2 above, MK Salvage Venture LLC knows of no claims against the Company.

4. After the distribution of all assets and the payment of final expenses as set forth in ¶ 2 above, MK Pacific LLC authorizes Daniel Leston, Chief Financial Officer of the Company, to deliver to the Washington Secretary of State a Certificate of Dissolution.

# LLC OPERATING AGREEMENT ON DISSOLUTION

16. DISSOLUTION AND TERMINATION

16.1 <u>Dissolution.</u> The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following events (each a "Dissolution Event"):

16.1.1 by the written agreement of all Members;

16.3 <u>Winding Up, Liquidation and Distribution of Assets.</u> Upon dissolution, the Members shall immediately proceed to wind up the affairs of the Company. The Members shall sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members may determine to distribute any assets to the Interest Holders in kind) and shall apply the proceeds of such sale and the remaining Company assets in the following order of priority:

# REFUSAL TO GRANT MAY USE OF IP

- JANUARY 2017- MAY DEMANDS TRANSFER OF IP FOR USE IN SALVAGE OPERATIONS

- JULY 2017 – MAY AGAIN REQUESTS IP TO COMPLY WITH ONGOING OMI CONTRACT

# HOLDING THE IP HOSTAGE

- FIRST TIME BEAR ASSERTS MKSV IS STILL "OWNER" OF IP POSSESSORY LIEN

- DEMANDS THAT MKSV RECEIVE THE RECOVERY INVESTMENT BEFORE IT ALLOWS USE OF IP

- IGNORES PARTIES' AGREEMENT THAT IP WAS TO BE USED IN SALVAGE OPERATIONS

- IGNORES MAY'S 50/50 MANAGEMENT RIGHTS

# FAILURE TO DISSOLVE MKSV

- ALL CONDITIONS STATED IN AGREEMENT SATISFIED BY 2017

- BEAR'S DAN LESTON DID NOT DISSOLVE COMPANY

- BEAR KEPT MKSV ALIVE TO JUSTIFY ITS HOLDING OF THE IP

# BEAR'S SECRET ACTIONS

- APRIL 2018 - MOVES THE IP TO HIS PRIVATE RESIDENCE

- AUGUST 2018 - DIRECTS RENO TO REVIVE THE COMPANY AFTER ADMINISTRATIVE DISSOLUTION

- RENO REGISTERS CORPORATE ADDRESS AT RENO'S LAW OFFICE

# BEAR'S ACTIONS HARM MAY

- MAY PREVENTED FROM USING THE "TREASURE MAP" HE HAD HELPED PAY FOR

- WITHOUT THE IP, MAY'S SALVAGE RIGHTS WERE IMPAIRED

- OMI'S SALVAGE CONTRACT HAVE NOW LAPSED AND ANOTHER COMPANY HAS OBTAINED SALVAGE RIGHTS

- TYCHE CONTACTED MKSV/BEAR TO BUY IP

L. Meier Decl., Ex. 4, p. 209 of 275

# REASONABLE INTERPRETATION

- Summary judgment on an issue of contract interpretation is proper if a written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning. *Spradlin Rock Prods., Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County*, 164 Wn.App. 641, 655 (2011). On the other hand, "if two or more meanings are reasonable, a question of fact is presented." *Interstate Prod. Credit Ass'n v. MacHugh*, 90 Wn.App. 650, 654 (1998).

# *CITY OF TACOMA v. BONNEY LAKE*
## 173 Wn.2d 584 (2012)

- Example of Court using extrinsic evidence and "course of conduct" to include terms not expressly used.

- Court looked at prior contracts and parties' understanding of terms

# THREE POSSIBLE INTERPETATIONS

- MAY RECEIVED RIGHT TO POSSESS AND USE THE IP ALONG WITH SALVAGE RIGHTS

- MAY AND KUTTEL RECEIVED EQUAL SHARE OF MKSV'S POSSESSORY LIEN AS PART OF ASSIGNMENT OF REIMBURSEMENT RIGHTS

- MKSV IS SOLE OWNER OF THE IP POSSESSORY LIEN AND MAY CANNOT USE IT

# OPTION 1: PART OF SALVAGE RIGHTS

- SUPPORTED BY "100% OF ANY INTEREST" LANGUAGE IN ASSIGNMENT

- CONSISTENT WITH PARTIES' PRIOR REFERENCE TO IP AS "ASSET" OF MKSV

- CONSISTENT WITH AGREEMENT TO DISSOLVE MKSV

- CONSISTENT WITH PARTIES' "COURSE OF CONDUCT" TO USE IP DURING SALVAGE OPERATIONS

- MAINTAINS VALUE OF LIEN BY ALLOWING SALVAGE TO CONTINUE AND GENERATE FUNDS

- PROTECTS MAY AND BEAR'S INTEREST IN REPAYMENT

# OPTION 2: PART OF ASSIGNED REIMBURSEMENT RIGHTS

- MAY AND BEAR EACH OWN ONE-HALF OF POSSESSORY LIEN RIGHTS

- CONSISTENT WITH PARTIES' PRIOR REFERENCE TO IP AS "ASSET" OF MKSV

- CONSISTENT WITH AGREEMENT TO DISSOLVE MKSV

- CONSISTENT WITH PARTIES' "COURSE OF CONDUCT" TO USE IP DURING SALVAGE OPERATIONS

- MAINTAINS VALUE OF LIEN BY ALLOWING SALVAGE TO CONTINUE AND GENERATE FUNDS

- PROTECTS MAY AND BEAR'S INTEREST IN REPAYMENT

# OPTION 3: MKSV OWNS IP RIGHTS TO EXCLUSION OF MAY

- CONTRARY TO DIVISION OF "ALL KNOWN ASSETS"
- CONTRARY TO ASSIGNMENT LANGUAGE
- CONTRARY TO PARTIES' "COURSE OF CONDUCT" TO USE IP DURING SALVAGE OPERATIONS
- IGNORES EXPIRATION OF ESCROW AGREEMENT
- CONTRARY TO AGREEMENT TO DISSOLVE MKSV
- IGNORES BEAR/KUTTEL'S SECRET ACTIONS AND VIOLATIONS OF MAY'S RIGHTS
- DIMINISHED VALUE OF LIEN BY DISCOURAGING MAY AND OMI FROM FURTHER OPERATIONS
- HAS PREVENTED MAY AND BEAR FROM BEING PAID RECOVERY INVESTMENT

# RELEASE

FOR THE SOLE CONSIDERATION of the mutual covenants contained herein, the receipt and sufficiency of which is hereby acknowledged, the undersigned, Peter J. Kuttel, Bear Enterprises LLC and Rodger D. May, on behalf of themselves and on behalf of MK Pacific, LLC and MK Salvage Venture LLC, (the "Entities") and any and all affiliated persons, subsidiaries and related companies, their successors and assigns (hereinafter "RELEASORS"), hereby forever release and discharge each other individually, and in their corporate capacity (hereinafter "RELEASEES"), none of whom admit any liability to other Releasors, but all expressly deny any liability from any and all claims, demands or suits of any kind on account of and resulting from any and all damage to any Releasors, arising from their activities as owners, operators, managers, and/or Members of the Entities and the conduct of the business and affairs of the Entities, said damages to include but not be limited to expenses, fees, damages of any kind whatsoever, whether known or unknown, loss of profits, and other costs and expenses. Releasors hereby expressly release the Releasees from any and all obligations which have arisen or may arise under any applicable limited liability company Operating Agreement between the Entities.

Releasors hereby indemnify and hold Releasees harmless from any and all claims for damage, contribution or indemnity brought by any person or entity arising out of the said ownership and conduct of business of the Entities.

# ZORETIC DEC. ON REASONABLENESS

# EXHIBIT D

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| RODGER MAY, an individual, | CAUSE NO: 19-2-10613-1 |
| Plaintiff, | PLAINTIFF'S SUPPLEMENTAL DISCLOSURE RE: EXPERT WITNESSES |
| v. | |
| MK SALVAGE VENTURE LLC; a Washington limited liability company; BEAR ENTERPRISES LLC, a Washington limited liability company, and PETER KUTTEL, an individual. | |
| Defendants. | |

Pursuant to KCLR 26, and subject to the following reservations, Plaintiff Rodger May hereby supplements his prior disclosures of witnesses as follows:

## I. FACT/EXPERT WITNESS

**1.**     **Fred Holabird**
            **3555 Airway Dr. #308**
            **Reno, NV 89511**
            **(775) 851-1859**

Mr. Holabird is a mineral exploration and mine geologist, and owner of Holabird Mining, Historical and Environmental, and Holabird's Western Americana Collections LLC, which specializes in auctioning, selling and appraising historical Americana, numismatics, exonumia, and antiquities. A copy of his curriculum vitae is attached.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 1

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

Mr. Holabird has studied the *SS Islander* shipwreck for several years and was retained by MK Salvage Venture LLC and/or its principals to assist in the marketing and display of a portion of the gold and possibly other artifacts recovered during MK Salvage Venture's salvage operations. Mr. Holabird may be called to provide both fact and/or expert witness testimony regarding the following:

1.    The historical record and other available evidence indicating the nature, content and value of the gold that was likely to have been carried by the *SS Islander* at the time of its sinking in 1901.

2.    The nature, amount and value of gold that is known, and/or was likely, to have been removed from the *SS Islander* site from the time of its sinking through MK Salvage Venture's salvage operations in 2012.

3.    The nature, amount, and value of the gold and other artifacts recovered by MK Salvage Venture.

4.    Mr. Holabird's opinions of the nature, amount, and value of the remaining gold that likely still available for salvage.

5.    <u>Historical Background</u>. Mr. Holabird is expected to testify to the following:

    a.    Gold was discovered in the 1860's in parts of the Alaska and Yukon territories, near the existing communities of Sitka and Juneau, Alaska. However, the gold mining activity was slow to develop in large part because of the difficulty in accessing this remote part of the world.

    b.    In 1868, US Mineral Commissioner J. Ross Browne mentioned Alaska gold in his annual report, which may have stimulated prospecting. The first gold prospecting companies were formed in approximately 1871. Over time, gold was discovered in multiple locations, including Douglas Island, Forty Mile, and further into the Yukon Territory.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 2

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 219 of 275

c.     In 1895, after a string of strong producing years at Douglas Island by the Alaska Treadwell Company and at other large-scale placer deposits, the US Geological Survey sent George Becker, one of its most prominent ore deposit geologists, to the region. After additional lode and placer gold discoveries, Becker published his findings in *Reconnaissance of the Gold Fields of Southern Alaska with Some Notes on General Geology*, published in the *18th Annual Report of the USGS, 1896-97, Chas. D. Walcott, Director; Part III, Economic Geology*, 1898. Becker's work was highly respected and, along with the work of geologist Josiah Edward Spurr, led the way to increased exploration and prospecting in the region.

d.     Gold was discovered in mass shortly after Becker's visit and by 1898, the Alaska Gold Rush was in full swing. Other geologists followed and by 1901 had published dozens of technical reports on Alaska and Yukon gold deposits, adding to the boom. There is a significant body of geologic technical data and publications available on the Alaska gold regions published by the US Geological Survey and others and equivalent Canadian Geologic Surveys.

e.     In July 1899, gold was discovered in beach sands at Nome, on the west coast of Alaska. Soon after, layered ancient sands on uplifted segments inland were found to contain three pay streaks from one- to three-inches wide containing gold, magnetite and garnets, known as a "red sand" layer. This resembled the "blue lead" of California tertiary river channels, which fueled even more intense prospecting and mining in the Alaska and Yukon regions.

f.     Charles G. Yale wrote a description of the "red sand" found in the Nome, Alaska placer deposits and the attendant exploration in the *Report of the Director of the Mint for the Year 1900*, published in 1901. He noted that once the tundra, up to 8 feet

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 3

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

thick was removed, the gravels became exposed and was able to be extracted. With this additional break-through, the rush for Alaska gold was in full force.

       g.     The Dawson Rush, in the Yukon region, was also taking place at this time, but started more slowly. Located nearly fifty miles from Forty Mile (a town and mining district), the region was exceptionally isolated. Gold was found in small quantities nearly everywhere, but it took some time for prospectors to get acquainted with the Bonanza Creek region. However, the Dawson region soon became a major gold production area by 1899. By 1900, Nome had grown to over 20,000 people.

       h.     It has been estimated that over 100,000 prospectors came to Dawson/Yukon between 1896 and 1899.

       i.     Export certificates were not required until May 1901. According to the *Mining and Scientific Press* publication of September 21, 1901, some $18,643,000 worth of gold had come out of Dawson from June 1, 1901 to approximately September 28, 1901. Estimates of $2 million from Nome region in 1899 would also indicate that similar amounts, if not higher, came out of Nome during 1901.

       j.     The act of extracting the gold from the ground was more difficult than the eager prospectors were led to believe. In the 1900 *Report of the Director of the Mint*, Mr. Yale discussed how gold was accumulated by miners and prospectors. He described the sluice boxes as made of 1.5-inch lumber with riffles in 12-foot long sections. A complete sluice was two to four sections, 25-50 feet long. When the riffles were full of red sand, they were emptied out by hand, and panned. This usually required use of a magnet or other device for thoroughly cleaning magnetite from the heavy garnet-laden concentrate. The miners would try to remove foreign matter as best they could, leaving what is known as gold "dust." This dust, often as fine as beach sand, was placed in gold bags, which were usually made of deerskin or sheepskin, and then brought to market.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 4

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1  k.  The fineness of the gold throughout the Alaska-Yukon region varied

2 significantly from about 700 to 900 fine, typical perhaps of any major gold region on the

3 North American Continent.

4    l.  Gold from the Yukon had only one easy way out – through the Alaska

5 panhandle and to the ports at Sitka or Skagway in southwest Alaska. Nome gold also was

6 transported on this southerly route, which resulted in the development of a fleet of

7 steamships to carry passengers and their cargo between Alaska ports and Seattle/Vancouver,

8 B.C. A third route was far more difficult – an on-land route back across inland Canada to

the Ontario and other major populated regions.

9    m.  The *SS Islander* was a luxury steamer owned by Canadian Pacific

10 Navigation Co. It was a twin-propellered steamship 240 feet long, 42' wide with a draught of

11 14 feet, capable of carrying over 200 passengers and rated for 15 tons of cargo. The *Islander*

12 worked the Seattle/Victoria to Alaska route, and had been to Dyea as well, another

13 important coastal community that accessed the gold camps, particularly the southern route

14 from Dawson.

15    n.  Banks and mining companies shipped gold to other banks and the US

16 Assay office in Seattle, as well as the US Mint in San Francisco, or perhaps deposited in

Vancouver. Passengers on these steamships during the rush often took their gold with them.

17    o.  The Islander was reputed to be the most luxurious steamer on the

18 route and as a result was known to be favored by many wealthy businessmen, speculators,

19 bankers, railroad tycoons and others who had a stake in the lucrative Alaska-Klondike gold

20 fields.

21    p.  In 1901, the three-month prospecting season of July to September had

22 started two months late due to an exceptionally cold and late winter. Many prospectors were

23 returning home in the late summer without waiting on the close of the season.

24

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 5

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1      q.      On August 14, 1901, the *Islander* left Skagway, Alaska expecting to

2  land in Victoria, B.C. on schedule.  Contemporaneous reports indicate she was carrying 107

3  passengers and a crew of 61.  The Islander was also carrying a substantial amount of

4  passenger cargo, including gold, as will be discussed below.

5      r.      At about 2:00 a.m., the ship struck a submerged iceberg in Stephens

6  Passage next to Douglas Island near modern day Juneau.  The port bow was sheared, the

7  interior left unprotected. The captain was reported to have attempted to steer the ship to

8  nearby Douglas Island but this was in vain.  The ship sank in approximately twenty minutes,

9  so quickly that the crew gave no distress bells, sirens or warnings.

10      s.      Some passengers reportedly awoke to hear crew walking the corridors

11  telling them not to be alarmed.  The first lifeboat left the Islander almost immediately, but

12  with only 8 crew on board a boat that would hold 40.  There was little organized effort of

13  evacuation and by the time many of the passengers reached the deck, all the lifeboats had

14  left and the ship was quickly sinking.  As lifejackets were disbursed, the boilers exploded and

15  the ship broke apart about 50 feet from the bow and sank to depths of approximately 350

16  feet.  Some passengers survived nearly seven hours in the freezing water, but many did not

17  make it.  It was later reported that 40 people lost their lives, once thought to be nearly

18  double that many because of unreported stowaways.

19      t.      The amount of gold carried on the ship has never been definitively

20  determined.

21      u.      When the *Islander* sank in August 1901, the Nome gold rush was only

22  one year old.  However, it had brought thousands of prospectors to Alaska and Yukon, and

23  those returning on the *Islander* brought gold from Nome and other regions of Alaska and

24  Dawson/Yukon.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 6

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

v.      The gold on the *Islander* would have been shipped primarily in three ways:  shipments from mining companies, banks, and individual miners.  Most used the express system to ship and carry gold.

w.      The ship's reported cargo was $275,000 in gold, which became the supposedly official amount listed in newspapers. At the 1901 rate of $20.67 per ounce, that would amount to approximately 13,300 ounces. This would amount to approximately $23 million at current gold prices.[1]

x.      However, rumors of $2 million or more in gold onboard surfaced in Skagway within days of the sinking.  Interviewed right after the rescue, A.E. McCormick, a seaman and quartermaster in charge of part of the payload, said it was "my honest belief that there was more than $2 million in gold aboard."   That would equate to approximately $167 million or more at today's gold prices.

y.      The later statements of other crew members and passengers reveal that Mr. McCormick's estimate was likely dramatically low, as they described in detail various areas of the ship that were carrying substantial amounts of gold.

z.      Bert Sparrows, another surviving crewman, later testified that he saw 18 pouches or sacks of gold, each weighing approximately 50 to 75 pounds, stored in the express room, next to the mail room.  He also saw at least 25 sealed treasure boxes, the kind used for shipping gold bricks or gold dust, stored in the same room.  He also testified that he saw the safe opened, and that it was filled with pouches and packages filled with heavy material he believed to be gold.  In addition to the safe, he stated the Purser's quarters were filled with "all kinds of baggage, consisting of suitcases, grips, sacks, and some five or six boxes identically like the boxes observed in the express room".  Each of these boxes weighed from 100 to 300 pounds.  Sparrows recalled that the Purser's quarters was located in the aft

---

[1] Gold prices have dramatically increased in the two years and at this writing is approximately $1,725/oz.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE:  EXPERT WITNESSES - 7

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

part of the ship portside, just forward of the dining room, and that the mail room and express room were on the starboard side of the ship, forward of the Purser's quarters on the main deck. Sparrows testified he heard a Canadian Mounted Police state to another officer that the express room alone contained over $2 million in gold. Sparrows further stated that he saw "a great number of boxes stored down in the hold of the ship, below the purser's office, these boxes were also very heavy and, I believe, contained fossile ivory." He estimated the boxes weighed approximately five tons and also contained furs. Sparrow further stated he observed several English passengers who were carrying large amounts of gold dust in their staterooms.

aa. Another surviving passenger also later testified to the extensive amount of gold on the Islander. William S. Herbert, an electrical engineer for the Canadian Klondike Mining Company, stated that the adjoining stateroom was temporarily fitted for a strong room. Herbert was experienced in placer mining and shipping gold and testified "there was stored in said room between two and three million dollars in gold bullion boxes."

bb. Interviews with the surviving crew told of two different-sized treasure boxes with gold held in pokes, as well as gold shipped in standard leather mail sacks, designed to hold a decent amount of weight and lockable at the top.

cc. The amount of gold likely carried in the described boxes was addressed in an affidavit of John S. Glenn, who worked for the White Pass & Yukon Railroad during the same time period as the Islander shipwreck. Mr. Glenn stated that Dawson/Klondike gold was shipped in three ways: in boxes, in pikes and in leather mail sacks. The boxes were two different sizes: The largest carried from $50,000 to $60,000 dollars in gold, and the smaller boxes $25,000 to $30,000 in gold. The boxes were made of spruce lumber, about an inch in thickness, with straps of sheet iron around them.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 8

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 225 of 275

dd.     One news report of the day chronicled a single miner losing $35,000 in gold on the Islander. Based on 1901 prices, that would be about 1,700 ounces. That gold might have been carried in a box, or pokes in his luggage, unreported to the ship's captain on a manifest. Other passengers, such as the English family, were also likely keeping gold with them in staterooms.

ee.     Recovery Efforts. Rumors of lost treasure on the *Islander* resulted in at least 12 significant recovery efforts, from shortly after the sinking through 1929. Within a few weeks of the sinking, the Canadian Pacific Navigation Company (CNPC) had sent the *SS Haling* to search for the *Islander*. The *Haling* was unable to locate the remains of the ship.

ff.     Subsequent efforts also ended without success. In 1902, the CPNC hired an experienced diver Henry Finch to locate the wreck. He did, but determined the depth of 350 feet and the strong, cold currents of the channel made it impossible to dive with the equipment at his disposal. Finch came back in 1904 with a custom barge and diving bell. He was not able to get into the Purser's cabin, where a large amount of gold was believed to have stored as noted above. He also could not access the locker area in the bow, which was buried in muck.

gg.     Several more attempts over the next two decades were also unsuccessful due to the conditions. Worse yet, the remains may have shifted and the exact location within the channel was unknown.

hh.     In 1929, the Curtis-Wiley Salvage Company of Republic, Washington made a major salvage effort. The company was used to moving large structures and thought they could apply their technology to ship recovery. Several ships using a complicated cable system were successful in lifting the hull of the ship and moving it toward shore. At the time, they did not realize the ship had broken apart.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 9

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

ii.     The recovery effort took until 1934 to complete.  While they found the Purser's cabin and the safe, only a reported $75,000 (1934 dollars of $35/oz.) or about 2,150 ounces in gold was recovered, which was later sold to help pay for the salvage.  The main storage room, where the CNPC and Royal Canadian Police stated the gold was contained, was still missing.  It was likely part of the broken off section of the ship when the boilers exploded.  Leonard DeLano, one of the members of the 1934 recovery effort wrote a first-hand account of the recovery, *Sunken Klondike Gold*.

jj.     Photos from the 1934 recovery show two classic iron Railway Express strong boxes (treasure boxes) were removed, fitting the descriptions of above.

kk.     <u>2012 Ocean Mar/MK Salvage Venture Recovery</u>.  The next known recovery effort took place in 2012.  Mr. Holabird did not take part in the actual salvage operations but became familiar with the results of the recovery effort of Ocean Mar, Inc. and MK Salvage Venture, LLC.

ll.     Thousands of artifacts were recovered during the 2012 salvage efforts, from passenger hats and clothing to personal items.  An ivory tusk was also recovered (discussed below).  All these artifacts were later turned over to the State of Alaska per the terms of the court order and agreement between the parties.

mm.     Among the recovered goods was one treasure box, weighing about 85 pounds.  The box was caught in the teeth of the recovery tool, crushing it from its original rectangular shape, but maintaining its cargo.  The box was full of fine placer gold, still held in their original leather bags (or pokes) nearly 10 inches long and holding about 200 ounces each.  The box had four original bags still intact.  Each of the leather pokes has a red wax seal attached to the tie strings.  There was originally at least one more poke in the box, but it broke open during the recovery process, the contents falling to ocean floor.  The gold was

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE:  EXPERT WITNESSES - 10

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1  subsequently recovered, brought onboard the recovery vessel and processed in an onboard

2  sluice box.

3          nn.    The gold recovered in 2012 was reported to be about 1,100 ounces,

4  which had a spot value in 2012 of roughly $1,660/oz. (similar to the current price) or

5  approximately $1.8 million. Mr. Holabird was involved in attempts to display and market

6  the gold for sale at a higher price (based on historical value of the gold), but the efforts were

   not completed.

7          oo.    The gold recovered was turned over to MK Salvage Venture in

8  accordance with the approved Financing Agreement between MK Salvage Venture and

9  Ocean Mar. In a separate action, the gold was later split between Mr. May and Bear

10 Enterprises in an unknown fashion.

11         6.    <u>Opinions</u>. Mr. Holabird will offer the following opinions of the amount and

12 range of value of the gold that was likely carried on the *Islander* at the time it sank in 1901:

13         a)    The reported amount of $275,000 in gold lost on the *Islander* in 1901

14 was equivalent to about 13,304 troy ounces, or about 1,110 pounds of gold. The price of gold

15 at the time was $20.67 per troy ounce. If this is accepted as the actual amount of gold on the

   ship, current spot value would be $23 million at $1,725 per ounce.

16
17         b)    However, Mr. Holabird believes the eyewitness testimony of the

18 surviving crew members and passengers stated above make it more likely than not that the

   *Islander* was carrying substantially more than the reported amount. Using the estimate of

19 Mr. McCormick, who stated he believed the ship was carrying over two million dollars in

20 gold, this would have been at least 96,000 ounces. The current spot value of the gold in

21 current pricing ($1,725/ounce) would result in a value of at least $165 million using that

22 estimate alone.

23

24

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE:  EXPERT WITNESSES - 11

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 228 of 275

c)      In addition, Mr. Holabird believes the sworn statements of the other crew members identifying additional rooms containing treasure boxes and gold bags makes it more likely than not the *Islander* was carrying much more than the $2 million stated by McCormick.

d)      Mr. Sparrows' testimony outlines in detail that he saw 18 pouches or sacks of gold, each weighing approximately 50 to 75 lbs., stored in the express room, next to the mail room. At 14.583 troy ounces/lb , this would equal approximately 13,000 to 20,000 ounces of gold. This would have been $270,000 to $425,000 in 1901 value in this area alone ($22.5 million to $34.5 million in today's value). Mr. Sparrows also claims he saw 25 sealed treasure boxes in the same room and five more in the Purser's quarters, for a total of 30. Assuming these were the large boxes described by Mr. Glenn as carrying $50,000 to $60,000 of gold, this would total approximately $1.5 million to $1.8 million in 1901 dollars. Added to the pouches of gold in the ship safe, this was consistent with McCormack's estimate of at least $2 million in 1901 value. However, Mr. Holabird believes the Sparrows testimony about seeing heavy boxes in the hold below the Purser's office provides credible evidence of even more gold on the ship. Recall that Sparrows stated some of the boxes contained "fossil ivory." In fact, an ivory tusk was found during the 2012 salvage operation. Using Sparrows' estimate of 5 tons of boxes, and assuming approximately half of this weight consisted of gold, that would add another 5,000 lbs, or 72,500 ounces of gold. This would equal approximately $1.5 million in 1901 value, raising the total carried by the Islander to $4.5 million in 1901 value, or approximately $375 million in current value.

e)      Mr. Herbert had also testified to seeing "between two and three million dollars in gold bullion boxes" in the temporary safe room next to his passenger

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE:  EXPERT WITNESSES - 12

stateroom. This would raise the 1901 value to $6.5 million to $7.5 million, equaling between 312,500 and 360,000 oz. of gold. This would raise the current value to $537 million to more than $621 million.

  f)  The amount of placer gold carried by the passengers on their persons or in their staterooms is difficult to estimate but would be added to the above totals. For example, the $35,000 loss by the miner alone would be worth almost $3 million today.

  g)  Based on the above, Mr. Holabird is expected to give his opinion that the *Islander* was more likely than not carrying at least 145,000 oz. of gold (current value of $250 million) and likely between 312,500 oz. ($539 million current) and 360,000 oz. ($620 million current) of gold when it sank.

  h)  <u>Other Supporting Evidence</u>. These witness statements and the stated values are consistent with the historical record of the Klondike and Dawson/Yukon gold rush statistics. The entire annual 1901 gold production from Alaska was approximately 373,000 ounces, and from Yukon, 267,000 ounces, according to the USGS and US Customs reports, or a combined 640,000 ounces. This was a decrease of about 62,000 ounces from the year before, probably because of the decreased working season which was two months late in starting because of the severe and late winter of the 1900-01 season. Several lode gold mines produced a significant portion of this amount. But 1901 also marked the first year that the "red sand" layers were discovered, delineated and mined.

  i)  Published reports in the American and Canadian government sources indicate that the published gold shipment data was seriously flawed. The Yukon placer production would jump twenty-fold within five years and some Canadian mining official production reports list the 1901 production at significantly higher levels.

  j)  The report cited earlier from the *Mining and Scientific Press* publication of September 21, 1901 stating $18,643,000 worth of gold had come out of

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 13

Dawson from June 1, 1901 to approximately September 28, 1901, appears more reliable, as gold shipments were tracked more closely. Using another $2 million for the Nome gold from 1901, this would total about $20 million in total gold recovered in the region during the 1901 prospecting season. Gold was trading at $20.67 per ounce in 1901, so this would equate to approximately 967,000 ounces of gold.

        k)     In Mr. Holabird's opinion, based on the above background facts and his experience with other shipwreck projects, it is reasonable to surmise that the *Islander* would have been carrying at least 15% and up to one-third of the annual gold production of the combined regions as reflected in his opinions.

        7.     Mr. Holabird is also expected to testify to the amount and value of gold that is likely to have been removed from the SS Islander site from the time of its sinking through MK Salvage Ventures' operations in 2012.

        a)     A reported $75,000 in gold was recovered in 1934. That is equivalent to about 2,134 ozs., which is likely two treasure boxes of gold, as shown by Delano in his 1934 photograph of the two American Railway Express treasure boxes full of gold that they recovered. This would be approximately $3.68 million in current value.

        b)     As stated above, the value of the 1,100 ounces of gold recovered by MK Salvage Venture in 2012 is approximately $1.8 million in current value.

        c)     Mr. Holabird believes it is likely the crew of the ship took some of the gold with them in the nearly empty rescue boat. This happened on another famous wreck, the *SS Republic*. However, because no contemporaneous reports or subsequent investigations revealed that this occurred on the *Islander* and based on the speed with which the ship sank, Mr. Holabird believes it is unlikely the crew was able to remove more than one or two boxes of gold on the life raft. He will assume that the total was twice the 1,100 ounces

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 14

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 231 of 275

1  recovered by MK Salvage Venture, equaling 2,200 ounces. The value of such gold would be

2  approximately $3.6 million at today's gold price.

3          d)     Mr. Holabird also believes it is possible, if not likely, that some gold

4  has been recovered in the other reported or unreported salvage attempts. Given the

5  challenges associated with depths, current and cold water temperatures, Mr. Holabird

6  believes this amount in total would be no more than the 1,100 ounces ($1.8 million current)

   recovered by MK Salvage Venture.

7          e)     Accordingly, based on the above, Mr. Holabird is expected to state his

8  opinion that the total amount of gold removed from the Islander and/or the wreckage site

9  likely totals less than 6,250 ounces ($10 million in current value.)

10      8.     Mr. Holabird is therefore expected to give his opinion on a more probable

11  than not basis that the value of the remaining gold likely still available for salvage is at least

12  140,000 ounces ($241.5 million current) and likely between 300,000 ounces ($517.5 million

13  current) and 355,000 ounces ($612 million current).[2]

14      9.     <u>Cost of Future Salvage Operations</u>. Mr. Holabird may also present testimony

15  and opinions regarding the estimated costs of performing future salvage operations.

16      10.    <u>Media Rights</u>. Mr. Holabird may also testify regarding the opportunities and

17  potential value of media rights for future savage operations that would have been available

   for future salvage operations.

18      11.    Discovery is ongoing and Mr. Holabird is continuing to develop his opinion

19  testimony.

20

21

22

---

[2] Mr. Holabird will use the current approximate spot value at time of trial, so the dollar values stated herein may

23  differ as the markets fluctuate. The value of the gold retrieved and/or still likely to be available for salvage can be determined at specific dates by applying the selected gold spot value to the number of ounces stated.

24

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 15

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

References:

Affidavits of Bert Sparrows (5/1/1931), A.E. McCormick (8/29/1929), William S. Herbert (5/2/1931), John S. Glenn (5/9/1931) and H.E. Bennett (5/8/1931)

Alaska History and Cultural Studies – Northwest and Arctic – 1897 -1920

Alaska State Museum; Bulletin 70, Islander Artifacts , 2013

Becker, G.F.; Reconnaissance of the Gold Fields of Southern Alaska, With Some Notes on General Geology, in 18th Annual Report of the United States Geological Survey; 1896-7; C.O. Walcott. Director, Part Ill, Economic Geology; 1898.

Brewer, W.M.; Alaska in The Mineral Industry, Vol. 10, 1902 (for 1901), an annual publication
of the Engineering and Mining Journal.

Brooks and others; Mineral Resources of Alaska, 1914; 1915

Brooks and others; Report of Progress of Investigations of Mineral Resources of Alaska In 1906; 1907 USGS Bulletin 314

Browne, J .R.; Mineral Resources of the States and Territories West of the Rocky Mountains; 1868

Buddington, A.F. and Chapin, T.; Geology and Mineral Deposits of Southeastern Alaska, USGS Bulletin 800; 1929

Canadian Mining Journal; Vol.31, September; 1910.

Canadian Mining Review; Vol. 24, Jan. 1905.

Delano, L; Sunken Klondike Gold; 2011

Eldridge G.H. et al; Maps and Descriptions of the Routes of Exploration in Alaska In 1898;

Gedney, Larry; The Nome Gold Rush; Alaska Science Forum, August 12, 1985.

MacLean, T.A.; Lode Mining in Yukon; Canadian Department of Mines; 1914

McMahan. David; SS Islander, archaeological reports, 2012, 2013.

Mertie, Jr. J.B.; The Yukon Tanana Region Alaska; USGS Bulletin 872; 1937

Messinger; Nick; SS Islander web site

Mining and Scientific Press; Aug. 31, 1901; Sept. 7, 1901; Sept 21, 1901; Oct.12, 1901

Roberts, W.E.; Gold and Silver in USGS Report of the Mineral Resources of the United

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE:  EXPERT WITNESSES - 16

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 233 of 275

States Calendar Year 1901 by David T. Day; 1902

Robertson, W.F.; Annual Report of the Minister of Mines for the Year Ending 1913 for the province of British Columbia; 1914.

Schrader. F.C. and Brooks, A. H., Preliminary Report of the Cape Nome Gold Region Alaska; 1900.

Smith, Phillip S.; Past Placer Placer Gold Production from Alaska; USGS Bull 917C; 1941.

Smithsonian National Postal Museum website, The Great Nome Gold Rush.

Wright, E.W.; Lewis & Dryden's Marine History of the Pacific Northwest, 1896

Yale C.G.; Alaska: In Report of the Director of the Mint upon the Production of the Precious Metals in the United States During the Calendar year 1900; 1901; 1902.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 17

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 234 of 275

## II. **EXPERT WITNESSES**

**1.** **Professor John Strait**
**901 12th Ave.**
**Seattle, WA 98122-4411**
**(206) 398-4077**

Mr. Strait is an attorney and noted expert on legal ethics in the State of Washington. Professor Strait may be called to testify as to facts and opinions set forth in his declaration dated September 4, 2019, which also includes his curriculum vitae. Plaintiff reserves the right to have Professor Strait update his testimony as discovery continues.

**2.** **Mr. Neil J. Beaton**
Alvarez & Marsal Valuation Services, LLC
1111 Third Avenue, Suite 2450
Seattle, WA 98101
(206) 664-8934

Mr. Beaton is a Managing Director at Alvarez & Marsal Valuation Services, LLC, specializing in the valuation of business interests and intangible assets for purposes of financial reporting, incentive stock options, litigation support, mergers and acquisitions, buy-sell agreements and estate planning and taxation. A copy of his Curriculum Vitae is attached hereto.

Mr. Beaton may be called to testify regarding the various forms of economic damages suffered by Plaintiff Rodger May as a result of Defendants' refusal to allow Plaintiff to possess and/or utilize the Intellectual Property at issue in this litigation. Mr. Beaton is still developing his testimony, but is expected to testify to the following:

### **Damages For Lost Salvage Operations Proceeds Under OMI Contract**

Mr. Beaton is expected to testify to the amounts Mr. May would have received under the provisions of Section 2 of the OMI/MK Salvage Venture Contract dated March 28, 2012. His analysis assumes Rodger May had been granted use and possession of the Intellectual Property by Defendants as of January 1, 2017, while OMI was still the court-approved salvor.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 18

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

Mr. Beaton's analysis also assumes that Mr. May would have pursued future salvage operations with OMI under the authority and terms of the OMI Contract in 2017 and/or 2018. It further assumes that the additional salvage operations would have resulted in the recovery of gold in the amounts stated below, amounts well within the ranges of gold remaining in and/or around the *Islander's* sunken remains as per the testimony of Mr. Holabird.

Mr. Beaton's analysis assumes the costs of the original Recovery Investment for the initial salvage operations was $5,384,459 as recorded in MK Salvage Venture's 2015 Balance Sheet. Mr. Beaton also assumes that the amount of gold recovered in the 2012 operations was 1,100 ounces, with said gold being distributed to MK Salvage Venture as partial repayment of the Recovery Investment. Mr. Beaton uses $1,260 as the spot value of gold in his analysis, which was the approximate average trading value of gold in calendar year 2013 (after the recovery of gold from the *Islander*) and in 2017-2018, the two years after Mr. May obtained the contract salvage rights in November 2016. Accordingly, Mr. Beaton uses $1,386,000 as the value of the gold recovered by MK Salvage and deducted this amount from the initial $5,384,459 original Recovery Investment, leaving $3,998,459 (rounded up to $4 million). For purposes of this analysis, Mr. Beaton assumes that the November 2016 resolutions between Mr. May and Bear Enterprises entitle Bear Enterprises to receive one-half of the remaining unpaid original Recovery Investment totaling approximately $4 million, so that Bear Enterprises will receive $2 million of the future recovery.[3]

Mr. Beaton's analysis presents _two_ underlying assumptions resulting in various scenarios of future salvage revenue and distributions:

---

[3] For purposes of this disclosure, some of the amounts stated will be rounded off given the large amounts at issue and for ease of reference. More exact figures will likely be used in Mr. Beaton's final testimony.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 19

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 236 of 275

**Scenario 1:  Recoveries Based on Assumed Recovery Investment of $10 Million.**

In the first set of scenarios, Mr. Beaton assumes that Mr. May would have spent another approximately $4.6 million for the new salvage recovery efforts in addition to the original $5,384,459, increasing the total incurred Recovery Investment to approximately $10 million.  Applying the terms of Section 2 of the OMI Contract and using the above assumptions, Mr. Beaton is expected to testify that Mr. May would have received the following amounts under the different recovery scenarios:

**Assumes $10,000,000 in Total Recovery Investment**

|  | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4[a] |
|---|---|---|---|---|
| Value of Gold Recovered: | $100,000,000 | $150,000,000 | $250,000,000 | $306,666,666 |
| Salvage Association Share[b]: | ($25,000,000) | ($37,500,000) | ($62,500,000) | ($76,666,667) |
| Net after payment to Salvage Association: | $75,000,000 | $112,500,000 | $187,500,000 | $230,000,000 |
| Section 2(a)(ii) Recovery Investment (RI) to May (RI or 7 times RI if gross recovery equals 15 times RI, not to exceed $30 million): | $10,000,000 | $30,000,000 | $30,000,000 | $30,000,000 |
| Repayment to Bear of ½ of original RI under Section 2(a)(i): | ($2,000,000) | ($2,000,000) | ($2,000,000) | ($2,000,000) |
| Net Section 2(a)(ii) Repayment to May: | $8,000,000 | $28,000,000 | $28,000,000 | $28,000,000 |
| Net Recovery for Calculating Section 2(b): | $65,000,000 | $82,500,000 | $157,500,000 | $200,000,000 |
| Section 2(b) Recovery to May (50% of remaining net recovery, up to $100 million): | $32,500,000 | $41,250,000 | $78,750,000 | $100,000,000 |
| Total to May before Payments and New Recovery Investment: | $40,500,000 | $69,250,000 | $106,750,000 | $128,000,000 |
| Less Payments to Bear and New Recovery Investment: | ($6,600,000) | ($6,600,000) | ($6,600,000) | ($6,600,000) |
| Net to May: | $33,900,000 | $62,650,000 | $100,150,000 | $121,400,000 |

[a] Mr. May would receive the same amounts for any recovery over $366,666,666 up to $1 billion. Section 2(c) of the OMI Contract addresses the distribution when total gold recovery is in excess of $1 billion, allowing Mr. May one-half up to $100 million. This scenario is not addressed in Mr. Beaton's analysis but would be added to the amounts stated herein in the event of such recovery.

[b] As per Section 2(b) of the OMI Contract, the Salvage Association is entitled to payment of 25% of the recovery of insured gold. Mr. Beaton's analysis assumes that all recovered gold was insured.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE:  EXPERT WITNESSES - 20

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 237 of 275

**Scenario 2: Recoveries Based on Assumed Recovery Investment of $15 Million**

In his second scenario, Mr. Beaton assumes that Mr. May was required to spend an additional $9.6 million on the new salvage operations, raising the total Recovery Investment to $15 million.

**Assumes $15,000,000 in Total Recovery Investment**

| | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| Value of Gold Recovered: | $100,000,000 | $150,000,000 | $250,000,000 | $306,666,666 |
| Salvage Association Share: | ($25,000,000) | ($37,500,000) | ($62,500,000) | ($76,666,667) |
| Net after payment to Salvage Association: | $75,000,000 | $112,500,000 | $187,500,000 | $230,000,000 |
| Section 2(a)(ii) Recovery Investment (RI) to May (RI or 7 times RI if gross recovery equals 15 times RI, not to exceed $30 million): | $15,000,000 | $15,000,000 | $30,000,000 | $30,000,000 |
| Repayment to Bear of ½ of original RI under Section 2(a)(i): | ($2,000,000) | ($2,000,000) | ($2,000,000) | ($2,000,000) |
| Net Section 2(a)(ii) Repayment to May: | $13,000,000 | $13,000,000 | $28,000,000 | $28,000,000 |
| Net Recovery for Calculating Section 2(b): | $60,000,000 | $97,500,000 | $157,500,000 | $200,000,000 |
| Section 2(b) Recovery to May (50% of remaining net recovery, up to $100 million): | $30,000,000 | $48,750,000 | $78,750,000 | $100,000,000 |
| Total to May before Payments and New Recovery Investment: | $43,000,000 | $61,750,000 | $106,750,000 | $128,000,000 |
| Less Payments to Bear and New Recovery Investment: | ($11,600,000) | ($11,600,000) | ($11,600,000) | ($11,600,000) |
| Net to May: | $31,400,000 | $50,150,000 | $95,150,000 | $116,400,000 |

To the extent a different recovery amount for Mr. May is assumed, Mr. Beaton may also testify to the amounts Mr. May would have received under other recovery and/or investment scenarios.

**Market Value of the Right to Conduct Future Salvage**

This valuation method assumes Mr. May had possession and use of the Intellectual Property as of January 1, 2017, while OMI was still the court-approved salvor and Mr. May had the MK Salvage Venture contract rights to continue salvage operations with OMI. Mr. Beaton will testify to the market value of Mr. May's rights in 2017 had he received the benefit

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 21

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 238 of 275

of the bargain of his agreement with Bear Enterprises as per the parties' assignment resolutions of November 2016 (i.e., had the contractual agreements of the parties been followed).

Mr. Beaton bases his calculations, in part, on the undisputed fact that MK Salvage Venture has already taken part in salvage operations that produced substantial amounts of gold (1,100 ounces with 2013 estimated value of $1,386,000 using $1,260 spot value), in a form and amount demonstrating the likely presence of substantial additional gold as per Mr. Holabird's testimony.

Mr. Beaton has selected the Discounted Cash Flow Method (DCF) under the Income Approach as the most appropriate analysis for valuing Mr. May's contract rights. The rationale behind the DCF method is that the value of an asset is the present value of the cash flows the subject asset produces over a designated period of time, which is based on estimates of production, revenue and cost.

In the current situation, the key components for the DCF analysis are: 1) the expected amount of the available gold reserves; 2) the expected revenue produced by the gold to be obtained (volume x price); and 3) the likely costs of production. In addition to these factors, the time period over which the project is expected to take place, and the risk of achieving the resulting cash flows, are also components.

In conducting his analysis, Mr. Beaton makes the following assumptions, all of which are, or will be, supported by documentary and/or testimonial evidence:

1. Mr. May, as assignee of MK Salvage Venture's contract rights to continue salvage operations on the *Islander* shipwreck with OMI, would be engaged in salvage operations on only the *Islander* wreckage, and not engaged in other explorations.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 22

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 239 of 275

2. The cost of the prior salvage operations was $5,384,459 as per the MK Salvage Balance Sheet as of December 31, 2015.

3. The value of the of the gold recovered during the 2012 salvage operations is approximately $1,386,000 (based on $1,260 per oz. spot value).

4. The likely amount of gold remaining available for salvage is at least 140,000 ounces and likely between 300,000 ounces and 355,000 ounces, as per Mr. Holabird's testimony. Using the $1,260 spot value of gold, this would equate to at least $176,400,000 and likely between $468,000,000 and $547,300,000 in value.

5. Two different costs of future salvage operations are considered in addition to the cost of the prior salvage operations: Approximately $4.6 million and approximately $9.6 million, as utilized in the preceding charts.

6. The amounts of recovery for Mr. May under the stated scenarios would be as set forth in the charts above.

7. The additional salvage operations would have taken place over the course of no more than two years (2017 and 2018) and that the gold produced would have been recovered and sold during that same time period.

Based on the above assumptions and his knowledge and experience, Mr. Beaton believes and will opine that an appropriate discount factor for the first scenario (additional $4.6 million investment) is 35%. Mr. Beaton will testify that 30% is appropriate under the second scenario ($9.6 million investment). The lower discount rate reflects the additional likelihood of a successful salvage due to the higher assumed Recovery Investment.

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 23

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 240 of 275

Mr. Beaton will apply his DCF analysis[4] to the four recovery examples under each level of investment (all within the likely amounts of remaining gold stated by Mr. Holabird) to reach a valuation of Mr. May's interest in pursuing future contract salvage operations under the OMI contract in 2017 (assuming he had use of the Intellectual Property) for each recovery as follows:

| Assumes $10,000,000 in Total Recovery Investment | | | | |
|---|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
| Value of Gold Recovered | $100,000,000 | $150,000,000 | $250,000,000 | $266,666,666 |
| Salvage Association @ 25% | ($25,000,000) | ($37,500,000) | ($62,500,000) | ($66,666,667) |
| Payments to OMI | ($34,500,000) | ($43,250,000) | ($80,750,000) | ($72,000,000) |
| Revenue to May | $40,500,000 | $69,250,000 | $106,750,000 | $128,000,000 |
| Additional RI Expenses | ($4,600,000) | ($4,600,000) | ($4,600,000) | ($4,600,000) |
| Net Payment to May: | $35,900,000 | $64,650,000 | $102,150,000 | $123,400,000 |
| Discount Rate: | 35.0% | 35.0% | 35.0% | 35.0% |
| Present Value of Recovery to May: | $19,698,200 | $35,473,300 | $56,049,400 | $67,709,200 |
| Probability of Recovery Amount: | 5.0% | 5.0% | 45.0% | 45.0% |
| Prorata Value: | $984,900 | $1,773,700 | $25,222,200 | $30,469,100 |
| Probability-Weighted Recovery to May: | | | | $58,449,900 |

| Assumes $15,000,000 in Total Recovery Investment | | | | |
|---|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
| Value of Gold Recovered | $100,000,000 | $150,000,000 | $250,000,000 | $266,666,666 |
| Salvage Association @ 25% | ($25,000,000) | ($37,500,000) | ($62,500,000) | ($66,666,667) |
| Payments to OMI | ($32,000,000) | ($50,750,000) | ($80,750,000) | ($72,000,000) |
| Amount to May | $43,000,000 | $61,750,000 | $106,750,000 | $128,000,000 |
| Additional RI Expenses | ($9,600,000) | ($9,600,000) | ($9,600,000) | ($9,600,000) |
| Net Payment to May: | $33,400,000 | $52,150,000 | $97,150,000 | $118,400,000 |
| Discount Rate: | 30.0% | 30.0% | 30.0% | 30.0% |
| Present Value of Recovery to May: | $19,763,300 | $30,858,000 | $57,485,200 | $70,059,200 |
| Probability of Recovery Amount: | 5.0% | 5.0% | 45.0% | 45.0% |
| Prorata Value: | $988,200 | $1,542,900 | $25,868,300 | $31,526,600 |
| Probability-Weighted Recovery to May: | | | | $59,926,000 |

---

[4] A mid-year convention is used based on the assumption that the gold recovery will occur ratably over the final year of recovery operations.

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 241 of 275

Mr. Beaton may revise his analysis based on further discovery and/or analysis. He may also testify to the amounts Mr. May would have received and/or the market value of his interests under additional negotiated and/or litigated scenarios.

## RESERVATIONS

1.  Plaintiff reserves the right to disclose additional fact and expert witnesses as identified in discovery, as well as to amend this disclosure in the future as warranted by the discovery process and as reasonably appropriate under CR 26(e)(1)(B).

2.  Plaintiff reserves the right to not call any witness listed herein.

3.  Plaintiff also reserves the right to call any witness listed on any other party's disclosure of primary and/or additional witnesses in this case.

DATED this 17th day of April, 2020.

ZORETIC LAW

By_____
   Michael T. Zoretic, WSBA #21221
PO Box 427
Pateros, WA 98846
(206) 465-8109
mike@zoreticlaw.com (email)
Attorney for Plaintiff Rodger May

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE
RE: EXPERT WITNESSES - 25

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 242 of 275

SUPERIOR COURT OF THE STATE OF WASHINGTON

COUNTY OF KING

RODGER MAY,

               Plaintiff,

vs.

MK SALVAGE VENTURE LLC, BEAR
ENTERPRISES LLC, and PETER KUTTEL,

               Defendants.

Case No. 19-2-10613-1 SEA

**DECLARATION OF TERENCE K.
McGEE IN SUPPORT OF MOTION
FOR REASONABLENESS
DETERMINATION**

I, Terence K. McGee, declare the following under penalty of perjury under the laws of Washington:

    1.    I am counsel of record for defendant MK Salvage Venture LLC ("MKSV") in this action.

    2.    I make this declaration on personal knowledge, I am over 18 years of age, and I am competent to testify to the matters stated herein.

    3.    I graduated from the University of California at Berkeley and served on active duty aboard a U.S. Coast Guard Cutter in Southeast Alaska from 1970 to 1972. We must have passed over the wreck of *SS Islander* several times.

    4.    I was Editor-in-Chief of the Pacific Law Journal at the University of the

DECLARATION OF McGEE IN SUPPORT OF
MOTION FOR REASONABLENESS
DETERMINATION-1-

McGEE LAW OFFICES PLLC
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 ● fax 425-368-2322

1 Pacific, McGeorge School of Law, where I took my J.D. in 1975. I was law clerk to Judge

2 Herbert Swanson of the Washington State Court of Appeals for one year before entering

3 private practice in Seattle in 1976.

4     5.     I was a partner in LeGros Buchanan Paul & Madden, Detels Madden

5 Crockett & McGee, McGee & Reno, and Tousley Brain in Seattle before becoming of

6 counsel to Danielson Harrigan Leyh & Tollefson in 1995. In 2004, I founded McGee Law

7 Offices. I moved from Seattle to Bothell in 2008, and then to Woodinville in 2020.

8     6.     I have been admitted to the Washington State Bar since 1975. Throughout

9 my career, I have always focused primarily on admiralty and maritime law, where my

10 practice has been unusually broadly based. My maritime law experience includes

11 litigation on personal injury, salvage, collision, cargo damage, vessel construction,

12 vessel repair, marine insurance coverage, and disputes on charters, contracts of carriage,

13 towage contracts, and purchase and sale agreements. A substantial part of my maritime

14 practice is transactional. I frequently draft vessel purchase and sale agreements,

15 contracts for vessel construction or repair, charter parties, towage agreements, contracts

16 of carriage, preferred ship mortgages and other instruments of marine finance, and

17 documents for domestic and international sales of goods and financing for those

18 transactions.

19     7.     I became a Proctor Member of the Maritime Law Association of the United

20 States in 1981 and have written and lectured on maritime law issues at the Pacific

21 Northwest Admiralty Law Institute and the University of Washington. I also have

22 substantial experience in hazardous waste and commercial litigation and in

23 representing closely held companies in the timber, fishing, marine, and satellite

24 communication industries as outside general counsel. In this capacity, I have litigated

25 and provided substantial advice on corporate structure and governance and

**DECLARATION OF McGEE IN SUPPORT OF MOTION FOR REASONABLENESS DETERMINATION-2-**

McGEE LAW OFFICES PLLC
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 • fax 425-368-2322

1   commercial disputes and transactions. I have also drafted contracts, promissory notes,

2   financing documents, commercial leases, and documents for corporate governance.

3         8.    I have extensive trial experience in federal and state courts. I am admitted

4   to practice before all state and federal courts in Washington, Alaska, and Oregon, the

5   United States Tax Court, the United States Court of International Trade, the United

6   States Court of Appeals for the Ninth Circuit, and the United States Supreme Court.

7         9.    I was retained to represent MKSV in May 2019, and throughout this action

8   my only client has been MKSV. I was engaged by defendant Bear Enterprises, through

9   its managing member, defendant Peter Kuttel, to defend MKSV against the claims

10   brought against it in this action by plaintiff Rodger May. Bear Enterprises is one of the

11   two members of MKSV, the other being Mr. May. Each owns 50% of MKSV.

12         10.   As I have previously declared in this action, Dkt. 72, in response to Mr.

13   May's motion to disqualify me as counsel in September 2019, Dkt. 68, I advised Mr.

14   Kuttel upon my engagement that my only client would be MKSV, not Bear Enterprises,

15   Mr. Kuttel, or Mr. May. The Court authorized me to continue representing MKSV by

16   its order dated November 4, 2019, Dkt. 79, and to take direction from Mr. Kuttel, under

17   the circumstances of Mr. May's decision to sue MKSV in this case.

18         11.   The background of the dispute and the events leading up to the covenant

19   judgment settlement agreement are set forth in the Recitals to the Restated and

20   Amended Settlement Agreement attached to the joint motion. MKSV stipulates to them

21   for purposes of this motion as well.

22         12.   In October 2019, on behalf of all defendants, Mr. Kuttel tendered defense

23   and indemnity of May's claims to defendants' insurance carrier, Great American

24   Insurance Company of New York. All defendants were named insureds under the

25   policy.

**DECLARATION OF McGEE IN SUPPORT OF**
**MOTION FOR REASONABLENESS**
**DETERMINATION-3-**

McGEE LAW OFFICES PLLC
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 ● fax 425-368-2322

13. In its letter dated November 14, 2019, Great American denied any duty to defend or indemnify defendants against the claims filed by Mr. May. A true and correct copy of that letter is attached as Exhibit A to this declaration.

14. Defendants filed a motion for summary judgment that was heard by Judge Cahan. Working with Ms. Reno, I was the principal author of the motion for summary judgment and was confident that the Court would dismiss Mr. May's claims and grant defendants' summary judgment on their counterclaims for indemnity under the release, hold harmless, and indemnity agreement signed by the parties. Judge Cahan heard oral argument on December 6, 2019, and allowed counsel to make extended presentations. Judge Cahan had clearly read the materials and asked a number of questions to both sides. I was disappointed when Judge Cahan stated at the conclusion of the hearing that she was inclined to deny defendants' motion to dismiss Mr. May's claims, but wanted to take defendants' motion for summary judgment on their counterclaim under advisement. Judge Cahan then issued a written ruling on December 9, 2019, denying defendants' motion in its entirety.

15. Because defendants strongly reject all of Mr. May's claims on the facts and on the law, I considered settlement on the merits extremely unlikely, and I believed that the denial of defendants' summary judgment motion probably condemned the parties to trial on the merits.

16. This litigation had already proved very time-consuming and expensive. Mr. May had moved to disqualify both Vi Reno and me. Although I proved successful in defending against this motion, we briefed the issues thoroughly and engaged a highly qualified (and expensive) expert. Ms. Reno chose to withdraw rather than fight the motion, but this forced Mr. Kuttel and Bear Enterprises to engage Messrs. Williams and Davison of Perkins Coie to replace Ms. Reno. The parties had exchanged interrogatories

**DECLARATION OF McGEE IN SUPPORT OF MOTION FOR REASONABLENESS DETERMINATION-4-**

McGEE LAW OFFICES PLLC
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 • fax 425-368-2322

and requests for production that resulted in the production and review of several thousand pages of documents. Substantial disputes over privilege and the sufficiency of interrogatory answers and produced documents resulted in numerous discovery conferences between counsel.

17. Mr. Zoretic had taken the depositions of Bear Enterprises (through Mr. Kuttel) and Ms. Reno in November 2019, prior to the summary judgment hearing. This was a substantial expense for defendants, and I thought it likely that at least 18 more depositions would be necessary if the case were taken to trial—10 fact witnesses and 8 expert witnesses—in Washington, California, New Mexico, and Florida.

18. Defendants attempted to schedule the deposition of Mr. May in January 2020, but the deposition was postponed due to scheduling conflicts. The coronavirus pandemic intensified in March, resulting in drastic restrictions on court hearings and in-person depositions. This resulted in further delays of Mr. May's deposition.

19. On April 17, 2020, we received Mr. May's expert witness disclosures, which included the opinions of his damages experts. The opinions of gold salvage expert Fred Holabird and valuation expert Neil Beaton supported a judgment of $60 million against defendants.

20. Defendants had already begun preparing their planned expert testimony on these subjects, but the receipt of Mr. May's detailed analysis revealed the substantial potential exposure defendants faced in this action. With their insurer denying both defense and indemnity, I believed that fees and costs through trial would exceed $1 million.

21. I concluded that any conventional settlement of the case would require defendants to make a very substantial cash payment.

22. While I continued to believe in the merits of our defenses and

**DECLARATION OF McGEE IN SUPPORT OF MOTION FOR REASONABLENESS DETERMINATION-5-**

McGEE LAW OFFICES PLLC
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 • fax 425-368-2322

counterclaims, I considered it prudent to enter discussions with Mr. May's counsel about the possibility of a covenant judgment settlement.

23.     The concept of a covenant judgment settlement was first floated between counsel in May 2020, and from July counsel engaged in extensive back-and-forth negotiations of the terms of a possible covenant judgment settlement. By September discussions had advanced to the point where it made sense for Mr. May's counsel to prepare the first draft of a proposed settlement agreement. Over the course of the next four months, the parties exchanged no less than 13 detailed settlement offers and counteroffers. I was assigned the lead in conducting these negotiations on behalf of the defendants.

24.     The parties finally reached agreement on settlement on November 12, 2020. This agreement was amended on December 11, 2020, in the form of the Restated and Amended Settlement Agreement submitted for the Court's approval as reasonable.

25.     The terms of this covenant judgment settlement were negotiated in good faith and in my opinion, based on my knowledge of the case and my experience of over 45 years as a lawyer, represent a reasonable settlement of this lawsuit. In particular, I am satisfied that defendants obtained the best terms possible for a covenant judgment settlement that spared them from the substantial expense of taking the case through trial and the exposure to a possible adverse judgment of over $60 million and is otherwise reasonable based on the applicable factors set forth in *Besel v. Viking Ins. Co. of Wisconsin*, 146 Wn.2d 730, 737 (2002).

Dated this _18_ day of March, 2021, at Woodinville, Washington.

s/Terence K. McGee
Terence K. McGee, WSBA No. 6221
McGee Law Offices PLLC

DECLARATION OF McGEE IN SUPPORT OF
MOTION FOR REASONABLENESS
DETERMINATION-6-

McGee Law Offices PLLC
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 • fax 425-368-2322

1

2

3

4

15711 NE 143rd Place
Woodinville, WA 98072
Telephone: 425-368-2321
Fax: 425-368-2322
Email: tkmcgee@mcgeelaw.net
Counsel for MK Salvage Venture LLC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DECLARATION OF McGEE IN SUPPORT OF**
**MOTION FOR REASONABLENESS**
**DETERMINATION-7-**

McGee Law Offices pllc
15711 NE 143rd Place
Woodinville, Washington 98072
425-368-2321 ● fax 425-368-2322



OCEAN MARINE DIVISION
301 E. 4th Street 23N
P.O. Box 2468
Cincinnati, OH 45201
PHONE: (513) 412-1893
EMAIL: lmeier@gaig.com

*Lisa Meier, AIC-M, PTC I*
*Senior Claim Representative*

*VIA CERTIFIED MAIL, Tracking No. 7017 2680 0000 2419 2395*
*AND REGULAR MAIL*

November 14, 2019

Peter Kuttel
Bear Enterprises, LLC
4209 - 21st Avenue West, Suite 400
Seattle, WA 98199

| RE: | Lawsuit: | *Roger May v. MK Salvage Venture, LLC, Bear Enterprises, LLC, and Peter Kuttel* |
|---|---|---|
| | | King County Superior Court, Cause No. 19-2-10613-1 |
| | Insured: | Bear Enterprises, LLC |
| | Policy Nos.: | OMH 3133724 04, -05; -06; -07 |
| | Our Claim No.: | 976535779 |

### COVERAGE POSITION

Dear Mr. Kuttel:

You have tendered the above-referenced lawsuit to Great American Insurance Company ("Great American," "us," or "we") for defense. We have completed our review and have determined that Great American has no duty to defend, indemnify, or provide other coverage benefit to you or the other defendants on account of the allegations, under the policies Great American issued. This letter will explain our reasons for Great American's declination of your tender.

**Relevant Facts**

The information recited below is taken from the allegations of "Plaintiff's Complaint" (hereinafter "the Complaint"), filed in the Superior Court of Washington, in and for King County, in the case styled *May v. MK Salvage Venture LLC, et al.,* under cause number 19-2-10613-1. The Complaint was signed on April 17, 2019. By repeating or summarizing the plaintiff's allegations, Great American expresses no position on whether the allegations of the Complaint are true or not. Rather, for purposes of this letter, Great American simply assumes that the allegations are true.

Plaintiff Rodger May and Bear Enterprises, LLC ("Bear") formed MK Salvage Venture, LLC ("MKS") in 2012. The purpose of MKS was to invest in another entity's efforts to recover a sunken vessel. That other entity was Ocean Mar (Washington), Inc. ("Ocean Mar"). MKS and Ocean Mar entered into a contract governing the investment and operations. A section of that contract concerned security interests in intellectual property "to be generated during the future salvage operations".

This intellectual property would include "computer data, photographs, videos, imaging, readings, logs, journals, media discs, etc." The intellectual property was to be downloaded daily and held by a third party, in escrow. Salvage operations were pursued from 2012 through 2014.

EXHIBIT A page 1 of 9

The intellectual property was downloaded onto discs and sent to a law firm, which held it in escrow. Later, the intellectual property was stored at Bear's Seattle office.

Plaintiff May and Bear decided to end joint involvement in the project. They began winding up the business of MKS in 2016. These efforts included determining distribution of MKS assets. Plaintiff May was to be given the right to conduct further salvage operations on the sunken vessel. MKS assigned all salvage rights to plaintiff May. The only assets to be distributed to Bear were a vessel, a share of reimbursement rights from the Ocean Mar contract, and a share of the MKS bank account funds. "Bear Enterprises retained no rights in any future salvage operations, the intellectual property or the [Ocean Mar] contract, other than reimbursement rights." MKS further distributed various assets of MKS, but notably, sold or assigned to plaintiff May all rights to conduct further salvage efforts, and to salvage recovery proceeds. MKS then ceased operations.

Paragraph 31 of the Complaint states:

> Despite having no interest in the Intellectual Property or the security interest therein, Bear Enterprises and/or its member Peter Kuttel have wrongfully, improperly and without authorization continued to retain possession and/or control of the Intellectual Property at Bear Enterprises' office.

Plaintiff May needs the intellectual property to pursue further salvage operations. May has asked the defendants to relinquish the intellectual property, but they have refused.

Based upon those factual allegations, plaintiff May brings five causes of action:

1. Declaratory Relief against MKS and Bear: Plaintiff May asks the court to determine and declare the parties' respective rights in the intellectual property. He wants the court to rule that he has the right to possession and use of the intellectual property, and that the defendants do not.

2. Injunctive Relief against MKS, Bear and Kuttel: Plaintiff May asks the court to grant an injunction enforcing the declaratory judgment he asked for in his first cause of action. That is, plaintiff asks the court to order the defendants to turn over the intellectual property.

3. Breach of Contract against Bear: Plaintiff May claims that Bear's continued possession of the intellectual property breaches the agreements by which plaintiff was to obtain possession.

4. Conversion against MKS, Bear and Kuttel: Plaintiff May claims that the defendants have wrongfully interfered with his rights to possess the intellectual property, and such interference is a conversion of his property.

5. Derivative Claim on Behalf of MKS against Bear: Plaintiff May states that if the court determines that the intellectual property is an unassigned asset, MKS has continuing rights to that property. Plaintiff therefore sues on MKS's behalf to obtain return of the intellectual property from Bear to MKS, so that May as assignee may use it.

Then, plaintiff asks for the following relief from the court: declaring the parties' rights, declaring that plaintiff has a right to immediate possession of the intellectual property, enjoining the defendants to surrender the intellectual property to plaintiff, awarding damages, and awarding costs and fees.

**The Great American Policies**

We have identified policies Great American Insurance Company issued to Bear Enterprises, LLC and other, related businesses. The allegations of the Complaint are not definite as to time, and so we have reviewed four policies that could possibly be implicated. Because the Complaint arises out of transactions that occurred starting with the winding up of MKS's business operations (alleged to be in 2016), we have chosen to review the policies that are listed in the table below.

| POLICY NUMBER | EFFECTIVE DATES |
| --- | --- |
| OMH 3133724 04 | 9/28/2015-9/28/2016 |
| OMH 3133724 05 | 9/28/2016-9/28/2017 |
| OMH 3133724 06 | 9/28/2017-9/28/2018 |
| OMH 3133724 07 | 9/28/2018-9/28/2018[1] |

As will be shown below, although we reviewed four different policies, their operative language is the same across the entirety of the policy periods.

These policies all identify the following Named Insureds, which the Complaint names as defendants: Bear Enterprises, LLC and MK Salvage Venture, LLC. You, Peter Kuttel, qualify as an insured under the policy with respect to your conduct and duties in the business of Bear Enterprises, LLC.

As will be discussed below, the only arguably-implicated coverage is the Marine General Liability ("MGL") coverage. This is provided by form number GAI 2193, in each of the listed policies. There are two editions of this form in the four listed policies (12/13 and 06/16), but the relevant content is identical across the two editions. The following provisions of the policies appear relevant to the tender plaintiff May's Complaint:

> **MARINE        COMMERCIAL        LIABILITY        COVERAGE MCL-B1**
>
> Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.
>
> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the Company providing this insurance. The word "Insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED.**
>
> Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION VIII - DEFINITIONS.**
>
> **SECTION    I    -    COVERAGE    A    -    BODILY    INJURY    AND PROPERTY DAMAGE LIABILITY**
>
> **1.        Insuring Agreement**

---

[1] Our records show that this policy was initially issued for the time period 9/28/2018 to 9/28/2019, but that it was cancelled effective at inception (9/28/2018) with a full premium refund.

L. Meier Decl., Ex. 4, p. 252 of 275

A.     We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the Insured against any "suit" seeking those damages. However, we will have no duty to defend the Insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

\* \* \*

B.     This insurance applies to "bodily injury" and "property damage" only if:

(1)     the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2)     the "bodily injury" or "property damage" occurs during the policy period.

(3)     Prior to the policy period, no Insured listed under Paragraph **1.** of **SECTION II WHO IS AN INSURED** and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed Insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

C.     "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any Insured listed under Paragraph **1.** of **SECTION II - WHO IS AN INSURED** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

D.     "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any Insured listed under Paragraph **1.** of **SECTION II WHO IS AN INSURED** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1)     reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2)     receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3)    becomes aware of any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

\* \* \*

**2.**    **Exclusions**

This insurance does not apply to:

**A.**    Expected or Intended Injury "Bodily injury" or "property damage" expected or intended from the standpoint of the Insured.

\* \* \*

**SECTION I - COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.**    **Insuring Agreement**

A.    We will pay those sums that the Insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the Insured against any "suit" seeking those damages. However, we will have no duty to defend the Insured against any "suit" seeking

damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1)    the amount we pay for damages and Additional Payments is limited as described in **SECTION III - LIMITS OF INSURANCE** and

(2)    our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments, settlements or Additional Payments under Coverage **A, B** or Additional Payments or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **Additional Payments - Coverages A, B and Endorsed Coverage**.

B.    This insurance applies to:

"Personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period of this policy.

\* \* \*

**SECTION II – WHO IS AN INSURED**

EXHIBIT A page 5 of 9

**1.** If you are designed in the Declarations as:

    **A.**    An individual, you and your spouse are Insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **B.**    A partnership or joint venture, you are an Insured. Your members, your partners and their spouses are also Insureds, but only with respect to the conduct of your business.

    **C.**    A limited liability company, you are an Insured. Your members are also Insureds, but only with respect to the conduct of your business. Your managers are Insureds, but only with respect to their duties as your managers.

    **D.**    An organization other than a partnership, joint venture or limited liability company, you are an Insured. Your "executive officers" and directors are Insureds, but only with respect to their duties as your officers or directors. Your stockholders are also Insureds, but only with respect to their liability as stockholders.

    **E.**    A trust, you are an Insured. Your trustees are also Insured, but only with respect to their duties as trustees.

**2.** Each of the following is also an Insured:

    **A.**    Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees," other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are an Insured for:

        **(1)** "bodily injury" or "personal and advertising injury":

            **(a)** to you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while either is in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

            **(b)** to the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

            **(c)** for which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

EXHIBIT A page 6 of 9

(d) arising out of his or her providing or failing to provide professional health care services.

(2) "property damage" to property:

(a) owned, occupied or used by;

(b) rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by you, any of your "employees," "volunteer workers," any partner or member (if you are a partnership or joint venture) or any member (if you are a limited liability company).

B. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

C. Any person or organization having proper temporary custody of your property if you die, but only:

(1) with respect to liability arising out of maintenance or use of that property; and

(2) until your legal representative has been appointed.

\* \* \*

## SECTION VIII - DEFINITIONS

3.  **"Bodily injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\* \* \*

18.  **"Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

19.  **"Personal and advertising injury"** means injury including consequential "bodily injury" arising out of one or more of the following offenses:

A.  False arrest, detention or imprisonment;

B.  Malicious prosecution;

C.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

D.  Oral or written publication of material, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**E.**  Oral or written publication, in any manner, of material that violates a person's right of privacy;

**F.**  The use of another's advertising idea in your "advertisement" or

**G.**  Infringing upon another's copyright, trade dress or slogan in your "advertisement."

\* \* \*

**22.**  **"Property damage"** means:

**A.**  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**B.**  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

\* \* \*

**Discussion**

These policies contain four main coverages – Marine General Liability ("MGL"), employer's liability "stop gap", employee benefits liability, and for loss or damage to miscellaneous scheduled property. There is no claim for employee injury, so the stop gap coverage is not implicated. There is no claim arising out of employee benefits, so that coverage is not implicated. There is no claim for loss or damage to any scheduled property, so that coverage is not implicated. That leaves the MGL as the only potentially implicated coverage.

The allegations of the Complaint can be summarized as follows: a business venture was formed; plaintiff was one of the investors; the venture generated intellectual property during its operation; the venture ceased operations and was wound down; agreements related to the winding down of the venture were entered into; plaintiff is entitled to certain intellectual property generated by the venture during its operation; plaintiff has demanded that the other member(s) of the venture surrender it to him; the other member(s) refuse to give it to him; plaintiff has been harmed by their refusal.

This Complaint concerns a dispute over rights to possess property. But it is not physical property; it is, rather, intangible property.

MGL coverage contains Coverage A (for liability for bodily injury and property damage), Coverage B (for liability for personal and advertising injury) and Coverage C (for medical payments). No person was injured or killed, so "bodily injury" portion of coverage A, and all of coverage C, do not apply. After

L. Meier Decl., Ex. 4, p. 257 of 275

eliminating those, two possibilities remain: coverage for "property damage" caused by an "occurrence", and coverage for "personal and advertising injury." But neither of them apply.

Coverage A: The "property damage" portion of coverage A does not apply. First, there is no "property damage." The policy defines "property damage" as "physical injury to tangible property" or loss of use of tangible property. Here, the property in question is intangible – it is intellectual property. So, the predicate harm – "property damage" as defined – is not present. Second, there is no "occurrence." In order to be covered, any liability for "property damage" must be caused by an "occurrence," which is defined as an accident. The defendants are not accidentally refusing to turn over property to someone else. So there is no "occurrence". Third, relatedly, the "expected or intended" harm exclusion applies. The deliberate withholding of property from another person results in intended or expected harm of deprivation of possession.

Coverage B: This coverage does not apply. Coverage B applies only where the plaintiff against the insured sues alleging one or more of certain "offenses" or causes of action, against the insured. These are listed in the definition of "personal and advertising injury". None of the causes of action brought by the plaintiff against the defendant insureds lines up with the offenses listed in the definition of "personal and advertising injury." So, this coverage does not apply.

**Conclusion**

For the reasons stated above, Great American respectfully declines your tender of defense of MK Salvage Venture, LLC, Bear Enterprises, LLC and Peter Kuttel. These reasons are sufficient in and of themselves to support Great American's declination. However, there may be other reasons to justify Great American to deny, limit or condition its obligations, if any, to you on account of the allegations made by plaintiff Rodger May. Great American's failure to list every possible reason to deny, limit or condition its obligations, in this letter, should not be deemed a waiver of any reason under the policies or the law. Rather, Great American reserves all of its rights to protect its interests.

If you disagree with this determination, please provide me your written response explaining your position.

Sincerely,

*Lisa Meier*

Lisa Meier
Great American Insurance Group
Phone: 513-412-1893
Email: lmeier@gaig.com

cc:     Brown & Brown of Washington
        Mark McDermott
        mmcdermott@bbseattle.com

EXHIBIT A page 9 of 9

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| RODGER MAY,<br><br>               Plaintiff,<br><br>      v.<br><br>MK SAVAGE VENTURE LLC, BEAR<br>ENTERPRISES LLC, AND PETER<br>KUTTEL,<br><br>               Defendants. | No. 19-2-10613-1 SEA<br><br>DECLARATION OF JAMES F. WILLIAMS<br>IN SUPPORT OF MOTION FOR<br>REASONABLENESS DETERMINATION |

I, James F. Williams, declare under penalty of perjury of the laws of the State of Washington that the following is true and correct to the best of my knowledge, information and belief, and that I am over 18 years of age:

1.    I am the litigation counsel of record for Defendants Bear Enterprises LLC ("Bear Enterprises") and Peter Kuttel ("Kuttel") in this dispute over the intellectual property generated during gold recovery operations relating to the SS ISLANDER shipwreck, which

DECLARATION OF JAMES F. WILLIAMS IN
SUPPORT OF MOTION FOR
REASONABLENESS –1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

L. Meier Decl., Ex. 4, p. 259 of 275

shipwreck occurred in 1901 off the coast of Juneau, Alaska. The gold recovery operations occurred in 2012 to 2014.

2.      I submit this Declaration in support of *Plaintiff's and Defendants' Joint Motion for Determination of Reasonableness of Covenant Judgment Settlement.*

3.      I am a partner at Perkins Coie, LLC in Seattle and am currently Managing Partner of the Seattle Office. I have been practicing trial and complex business litigation law for over thirty years, and have extensive trial experience in federal and state courts.

4.      Perkins Coie was retained to represent Bear Enterprises and Kuttel in this matter in October 2019.

5.      While we continue to believe in the merits of our defenses and counterclaims, litigation is filled with uncertainties and significant discovery costs going forward. As a result, we concluded it would be prudent to enter discussions with Plaintiff's counsel about the possibility of a covenant judgment settlement.

6.      The parties finally reached their original Settlement Agreement on November 13, 2020. The agreement was amended on December 16, 2020 in the form of a "Restated and Amended Settlement Agreement," which is the form submitted for the Court to approve as reasonable.

7.      It is my belief that based upon the uncertainties of litigation, the possibility of an adverse judgment, and the continued legal fees and costs to my clients of proceeding to trial, this Restated and Amended Settlement Agreement constitutes a reasonable resolution of this case.

DECLARATION OF JAMES F. WILLIAMS IN
SUPPORT OF MOTION FOR
REASONABLENESS –2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax  206.359.9000

Executed on this 27th day of January, 2021 in Seattle, Washington.

PERKINS COIE LLP

By: _James F. Williams_

James F. Williams, WSBA No. 23613
JWilliams@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Defendants Bear Enterprises
LLC and Peter Kuttel

DECLARATION OF JAMES F. WILLIAMS IN
SUPPORT OF MOTION FOR
REASONABLENESS –3

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| RODGER MAY, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MK SALVAGE VENTURE LLC; a Washington limited liability company; BEAR ENTERPRISES LLC, a Washington limited liability company, and PETER KUTTEL, an individual.<br><br>Defendants. | NO. 19-2-10613-1<br><br>ORDER ON REASONABLENESS OF COVENANT JUDGMENT SETTLEMENT |

This matter came before the Court upon Plaintiff Rodger May and Defendants MK Salvage Venture LLC, Bear Enterprises LLC and Peter Kuttel's *Joint Motion for Determination of Reasonableness of Covenant Judgment Settlement*.

The Court has reviewed the Amended and Restated Settlement Agreement among the parties dated December 11, 2020, and the following declarations, with their attached exhibits:

1. Declaration of Rodger May

2. Declaration of Peter Kuttel

3. Declaration of Michael T. Zoretic

4. Declaration of Terence K. McGee

5. Declaration of James F. Williams.

ORDER ON REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 1

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

Great American Insurance Company ("Great American"), Defendants' insurer and interested party in these proceedings, was given reasonable notice of the hearing and opportunity to participate. The Court has considered the submission of Great American, if any.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. The Court has considered the reasonableness of the subject settlement under RCW 4.22.060.

2. When an insured negotiates a settlement and seeks reimbursement, the insurer is liable only for the amount of the settlement that is reasonable and paid in good faith. *Sharbono v. Univ. Underwriters*, 139 Wn.App. 383, 400 (Div. 2 2007).

3. To determine a settlement's reasonableness in the context of a consent judgment and covenant not to execute, the Court applies the nine-factor test recognized in *Besel v. Viking Ins. Co.*, 146 Wn.2d 730, 736-737 (2002), and *Bird v. Best Plumbing Group, LLC*, 17 Wn.2d 756, 764 (2012):

1) The plaintiff's damages;

2) The merits of the plaintiff's liability theory;

3) The merits of the defendant's defense theory;

4) The defendant's relative faults;

5) The risks and expenses of continued litigation;

6) The defendant's ability to pay;

7) Whether there is any evidence of bad faith, collusion, or fraud;

8) The extent of the plaintiff's investigation and preparation of the case; and

9) The interest of the parties not being released.

ORDER ON REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 2

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

*See also Chausee v. Maryland Cas. Co.*, 60 Wn. App. 504, 509-10 (Div. 1 1991), *citing Glover v. Tacoma Gen. Hosp.*, 98 Wn.2d 708, 717-718 (1983). No single factor is determinative, and not all nine factors are relevant in every case. *Id.* at 739 n.2.

4.     In this case, an evaluation of all nine factors weighs in favor of a finding of reasonableness.

5.     The Court's decision on whether or not the covenant judgment in this case is reasonable does not in any way consider the nature or existence of any coverage obligation owed to Defendants under the policies issued by Great American. That question will likely be the subject of a different proceeding and/or in a different court. *Martin v. Johnston*, 141 Wn. App. 611, 618 (2007). In this adjudication, the Court need only determine whether the covenant judgment was reasonable by and between the parties on the date they entered into the agreement, under the *Besel* factors.

6.     In adjudicating the reasonableness of the $30 million covenant judgment entered in this case, it is not the Court's duty to forecast the size of the jury verdict that would have been rendered had this case proceeded to trial, nor to substitute its judgment for the prediction of counsel representing the parties in this case. [cite]

7.     Rather, the Court's role is to determine whether the amount of the covenant judgment fell within the range of potential verdicts given the damages evidence the Plaintiff would have presented at trial and whether the settlement is reasonable under the nine (9) *Besel* factors. [cite]

**1)     Plaintiff's Damages.**

8.     The Plaintiff claimed substantial damages in this case. The evidence presented by the parties, particularly the opinions of Plaintiff's damages experts Fred Holabird and Neal Beaton, reflect a base claim of at least $60 million.

ORDER ON REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 3

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

9.      Plaintiff's primary claim against Defendants was for breach of contract.  Under Washington law, the general measure of damages for breach of contract is "(1) recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a position pecuniarily as he would have been had the contract been performed." *Knox v. Microsoft*, 92 Wn. App. 204, 208-09 (1998).

10.     "The measure of damages in any particular case will depend upon the facts in that case." *Bill & Melinda Gates Foundation v. Todd Pierce*, Case No. 79354-3-I (published opinion) (November 16, 2020), <u>*citing Dunseath v. Hallaur*</u>, 41 Wn.2d 895, 904 (1953).  A plaintiff need only prove its damages with reasonable certainty. *See Greensun Group v. City of Bellevue*, 7 Wn. App. 2d 754, 776 (2019); *see also Rorvig v. Douglas*, 123 Wn.2d 854, 861 (1994) ("Evidence of damages is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture.")

11.     May's claim for damages in this case was in the form of lost opportunity value of his right to utilize the Intellectual Property in future salvage operations with OMI, due to Defendants' refusal to grant access to this tangible and intangible property.  May presented evidence of damages of $60 million, based on expert testimony laying out a two-prong analysis.

12.     First, Fred Holabird, an expert on shipwreck recoveries, was retained to estimate the amount of gold that would likely still be available for recovery.  Mr. Holabird had previously been involved in analyzing  and assessing the gold and other artifacts that had been recovered during the MK Salvage/Ocean Mar salvage expeditions.  Mr. Holabird conducted a detailed analysis of 1) the history of the Alaskan/Yukon Gold Rush of the late 1800's, 2) the contemporary reports and statements of the amount of gold likely present on the ship on its final voyage in 1901, 3) subsequent salvage efforts, and 4) the forensic evidence of gold that has been discovered in the previous MK Salvage operations.  Based on

ORDER ON REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 4

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

Meier Decl., Ex. 4, p. 265 of 275

1  this information and his experience with shipwreck salvage operations over the last forty

2  plus years, Mr. Holabird calculated and opined that over $500 million and up to $650

3  million worth of gold likely remains in and around the *SS Islander* wreckage.

4      13.    Second, May retained business valuation expert Neil Beaton of Alvarez &

5  Marsal to assess the current value of May's contractual rights to use the Intellectual

6  Property in subsequent operations with OMI.  Based on Mr. Holabird's estimate, Mr.

7  Beaton applied the Ocean Mar/MK Salvage profit-sharing provisions to several different

8  recovery scenarios.  He then used a weighted present value analytical formula to reach the

9  conclusion that May's contract rights were likely worth at least $60 million, or <u>double</u> the

   final covenant judgment amount.

10      14.    Washington courts have recognized that similar jury verdicts can be used by

11  the trial court to assess the reasonableness of Plaintiff's claimed damages.  *See CBS*

12  *Corporation v. Ulbricht*, Nos. 79490-6-I & 79590-2-I (unpublished) (February 10, 2020).

13  While the unusual factual background of this case makes it difficult to find direct

14  comparisons, the $60 million claimed damages and $30 million covenant judgment

   amount falls well below the jury verdicts on other confidential information/trade secret

15  misappropriation cases in recent years.[1]

16

17  _____

[1] *See Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Group*, Case No. 1:15-cv-00211 (S.D.N.Y, October 27,
18  2020) ($855 million jury verdict for software developer against information technology company that
   misappropriated trade secrets and infringed copyrighted software related to a popular insurance administrative
   platform); *Optis Wireless v. Apple, Inc.*, Case No. 2:19-CV-00066 (E.D. Texas, August 11, 2020) ($506 million
19  for patent infringement of LTE cellular technology); *Alfred E. Mann Foundation for Scientific Research v.
   Cochlear Corporation*, Cause No. 2:07-cv-08108 (C.D. Cal., November 9, 2018) ($268 million intellectual
   property infringement); *Densify v. VMware*, Cause No. 19-742-LPS (D.C. Del., January 24, 2020) ($236 million
20  verdict for infringement of software patent and trademark infringement, subsequently vacated by trial judge for
   lack of standing); *United States Automobile Association v. Wells Fargo & Co.*, Case No. 2-18-cv-00245 (E. Dist.
   Texas, November 6, 2019) ($200 million verdict for violation of mobile banking software patent); *United States
21  Automobile Association v. Wells Fargo & Co.*, Case No. 2:18-CV-00366 (E.Dist. Tex., January 13, 2020) (Second
   verdict for $102.8 million on separate software technology); *Frontline Processing Corp. v. Global Payments,
   Inc.*, Case No. 15CV6007 (Dekalb County, Georgia, September 23, 2019) ($135 million to independent sales
22  organization for breach of contract when processor who blocked plaintiff from using defendant's computer
   systems); *see also, Trinity East Energy, LLC v. The City of Dallas*, Cause No. DC-14-01443 (Dallas County Texas,
   February 27, 2020) ($44.5 million for breach of contract and fraud for failing to allow oil exploration to drill on
23  parkland as promised.)

24  ORDER ON REASONABLENESS OF COVENANT
   JUDGMENT SETTLEMENT - 5

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

15.     The Court finds that the $30 million covenant judgment falls well within the range of judgment that Plaintiff could have been awarded had this case proceeded to trial and that this factor supports reasonableness of the settlement amount.

**2)     The merits of Plaintiff's liability theory.**

16.     May's principal argument on liability was that when he and Bear Enterprises ended their relationship, they agreed that May would be assigned all rights and interest in MK Salvage's ability to conduct future salvage operations under the Ocean Mar contract, and the right to use the Intellectual Property, while not specifically listed as one of the assets transferred, was logically included in the transfer of the Ocean Mar salvage contract rights.

17.     May originally sought injunctive relief to obtain use of the Intellectual Property so that he could participate in future salvage operations with Ocean Mar. As stated above, Ocean Mar's contract with the owners of the *SS Islander* gold cargo had expired by the time suit was filed in April of 2019, but the Alaska Court had not awarded the contract rights to another party. Shortly after the lawsuit was filed, the Alaska court terminated OMI's rights and awarded the contract to a different salvage company.

18.     At this point, May (as assignee of MK Salvage) did not have the right to use the Intellectual Property in an attempt to salve *SS Islander's* gold cargo with OMI. May's primary claim therefore became one for damages for Defendants' interference with May's salvage rights. As discussed above, the expert testimony in support of May's damages opined that $60 million constitutes the fair value of what May's contract rights were worth during the period he was deprived of the use of the Intellectual Property by Defendants.

19.     While the parties disagree on the strength of Plaintiff's liability claims, the Court finds that May's legal theory in this case was sufficient to warrant the compromise

ORDER ON REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 6

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1    settlement reached here. This factor further supports the reasonableness of the $30 million

2    covenant judgment amount.

3         **3)    The merits of Defendants' defense theory.**

4         20.    Defendants' theory was that (1) the Intellectual Property was owned by

5    Ocean Mar, (2) MK Salvage assigned to May the right to conduct further salvage efforts

     relating to *SS Islander*, not all of the salvage rights under the Ocean Mar contract, (3) the
6
     interest MK Salvage had in the Intellectual Property was not an "asset" of MK Salvage that
7
     was or could have been assigned, (4) the Intellectual Property remained in escrow and
8
     could not be used by May under the terms of the escrow agreement, (5) the settlement
9
     between May and Bear Enterprises did not grant ownership or use of the Intellectual
10
     Property to May, and (6) the mutual release executed by all parties released all of May's
11
     claims against Defendants.

12        21.    Defendants submitted these defenses to Judge Cahan on summary judgment

13   in December 2019. Judge Cahan determined that genuine issues of material fact existed on

14   all Plaintiff's claims, along with Defendants' counterclaims for indemnity.

          22.    In addition to the arguments made at summary judgment, Plaintiff would
15
     also argue at trial Defendants' liability defense is also undercut by RCW 62A.9A-
16
     207(b)(4)(A), which provides that a secured party having possession of collateral (i.e., a
17
     possessory lien) has the right to use the collateral as follows:
18
          *The secured party may use or operate the collateral:  (A) __For the purpose__*
19        *__of preserving the collateral or its value;__ (B) As permitted by an order of a*
          *court having competent jurisdiction; or (C) Except in the case of*
20        *consumer goods, in the manner and to the extent agreed by the debtor."*

21   May would argue that Section 4(A) applies here, and May had the right to use of the

     collateral (i.e., the Intellectual Property) as it would have preserved its value.
22

23

24   ORDER ON REASONABLENESS OF COVENANT                    ZORETIC LAW
     JUDGMENT SETTLEMENT - 7                                P.O. Box 427
                                                            Pateros, WA 98846
Tel. 206.465.8109

1    23.    While the parties continue to disagree on the merits and validity of these

2   defenses, the Court finds that Defendants faced a substantial risk that their defense theories

3   would not be accepted at trial, thus justifying a covenant judgment based on a 50%

4   reduction of Plaintiff's claimed damages. This factor further weighs in favor of the

5   reasonableness of the $30 million covenant judgment.

     **4)    Defendants' relative faults.**

6

7    24.    The Court finds this factor is of little or no relevance to this case because all

    Defendants have entered into the Settlement Agreement, leaving no unallocated fault.

8

     **5)    The risks and expenses of continued litigation.**

9    25.    Washington courts have held that the absence of insurance coverage makes

10  the risk of trial particularly high for the uninsured defendant. *Martin v. Johnson*, 141 Wn.

11  App. 611, 622 (2007).

12   26.    This case presented a significant risk to Defendants. Given May's expert

13  testimony on damages and theories of recovery, Defendants faced exposure of twice the $30

14  million that has been stipulated to – both in terms of May's damages as well as the

15  continuing costs of litigation and attorney's fees.

16   27.    Defendants' insurer had denied any coverage and refused to defend the

    lawsuit after Defendants tendered the claim, leaving Defendants to face the specter of

17  mounting an expensive legal defense, with potential exposure to an adverse and uninsured

18  judgment in the amount of $60 million or more.

19   28.    The costs of further litigation would also be borne by Defendants without

20  any insurance contribution based on the refusal to defend.

21   29.    Thus, it was in Defendants' interest to settle this matter by entering into a

22  covenant judgment for a reduced amount of $30 million to limit their further risk and

23  expense.

24  ORDER ON REASONABLENESS OF COVENANT
    JUDGMENT SETTLEMENT - 8

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

L. Meier Decl., Ex. 4, p. 269 of 275

30. The Court is also allowed to consider the risk of continued litigation <u>for the Plaintiff</u> in the future bad faith litigation assigned as part of the covenant judgment in assessing reasonableness. *See CBS Corporation v. Ulbricht*, Nos. 79490-6-I & 79590-2-I (unpublished) (February 10, 2020), *citing Werlinger v. Warner*, 126 Wn. App. 342, 350-51 (2005) (consideration of outside bankruptcy proceedings proper.)

31. In adjudicating the reasonableness of the $30 million covenant judgment in this case, the Court must consider the possibility that Plaintiff may recover nothing from Defendants' insurer.

32. In this case, May was justified in holding out for a $30 million covenant judgment and other terms based on the risk and expense of the eventual bad faith claim against First American.

33. The contingent nature of the settlement in this case justifies a larger covenant judgment amount than would be reasonable if Defendants and Plaintiff had entered into a cash settlement with sure payment on a date certain.

**6) The Defendants' ability to pay.**

34. Under this factor, the Court may consider evidence of the Defendants' inability to pay a personal judgment in the amounts sought by Plaintiff and whether such a verdict could bankrupt the Defendants. *Sharbano v. Underwriters Insurance Company*, 139 Wn. App. 383 (2007).

35. As set forth in the declaration of Peter Kuttel, Defendant MK Salvage Venture is no longer in business and has no financial assets to satisfy any judgment that would be entered in this case. The insurance indemnity proceeds would be its only source of payment.

ORDER ON REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 9

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1    36.    Defendant Bear Enterprises and Defendant Peter Kuttel have significant

2    assets, but a judgment for even a fraction of May's claimed amount would be damaging to

3    Bear and Kuttel's financial liquidity.

4    37.    The Court finds that this factor supports the reasonableness of Defendants'

5    agreement to execute a covenant judgment settlement in the amount of $30 million.

6    **7)    No evidence of bad faith, collusion, or fraud.**

     38.    The Court finds no evidence of bad faith, collusion or fraud between the

7    Plaintiff and Defendants.

8    39.    The terms of the settlement agreement were negotiated by counsel over the

9    period of several months and following over a dozen offers and counter-offers.

10   40.    The Defendants entered into the agreement with the advice and

11   representation of their experienced counsel, who vigorously advocated their position in

12   summary judgment proceedings, discovery and through the settlement negotiations.[2]

13   41.    After Great American denied coverage and Judge Cahan denied Defendants'

14   summary judgment motion, Defendants faced a lengthy discovery process and likely trial on

15   the merits.  After Plaintiff submitted its experts' opinions on damages identifying $60

16   million in damages and with their insurer denying a defense or indemnity, Defendants

     made the logical choice of negotiating a covenant judgment settlement.

17   42.    Rather than simply entering into Plaintiff's proposed agreement, Defendants

18   negotiated for over four months in a good faith effort to reach a reasonable settlement.

19   43.    Because the amount of the proposed covenant judgment fell well within the

20   range of possible verdicts, the decision to not hold out for a lower number than $30 million

21   was reasonable and does not evidence bad faith, collusion or fraud.

22   _____

     [2] MK Salvage Venture was represented by Terence McGee, an experienced civil litigation and maritime lawyer.
23   James Williams, Managing Partner of Perkins Coie, along with associate Zachary Davison represented Bear and
     Kuttel.

24   ORDER ON REASONABLENESS OF COVENANT
     JUDGMENT SETTLEMENT - 10

1    **8)    The extent of Plaintiff's investigation and preparation of the case.**

2    44.   The parties reached this settlement more than 19 months after Plaintiff's

3 counsel filed the lawsuit in April of 2019.

4    45.   As is set forth in the Zoretic declaration, Plaintiff's counsel has invested

5 several hundred hours into the investigation, research and preparation of the case, with

6 considerable time analyzing the extensive and complicated background of the case,

7 conducting discovery, developing Plaintiff's theories of recovery, and working with experts

to prepare the damages claims for trial.

8    46.   Plaintiff's preparation of the case, the arguments presented, and preparation

9 of well-supported damages testimony successfully postured the case for the current

10 settlement amount.

11    47.   This factor supports the reasonableness of the $30 million covenant judgment

12 settlement agreement.

13    **9)    The interest of the parties not being released.**

14    48.   This factor has little or no relevance to the Court because all defendants in the

15 case are parties to this settlement agreement. Peter Kuttel, individually, is not a named

16 judgment debtor on the judgment (another sign of the good-faith negotiation) but remains

17 liable for the guaranteed minimum recovery as per the Settlement Agreement. No other

culpable parties are <u>not</u> being released, so this factor is not applicable.

18    49.   In summary, the Court concludes that the nine *Besel* factors weigh in favor of

19 the reasonableness of the Covenant Judgment.

20    50.   Accordingly, the Court concludes that the Amended and Restated Settlement

21 Agreement dated December 11, 2020 between Plaintiff and Defendants is reasonable under

22 RCW 4.22.60.

23

24 ORDER ON REASONABLENESS OF COVENANT
JUDGMENT SETTLEMENT - 11

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1       BASED ON THE ABOVE FINDINGS AND CONCLUSIONS, THE COURT HEREBY

2   ORDERS:

3       1.      Plaintiff and Defendants' Joint Motion for Determination of Reasonableness

4   of Covenant Judgment Settlement is GRANTED.

5       2.      Upon presentation in accordance with the Amended and Restated Settlement

6   Agreement, the Court shall enter the parties' proposed Stipulated Judgment in the amount

    of Thirty Million Dollars ($30,000,000).

7       ENTERED this ____ day of _____, 2021.

8

9       _____

10      The Hon. Judge Sandra Widlan

11  Presented by:

12  ZORETIC LAW

13  */s Michael T. Zoretic*
    By_____
14  Michael T. Zoretic, WSBA #21221
    P.O. Box 427
    Pateros, WA 98846
15  206.465.8109 (tel)
    mike@zoreticlaw.com(email
16  Attorney for Plaintiff Rodger May

17  McGEE LAW OFFICES PLLC

18  */s Terence K. McGee*
    By_____
    Terence K. McGee, WSBA #6221
19  15711 NE 143rd Place
    Woodinville, WA 98072
20  (425) 368-2321 (tel)
    (425) 368-2322 (fax)
21  tkmcgee@mcgeelaw.net (email)
    Attorney for Defendant MK Salvage Venture, LLC

22  PERKINS COIE LLP

23

24  ORDER ON REASONABLENESS OF COVENANT
    JUDGMENT SETTLEMENT - 12

ZORETIC LAW
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109

1  /s James F. Williams
   By_____

2  /s Zachary E. Davison
   By_____
3  James F. Williams, WSBA #23613
   JWilliams@perkinscoie.com (email)
4  Zachary E. Davison, WSBA #47873
   ZDavison@perkinscoie.com (email)
5  1201 Third Avenue, Suite 4900
   Seattle, WA 98101-3099
6  (206) 359-8000 (tel)
   (206) 359-9000 (fax)
7  Attorneys for Defendant Bear Enterprises LLC
   and Peter Kuttel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  ORDER ON REASONABLENESS OF COVENANT
    JUDGMENT SETTLEMENT - 13

**ZORETIC LAW**
P.O. Box 427
Pateros, WA 98846
Tel. 206.465.8109